## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------x
                                                          :
In re                                                     :        **Chapter 11**
                                                          :
**SANTA FE GOLD CORPORATION,** *et al.,*                  :        **Case No. 15-11761 (____)**
                                                          :
                                         **Debtors.**[1]  :        **Joint Administration Requested**
                                                          :
---------------------------------------------------------------x

## DECLARATION OF JAKES JORDAAN IN SUPPORT
## OF CHAPTER 11 PETITIONS AND FIRST DAY RELIEF

I, Jakes Jordaan, do hereby declare, under penalty of perjury, that:

1.       I am the President and Chief Executive Officer and a director of Santa Fe

Gold Corporation ("Santa Fe" or the "Company"), a corporation duly organized under and

existing pursuant to the laws of the State of Delaware, and one of the above-captioned chapter 11

debtors and debtors in possession (collectively, the "Debtors").  I have acted as Santa Fe's

President and Chief Executive Officer since October 17, 2014, and as a director since August of

2013.  Prior to becoming involved with Santa Fe, I served as the Managing Member of The

Jordaan Law Firm, PLLC since 2000, and as a Managing Director of Stonegate Securities, Inc., a

full-service investment banking boutique dedicated to serving the specialized needs of small-cap

public companies, having held that position since 2010.

2.       In my role with Santa Fe, I am responsible for devising and implementing

the Debtors' business plans and strategies and overseeing the Debtors' financial, operational, and

legal affairs.  In addition, as President and Chief Executive Officer, I have been actively involved

---

[1]   The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Santa Fe Gold Corporation (4315); Lordsburg Mining Company (4474); Azco Mica, Inc. (8577); and Santa Fe Gold (Barbados) Corporation (N/A).  The Debtors' mailing address is 1219 Banner Mine Road, Lordsburg, NM 88045.

in the Debtors' efforts to develop, negotiate, and implement a strategic restructuring of the Debtors' assets in a manner that maximizes their value.

3.     On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").  As discussed below, the Debtors' primary objective in commencing these chapter 11 cases is to pursue an expedited sale of their assets in order to maximize value for all stakeholders.

4.     The Debtors intend to operate their business and to manage their property as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.  I am advised by counsel that this Court has jurisdiction over these chapter 11 cases pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012.  Venue of these cases is proper in the United States Bankruptcy Court for the District of Delaware pursuant to 28 U.S.C. §§ 1408 and 1409.

## I.     OVERVIEW OF THE DEBTORS' BUSINESS

5.     The Debtors are a group of mining and mineral exploration companies headquartered in Lordsburg, New Mexico.  Prior to ceasing operations, Debtor Lordsburg Mining Company ("Lordsburg Mining"), a New Mexico corporation, was the Debtors' primary operating entity.  Lordsburg Mining and Debtors Azco Mica, Inc. ("Azco") and Santa Fe Gold (Barbados) Corporation ("Santa Fe Barbados") are wholly owned by Santa Fe.  Sante Fe was incorporated in Delaware in 1991 and succeeded a Colorado concern of the same name (formed on July 13, 1988). Santa Fe is publicly traded over the counter under the trading symbol SFEG. As of July 31, 2015, Santa Fe has approximately 758 holders of record, and 144,312,726 shares

outstanding.    An organization chart reflecting the Debtors' corporate structure is set forth below.[2]



6.        Prior to ceasing operations, the Debtors' general business strategy was to explore, acquire and develop mining properties within the United States—specifically in states and other political jurisdictions with well-established mining, land ownership, and tax laws—that are amenable to low cost production.  As described in greater detail below, the Debtors have one principal project, the "Summit Project," a copper exploration initiate at the Summit Project's Lordsburg mill site (the "Lordsburg Copper Project"), as well as two legacy industrial  minerals projects.

A.        **The Summit Project and related Lordsburg Copper Project**

7.        The Summit Silver-Gold Project (the "Summit Project") consists of (a) a fully-permitted, underground silver-gold mine located in Grant County, New Mexico–near Duncan, Arizona–on the New Mexico-Arizona border (the "Summit Mine"), (b) a floatation ball mill in Hidalgo County, New Mexico near Lordsburg, New Mexico (the "Lordsburg Mill"), and (c) related property consisting of approximately 1,500 acres of wholly-owned patented, leased patented and unpatented mining claims.  The Summit Project is owned by Lordsburg Mining, and was acquired by the Debtors when they acquired Lordsburg Mining in 2006.  The Summit

---

[2] Minera Sandia S.A. de C.V. has no assets, liabilities or operations, and is not a debtor in these chapter 11 cases.

Mine consists of approximately 117.6 acres and 520 of patented and unpatented mining claims, respectively. The Lordsburg Mill site was initially situated on approximately 1,500 acres of wholly-owned patented, leased patented and unpatented mining claims. The unpatented mining claims are located on public land and held pursuant to the General Mining Law of 1872.[3]

8.    As part of the Summit Project, Lordsburg Mining constructed and developed the Summit Mine, which began processing ore in 2010. In April 2012, the Debtors commenced commercial production at the Summit Mine. However, in November 2013, the Debtors suspended mine and mill operations at the Summit Mine and Lordsburg Mill due to operating losses resulting primarily from a lack of operating capital and declining precious metals prices. The Debtors placed the Summit Mine and Lordsburg Mill on a "care-and-maintenance" program, and mining operations remain suspended pending placement of sufficient funds to restart development and bring the operation to full and sustained production.

9.    In October 2014, the Debtors commenced the Lordsburg Copper Project. In this regard, in December 2014 and January 2015, the Debtors staked an additional 377 unpatented claims on immediately adjacent federal land, bringing the total area of patented, unpatented and leased patented claims at the Lordsburg Mill site to approximate 16 square miles, or over 10,000 square acres.

10.    In regard to the Lordsburg Copper Project, the Debtors have compiled, organized and digitized historical geological and mine data, but no exploration drilling has been done.

---

[3]  Generally speaking, the difference between a "patented" and an "unpatented" mining claim is that a "patented" mining claim is one for which the Federal Government has passed title to the claimant making it private property. A mineral patent gives exclusive title to both the locatable minerals as well as the land. An "unpatented" claim gives the right only for those activities necessary for exploration and mining pursuant to the General Mining Law of 1872. The claimant has a right to only valuable mineral deposits and not the land.

B.      **Industrial Mineral Projects**

11.     In addition to the Summit Project and the Lordsburg Copper Project, the Debtors have two additional industrial mineral projects located in Arizona and New Mexico: the Black Canyon mica project in Yavapai County, Arizona (the "Black Canyon Mica Project"); and the Planet Micaceous Iron Oxide (MIO) project in La Paz County, Arizona (the "Planet MIO Project").

i.      *Black Canyon Mica Project*

12.     The Debtors acquired the Black Canyon Mica Project in 1999.  The property at the Black Canyon Mica Project covers approximately 1,385 acres, in the aggregate, and consists of 67 federal unpatented mining claims in Yavapai County, Arizona and 9 federal unpatented mill site claims in Maricopa County, Arizona.  The Debtors spent $15 million establishing mining and processing facilities at the mine site north of Phoenix, Arizona, and at a separate processing plant in Glendale, Arizona.  In 2002, the Debtors commissioned the processing facilities at the mine site and, in Glendale, operated for several months on a test basis and achieved limited production and commercial sales.  However, design capacity of the processing facilities was not achieved due to undercapitalization.  In November 2002, after unsuccessful attempts to raise the additional capital necessary to expand plant capacity in order to reach design capacity and to provide working capital, crushing and concentrating activities at the Black Canyon mine were suspended.  After the suspension of operations, limited production, marketing, and sales continued through 2005 at the Glendale processing facility.  Subsequently, the processing equipment was removed from the Glendale plant and the Black Canyon mine and placed into storage.

ii.        *Planet MIO Project*

13.        The Debtors leased the property (the "<u>Planet MIO Property</u>") for the Planet MIO Project in 2002 for its potential to produce micaceous iron oxide ("<u>MIO</u>").[4]   In August 2008, the Debtors purchased the Planet MIO Property.  The Planet MIO Property totals 523 acres and consists of thirty-one patented mining claims located in western Arizona.  No feasibility study has been completed, and there are no mineral reserves established for the Planet MIO Property.  Metallurgical work suggests that it may be possible to produce a high quality MIO product at the Planet MIO Property, although no MIO is currently being produced at the site.

## II.        ASSETS AND PRIMARY DEBT STRUCTURE

### A.        <u>Assets</u>

14.        The Debtors' primary assets are the properties, related mineral rights, and equipment underlying and utilized in the Summit Project (including the copper exploration initiative at the Lordsburg Mill site), the Black Canyon Mica Project, and the Planet MIO Project.

### B.        <u>Pre-Petition Financing</u>

15.        Prior to the Petition Date, the Debtors were involved in a number of secured and unsecured financing transactions.  These transactions, and the amount currently outstanding in connection therewith are described below.

---

[4]  MIO is an uncommon flake-like form of crystalline hematite ($Fe_2O_3$) valued for the anti-corrosive properties it contributes to coatings formulated to protect structural steelwork.  MIO is an increasingly recognized eco-friendly base pigment used in coating systems on many of the world's largest bridges, oil rigs, production platforms, transmission towers, pipelines, industrial plants, and other superstructures.

| Description | Approximate Amount Outstanding as of the Petition Date | Secured/Unsecured |
|---|---|---|
| Waterton Senior Secured Gold Stream Credit Agreement | 12.8 million | Secured, first priority lien on substantially all assets and stock of subsidiaries |
| Waterton Gold and Silver Supply Agreement | As of the Petition Date, the Debtors are still determining the amount of this obligation. | Secured, first priority lien on substantially all assets and stock of subsidiaries |
| Sandstorm Gold Supply Agreement | $6.5 million | Secured, second priority lien on gold production from the Summit-Silver Gold Project |
| IGS Senior Subordinated Convertible Notes | $3.9 million | Unsecured |
| Tyhee Bridge Loan Agreement | $2.4 million | Unsecured |
| Individual Convertible Unsecured Notes | $556,300 | Unsecured |
| Canarc Bridge Loan Agreement | $250,000 | Unsecured |
| Convertible Unsecured Notes | $225,400 | Unsecured |

     *i.*     <u>*Waterton Senior Secured Gold Stream Credit Agreement*</u>

       16.    On December 23, 2011, the Debtors entered into that certain *Senior Secured Gold Stream Credit Agreement* (the "<u>Pre-Petition Credit Agreement</u>") with Waterton Global Value, L.P. ("<u>Waterton</u>").  The Pre-Petition Credit Agreement provided for $25.0 million in financing, consisting of two $10.0 million non-revolving tranches and a $5.0 million revolving working capital facility.  On December 23, 2011, the Debtors closed on the first $10.0 million tranche of the Pre-Petition Credit Agreement.  Proceeds from the initial $10.0 million tranche of the Pre-Petition Credit Agreement were used to retire the Debtors' $5.0 million senior secured bridge loan provided by Victory Park Capital Advisors, LLC, in addition to the payment of transaction fees and expenses.  The Debtors utilized the remaining net proceeds for operations and working capital for the Summit Project.  The second $10.0 million tranche was never drawn because it was earmarked to fund a strategic acquisition that the Debtors did not consummate.

17.     Pursuant to a series of guarantees, security agreements, deeds of trust, a mortgage, and a stock pledge agreement, the obligations under the Pre-Petition Credit Agreement are secured by a first-priority lien on the stock of Santa Fe's subsidiaries and liens covering substantially all of the Debtors' assets.

18.     On October 9, 2012, the Debtors entered into an amendment to the Pre-Petition Credit Agreement, which modified the due dates of certain principal payments. The amendment provided for principal payments of $1,082,955 in October of 2012; $500,000 in November of 2012; $0 in December of 2012; $0 in January of 2013; and $3,852,275 in February of 2013. All other principal payments remained unchanged and interest payments continued to be due monthly. The Debtors have not made the required principal or interest payments under the Pre-Petition Credit Agreement since February, 2013, and March, 2015, respectively. Additionally, all amounts owed by the Debtors to Waterton that were not paid when due bear interest, from the date on which each such amount is due until each such amount is paid in full, payable on demand, at 14% per annum.

19.     On June 30, 2013, the Debtors signed a waiver of default letter (the "Waiver Letter") with Waterton whereby they agreed to sell, convey, assign, and transfer to Waterton certain accounts receivable as consideration for a waiver for non-payment under the Pre-Petition Credit Agreement, and also made certain representations, warranties, and covenants regarding such accounts receivable. The accounts receivable transferred to Waterton were applied as payments towards outstanding interest payables first, with any remaining receivables transferred being treated as payment towards other indebtedness under the Pre-Petition Credit Agreement, including principal. As of December 31, 2013, the valuation of receivables sold to Waterton under the Waiver Letter was finalized at $1,018,056.

20.     The Pre-Petition Credit Agreement was further amended on August 14, 2015 to, among other things, provide the Debtors with $200,000 in additional funding.

21.     As of the Petition Date, approximately $12.8 million (including accrued, unpaid and penalty interest) is outstanding under the Pre-Petition Credit Agreement.

*ii.*     _Waterton Gold and Silver Supply Agreement_

22.     Simultaneously with their entry into the Pre-Petition Credit Agreement, in December 2011, certain of the Debtors and Waterton entered into that certain *Gold and Silver Supply Agreement* (the "Pre-Petition Gold Supply Agreement") whereby the relevant Debtors would sell refined gold and silver to Waterton for the life the Summit Mine.  The gold subject to the Pre-Petition Gold Supply Agreement includes all gold originating from the Summit Mine that is not subject to the Sandstorm Gold Supply Agreement (defined below).  The sales price for refined gold and silver under the Pre-Petition Gold Supply Agreement is based upon a formulation which considers the London Bullion Market Association ("LBMA") PM fix settlement price for each respective metal, less a discount of three percent for each metal, and a transaction cost of $1.75 per ounce for gold and $0.07 per ounce for silver.  The discount on gold and silver is only applicable until the latter of either three years after all outstanding amounts due under the Pre-Petition Credit Agreement have been repaid, or the date on which the Company has sold 125,000 gold equivalent ounces under the Pre-Petition Gold Supply Agreement.

23.     As of the Petition Date, the Debtors are still in the process of determining their obligations under the Pre-Petition Gold Supply Agreement.  In connection with the Pre-Petition Credit Agreement, Waterton's claims against the Debtors pursuant to the Pre-Petition Gold Supply Agreement are secured by a first-priority lien on the stock of Santa Fe's subsidiaries and substantially all of the Debtors' assets.

*iii.* *Sandstorm Gold Supply Agreement*

24. On September 9, 2009, the Debtors entered into that certain Purchase Agreement (the "Sandstorm Gold Supply Agreement") with Sandstorm Gold (Barbados) Ltd. ("Sandstorm") to deliver to Sandstorm a portion of the life-of-mine gold production (excluding all silver production) from the Summit Mine. In connection therewith, Lordsburg Mining, but none of the other Debtors, granted Sandstorm a charge, as described in the Sandstorm Gold Supply Agreement, over all of the "assets, property and undertaking" in respect of the Summit Mine. On December 23, 2011, Sandstorm, Waterton, Lordsburg Mining, and Santa Fe Barbados (the "Sandstorm Agreement Parties") executed that certain *Intercreditor Agreement* that provides that, among other things, Sandstorm's interests shall at all times remain inferior, junior, and subordinate to Waterton's liens and interests.

25. Under the Sandstorm Gold Supply Agreement, certain of the Debtors received an upfront deposit of $4.0 million and would receive future ongoing payments equal to the lesser of $400 per ounce or the prevailing market price (the "Fixed Price") for each ounce of gold delivered pursuant to the agreement for the life of the mine. The Debtors purchase and deliver refined gold in order to satisfy the requirements of the Sandstorm Gold Supply Agreement and receive the Fixed Price per ounce in cash from Sandstorm. The difference between the prevailing market price and the Fixed Price per ounce for gold delivered is credited against the upfront deposit of $4.0 million until the obligation is reduced to zero.

26. On March 29, 2011, the Sandstorm Agreement Parties executed an amendment to the Sandstorm Gold Supply Agreement that extended the original completion guarantee date from April 2011 to June 30, 2012, and put in place a completion guarantee test. In exchange for the amended completion guarantee date, the Debtors agreed to deliver an

additional 700 ounces of gold at equivalent sales terms over and above the original agreement. Under the terms of the amendment, the delivery of the additional gold was to be made prior to June 30, 2011.

27.     On June 28, 2011, the Sandstorm Agreement Parties executed a second amendment to the Sandstorm Gold Supply Agreement that extended the delivery date for the additional 700 ounces of gold to October 15, 2011.  In exchange for the deferred delivery date, the Debtors agreed to pay a per diem of 3 ounces of gold for each day the additional gold under the first amendment remained outstanding past June 30, 2011, which could be no later than October 15, 2011.  On August 9, 2011, the Debtors satisfied the requirements of the second amendment by delivering 817 ounces of gold.  The net cost of delivering the gold after receiving payment from Sandstorm of $400 per ounce delivered was $1,075,785.

28.     On June 30, 2012, the Debtors calculated the completion guarantee payable provided by the first amendment to the Sandstorm Gold Supply Agreement.  Based upon the provisions of the Sandstorm Gold Supply Agreement and the related completion guarantee test, incremental financing charges totaling $504,049 were recognized and accrued at June 30, 2012.  These accrued charges, combined with the remaining uncredited liability for the upfront deposit totaled $3,359,873 as of March 31, 2015.

29.     Under the Sandstorm Gold Supply Agreement, as of March 31, 2015, the Company has a recorded obligation of 3,709 ounces of undelivered gold valued at approximately $2.9 million, net of the Fixed Price of $400 per ounce to be received upon delivery.

iv.     *IGS Convertible Secured Notes*

30.     In October and November 2012, the Debtors received from International Goldfields Limited ("IGS") advances totaling $3.9 million (Australian), representing cash

proceeds of $3,985,000 (Australian), in connection with a contemplated business combination with IGS, as discussed below in greater detail. The funds were advanced by way of two convertible secured notes (each a "<u>Convertible Secured Note</u>"). The Convertible Secured Notes bear interest at a rate of 6% per annum and have a three-year term.

31.     In June 2013, the Debtors negotiated for an additional capital injection from IGS up to an additional $2.0 million (Australian). In connection therewith, the Debtors issued a third Convertible Secured Note to IGS. The third Convertible Secured Note bears interest at a rate of 10% per annum, has a maturity date of October 31, 2015, and is secured by the Debtors' contractual rights in certain real property; however, such the Debtors' relevant contractual rights expired in November 2014 and thus the obligations under the third Convertible Secured Note are unsecured. Upon a refinancing of the funding provided under the Pre-Petition Credit Agreement, the third Convertible Secured Note is repayable in cash or stock of Santa Fe, at IGS's election. The Debtors have received advances totaling $1,250,000 in connection with the third Convertible Secured Note.

32.     As of March 31, 2015, the total outstanding principal balance under the three Convertible Secured Notes is $2,998,710 and accrued interest was $436,642.

*v.*     *Tyhee Bridge Loan Agreement*

33.     In conjunction with a proposed merger with Tyhee Gold Corp. ("<u>Tyhee</u>"), described below, Tyhee and the Debtors entered into a bridge loan agreement (the "<u>Tyhee Bridge Loan Agreement</u>"), pursuant to which Tyhee was obligated to advance up to $3.0 million to the Debtors (the "<u>Tyhee Bridge Loan</u>"). However, Tyhee advanced only $1,745,092 under the Tyhee Bridge Loan. The Tyhee Bridge Loan bears interest at 2% per month on the outstanding principal amount. Tyhee has given purported notice to Santa Fe that the Company is in default

under the Tyhee Bridge Loan, and has demanded that Santa Fe repay $1,745,082 in principal and $569,986 in accrued interest and merger expenses.

*vi.*        *Individual Senior Subordinated Convertible Notes*

34.     On October 30, 2007, the Debtors completed the placement of $450,000 of 10% senior subordinated convertible notes (the "Individual Senior Notes").  The Individual Senior Notes were placed with three accredited investors for $150,000 each and bear interest at 10% per annum.  The notes had a term of 60 months, at which time all remaining principal and interest were due.

35.     In connection with the Individual Senior Notes issuance, Santa Fe issued 180,000 five-year warrants, reflecting a warrant for each $2.50 invested in the Individual Senior Notes.  Each warrant gave the relevant holder the right to purchase one share of common stock at a price of $1.25 per share.  At the option of the holders of the Individual Senior Notes, the outstanding principal and interest were convertible at any time into shares of the Company's common stock at a conversion price of $1.25 per share.  The Individual Senior Notes were to be automatically converted into common stock if the weighted average closing sales price of the stock exceeded $2.50 per share for ten consecutive trading days.

36.     On October 31, 2012, the Individual Senior Notes became due and payable.  On January 15, 2013, the maturity dates for the Individual Senior Notes were extended for a period of two years from the original maturity dates.  Additionally, the convertible price of the Individual Senior Notes was reduced to $0.40 and the automatic conversion price of $2.50 was reduced to $0.80.  In connection with the extension of the Individual Senior Notes, 562,500 warrants were issued with a strike price of $0.40 and term of two years from the original

maturity dates.  On October 23, 2014, 375,000 of these warrants expired and, on November 20, 2014, the remaining 187,500 expired.

37.     As of March 31, 2015, the outstanding principal balance on the Individual Senior Notes was $450,000 and, along with any unamortized discount, is classified as current. Both principal and interest on the Individual Senior Notes are currently due and payable.

vii.     *Canarc Bridge Loan*

38.     As described in greater detail below, on July 15, 2014, Santa Fe entered into a Share Exchange Agreement (the "Share Exchange Agreement") with Canarc Resource Corp., a British Columbia, Canada corporation whose common shares are listed on the TSX Exchange under the symbol CCM ("Canarc").  In connection with the Share Exchange Agreement the Debtors and Carnac entered into that certain interim financing facility pursuant to which Canarc advanced the Company $220,000.  The loan bears interest at a rate of 1% a month and was due and payable upon the closing of a gold bond financing by the Debtors or January 15, 2015, if the gold bond financing did not close.  As noted below, the financing failed to close and the entire amount of the loan is outstanding and in default.

viii.     *Convertible Unsecured Notes*

39.     Finally, the Debtors are a party to two agreements under which they have issued convertible unsecured notes.  As of the Petition Date, approximately $225,400 (including accrued and unpaid interest) is outstanding under convertible unsecured notes.

C.     **Additional Liabilities**

40.     As of the Petition Date, the Debtors have approximately $860,000 in outstanding property taxes, and $6.1 million in trade debt.

Case 15-11761-MFW    Doc 2    Filed 08/26/15    Page 15 of 32


## III.    EVENTS LEADING TO THE BANKRUPTCY FILINGS AND THE DEBTORS' POST-PETITION STRATEGY

41.    As a consequence of chronic underfunding, constrained liquidity, an overly-leveraged balance sheet, operational and management challenges and declining precious metals prices, for the past several years the Debtors have pursued a strategic or financial partner. In this regard, Santa Fe has entered into three strategic transactions, all of which were subject to certain customary conditions.  As detailed below, because in each instance one or more of the conditions in connection with the transactions were never completed, each of the transactions failed.

### A.    <u>Failed Strategic Transactions</u>

i.    <u>*International Goldfields Limited*</u>

42.    On February 15, 2013, Santa Fe entered into an Agreement and Plan of Merger (the "<u>IGS Merger Agreement</u>") with IGS. Under the terms of the IGS Merger Agreement, Santa Fe would have become a wholly-owned subsidiary of IGS.  Completion of the merger with IGS was subject to IGS closing before March 14, 2013 an equity financing that would have resulted in IGS having at least $10,000,000 (Australian) in available cash (a "<u>Qualified Equity Financing</u>").  Because IGS was unable to consummate a Qualified Equity Financing, the IGS Merger Agreement terminated.

ii.    <u>*Tyhee Gold Corp.*</u>

43.    After termination of the IGS Merger Agreement, on September 13, 2013, Santa Fe engaged Fairfax Securities Corporation D/B/A Jett Capital Advisors, New York ("<u>Jett Capital</u>") as its exclusive United States placement agent and exclusive corporate advisor in relation to capital raising, change of control transactions, and any other material corporate or asset transaction, including acquisition or divestment of a mining project, restructuring, spin-off,

corporate acquisition or joint venture.  Jett Capital has represented to Santa Fe that it reached out to over 100 qualified entities in its database, and in October 2013, Jett Capital introduced Santa Fe to Tyhee.

44.    On January 23, 2014, Santa Fe entered into a definitive merger agreement (the "Tyhee Merger Agreement") with Tyhee.  Completion of the merger was subject to customary conditions, including (i) adoption of the Tyhee Merger Agreement by the required vote of the holders of outstanding Company common stock, (ii) obtaining certain approvals from the Securities and Exchange Commission, (iii) consummation of secured debt restructurings, (iv) receipt of the approval of the TSX Venture Exchange, and (v) Tyhee closing a qualified financing of at least $20 million (a "Qualified Financing").  On March 23, 2014, the Company terminated the Tyhee Merger Agreement as a result of Tyhee's failure to close the Qualified Financing.

45.    As of the Petition Date, Tyhee has not paid a $300,000 break-fee owed to the Company for its failure to consummate the Tyhee Merger Agreement, has not advanced any additional funds under the Tyhee Bridge Loan Agreement, and has failed to return Santa Fe's confidential information pursuant to the terms of a Confidentiality Agreement between Santa Fe and Tyhee.  Santa Fe has commenced legal action against Tyhee and its chief executive officer for injunctive relief and conversion of Santa Fe's confidential information.

iii.    *Canarc Resource Corp.*

46.    On July 15, 2014, Santa Fe entered into a certain Share Exchange Agreement (the "Share Exchange Agreement") with Canarc.  Under the terms of the Share Exchange Agreement, Santa Fe was to issue 66,000,000 shares of its common stock to Canarc; and, in exchange, Canarc was to issue 33,000,000 of its common shares to Santa Fe (the "Share

Exchange"). Upon consummation of the Share Exchange Agreement, Santa Fe was to own approximately 17 percent of Canarc's outstanding shares and Canarc was to own approximately 34 percent of Santa Fe's outstanding common shares.

47.     In connection with the Share Exchange, Bradford Cooke, Chairman and Founder of Canarc, was appointed as a director and Chairman of Santa Fe, Catalin Chiloflischi, Chief Executive Officer of Canarc, was appointed President, Chief Executive Officer, and Director of Santa Fe, and Garry Biles, President and Chief Operating Officer of Canarc, was appointed Chief Operating Officer of Santa Fe.

48.     Significantly, in connection with the Share Exchange Agreement, Santa Fe entered into a "best efforts" placement agency agreement with Euro Pacific Capital, Inc. ("Euro Pacific") pursuant to which Euro Pacific agreed to use its "best efforts" to complete the private placement of Convertible Gold Notes in the aggregate principal amount between $20 million to $25 million. Euro Pacific did not place any securities or raise any capital for Santa Fe.

49.     When the relevant transactions under the Share Exchange Agreement failed to close, the Share Exchange Agreement terminated pursuant to its terms on October 15, 2014.

50.     Without any prior notice of their intention to resign, on October 16, 2014, Santa Fe received the resignation letters of Messrs. Cooke, Chiloflischi, Biles and Philip Yee, leaving Santa Fe without any executive officers. Furthermore, the Canarc affiliates left Santa Fe with less than $100 in available cash.

**B.      Recent Restructuring Efforts and Post-Petition Strategy**

51.     Following Euro Pacific's failure to raise any capital pursuant to its best-efforts placement agreement, Santa Fe changed its operational strategy from a mine restart plan

01:17464338.11

to a resource drilling and engineering program.  Additionally, Santa Fe formulated a copper exploration strategy at the Lordsburg Mill site.

52.    Specifically, in light of recent operational results combined with lower metal prices, the Company is reporting no reserves for its Summit Project.  As such, and in light of the termination of the Share Exchange Agreement, the Company adopted a strategy to conduct additional technical work, including drilling and sampling, to reclassify some of the mineralized material at the Summit Project as "reserves."  The Company intended to execute this strategy with the assistance of a potential strategic or financial partner.  In this regard, Santa Fe conducted an extensive strategic process by inviting potential strategic partners, financial investors, private equity funds, hedge funds and ultra-high net worth family offices to participate in either a minority or control investment, or acquire Santa Fe.  Although Santa Fe received interest as to further exploring its Lordsburg Copper Project from certain strategic investors, none of the strategic investors, financial investors, private equity funds, hedge funds and ultra-high net worth family offices was willing to enter into a transaction that would have allowed Santa Fe to continue as a going concern.

53.    At this time, each of the Debtors' projects is non-operational, because the Debtors lack the funding to conduct additional technical work, including drilling and sampling, to reclassify some of the mineralized material at the Summit Project as "reserves," and to restart any mining, milling, or processing activities.  Consequently, the Debtors have no way of generating income.  With no available cash or even the prospect of generating cash flow, the Debtors face multiple threats, including, without limitation, litigation with the Summit Mine royalty holder for past due royalties, collection efforts of a judgment creditor, and defaults under numerous debt instruments including, without limitation, the Pre-Petition Credit Agreement and

the Sandstorm Gold Supply Agreement. In light of these challenges, along with their failed restructuring efforts to date, the Debtors have determined that they have no choice but to aggressively pursue and consider all possible transaction scenarios. Most recently, the Debtors began working with Canaccord Genuity Inc. ("Canaccord") as their investment banker to assist with these efforts. Canaccord's role has included negotiating with interested parties, preparing for and initiating marketing efforts, and facilitating due diligence requests.

54.    Upon being made aware of the Company's renewed restructuring efforts, Waterton offered to provide the Debtors with a limited amount of debtor in possession financing (the "DIP Facility") to support a sale process within the context of a chapter 11 proceeding. In addition, Waterton offered to enter into a stalking horse asset purchase agreement (the "Stalking Horse Agreement") with the Debtors and participate in an open market process for the sale of substantially all of the Debtors' assets at an auction. The Debtors considered this offer, and have determined that the most prudent course of action is to obtain the DIP Facility and enter into the Stalking Horse Agreement so that they may conduct an expedited, yet orderly asset sale and wind-down of operations through the present chapter 11 cases. At this time, as set forth in greater detail below, the DIP Facility is the Debtors' best and only means of obtaining the liquidity necessary to effectuate a sale and, thereby, maximize the value of the Debtors' assets. Although the Debtors cannot be certain that the price obtained through such a process will be higher than that which may be obtained outside of a chapter 11 process, conducting the process within these chapter 11 cases gives the Debtors a means to assess interest from other parties and make sure that an appropriate value is received. Based on the advice of Canaccord and the Debtors' other professionals, as well as my expertise with respect to the Debtors' business, I

believe that an orderly sale process will produce substantially more realizable value than any possible alternative.

55.     In order to maximize the value of their assets, the Debtors are continuing to work with Canaccord to assist with a sale process that the Debtors must consummate within the next 90 days.  Based upon the limited financing provided by the DIP Facility, the Debtors, in consultation with Canaccord, determined that a sale process concluding within this timeframe is in the best interests of the Debtors, their estates, and creditors.  Given the Debtors' pre-petition marketing efforts, should the sale process take any longer, it is unlikely that the Debtors would be able to obtain any meaningful incremental value for their stakeholders.

## IV.     DIP FINANCING

56.     As noted above, upon being made aware of the Debtors' restructuring efforts and the assistance being provided by Canaccord, Waterton offered to provide the Debtors with the DIP Facility to support a sale process within the context of a chapter 11 proceeding, and to enter into the Stalking Horse Agreement.   The Debtors and their advisors had considered potential sources of debtor in possession ("DIP") financing aside from Waterton, and even inquired as to whether Waterton would agree to allow a priming DIP loan provided by a third party lender.  However, Waterton advised the Debtors that it would not consent to a priming DIP loan.   During our efforts to identify alternative financing, the Debtors' other advisors and I contacted several potential DIP lenders, including not only those that were familiar with the Company's assets and industry, but also certain financial investors with the ability to  promptly evaluate potential investment opportunities.  Unfortunately, despite these efforts, the Debtors were unable to obtain any alternative proposals for DIP financing.

01:17464338.11

20

57.     Accordingly, because of the expedited need to commence the chapter 11 cases in light of the Debtors' cash position, and the lack of interest from the numerous other financing options that had been consulted, the Debtors concluded that they would be unable to obtain any alternative proposals for DIP financing.

58.     The Debtors and Waterton, by its investment manager, Altitude Management Limited as proposed DIP lender (in such capacity, the "DIP Lender"), negotiated a Debtor-in-Possession Credit Agreement (the "DIP Credit Agreement").  These negotiations, which were extensive and at arm's length, culminated in the proposed DIP Facility.

**A.     Financing Negotiations**

59.     The DIP Credit Agreement permits the Debtors to incur expenditures in accordance with an approved budget (the "DIP Budget").  The DIP Budget is attached to the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Post-Petition Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing, and (IV) Granting Related Relief* (the "DIP Motion") as Exhibit C.  The proceeds of the DIP Facility, which the Debtors estimate will be sufficient to finance the chapter 11 cases, will be used (i) for working capital and general corporate purposes of the Debtors and (ii) to pay fees and expenses related to the DIP Facility and the chapter 11 cases.

60.     The terms of the DIP Facility require the Debtors to complete a sale of their assets in accordance with certain milestones.  To maximize the value of their estates, and in compliance with the milestones under the proposed DIP Facility, the Debtors will file a motion seeking authority to conduct an auction process (the "Sale Motion") by which the Debtors will solicit offers and ultimately seek approval to sell substantially all of their assets to the bidder with

the highest or otherwise best offer.  The Debtors also will seek authority to retain Canaccord to serve as their investment bankers to assist with conducting the marketing and sale of their assets.

61.    The Debtors and their advisors considered a variety of potential transactions, including refinance and sale options.  Based on all of the factors described herein, the Debtors deemed that it was in the best interests of their business to commence these chapter 11 cases and effectuate a comprehensive restructuring.  The Debtors also have determined that the DIP Facility presents the only viable mechanism for providing the liquidity that the Debtors require to preserve the value of their assets during the chapter 11 cases.  In addition, the Debtors have determined that a prompt and open sale of their assets in which all interested buyers are encouraged to participate is the best way to maximize value for their estates under the circumstances.

### B.    The DIP Facility

62.    Along with other motions seeking certain first day relief, the Debtors filed the DIP Motion, seeking approval of the DIP Facility.  Importantly, I believe the financial terms and covenants of the DIP Facility are standard and reasonable for financing of this kind.  Based on the extensive negotiations that took place, I believe that these are the only terms on which the DIP Lender will provide the financing.  As the DIP Facility proceeds are necessary and the only financing available at this time, I believe that sufficient justification exists for agreeing to these provisions.  Moreover, it is my understanding that the DIP Lender would not have been amenable to providing financing without the heavily bargained-for protections contained in the DIP Credit Agreement.

### C.    The Terms of the DIP Facility are Fair and Reasonable

63.    The proceeds of the DIP Facility are sized to support the Debtors through the anticipated pendency of these chapter 11 cases and preserve and promote the health and

viability of the Debtors' assets.  Moreover, I believe that the financial terms and covenants of the DIP Facility are standard and reasonable for financing of this kind.  Based on the negotiations that took place, I believe that these are the only terms on which the DIP Lender will provide the financing.

64.     Specific to the chapter 11 cases, the DIP Facility sets certain milestones for certain restructuring initiatives (e.g., obtaining approval of bid and sale procedures, consummating a sale of all or substantially all of the Debtors' assets) and entitles the DIP Lender to certain fees.  Based on the extensive negotiations that took place, I believe that these are the only terms on which the DIP Lender will provide the financing.  In addition, I am generally aware that terms similar to those included in the DIP Credit Agreement have been approved in other recent and/or ongoing cases.

65.     The Debtors and the DIP Lender engaged in discussions prior to the Petition Date concerning the provisions of the DIP Facility.  I believe that the terms of the DIP Credit Agreement and associated loan documents (collectively, the "DIP Loan Documents") constitute, on the whole, the most favorable terms the Debtors could achieve upon which the DIP Lender will extend the necessary postpetition financing.  Although the Debtors explored whether the DIP Lender would provide the DIP Facility without certain provisions, in the course of negotiations, the DIP Lender indicated it would not be willing to provide the DIP Facility without such terms.  In particular, it is my understanding that the provisions requiring: (i) the achievement of certain sale milestones, including the filing of the Sale Motion; and (ii) the roll-up of the Pre-Petition Obligations (as defined in the DIP Credit Agreement) are key components of consideration for the DIP Lender without which they have indicated they are unwilling to provide the DIP Facility.

01:17464338.11

66.     It is my further understanding that any alternative financing arrangement, including an arrangement provided by other potential DIP lenders, likely would have led to a lengthy and almost certain value-destroying priming fight.  Moreover, I understand that the DIP Lender would not have been amenable to providing financing without the bargained-for provisions.  In the course of negotiations with the DIP Lender, the Debtors explored whether the DIP Lender would provide the DIP Facility with lower or no associated fees and free from procedural milestones.  The DIP Lender made clear that it would not be willing to provide the DIP Facility on more favorable terms.

67.     Accordingly, the Debtors, in consultation with their advisors—recognizing the absence of favorable competing proposals and the benefits to be provided under the DIP Facility—determined in their sound business judgment that the terms of the DIP Credit Agreement were and remain superior to any other set of terms reasonably available to the Debtors at this time.  I therefore believe that the DIP Facility provides the Debtors with the best, most feasible, and most value-maximizing financing option available at this time.

**D.     The Terms of the Debtors' Cash Collateral Use are Fair and Reasonable**

68.     In addition to the DIP Facility, the Debtors require the continued use of cash collateral (as defined in section 363(a) of the Bankruptcy Code, the "Cash Collateral"). Waterton has consented to the Debtors' continued use of Cash Collateral subject to the terms of the form of order approving the DIP Facility on an interim basis (the "Interim DIP Order").  I believe that continued access to Cash Collateral will ensure that the Debtors have access to sufficient working capital to, among other things, pay their employees and creditors, and satisfy administrative expenses incurred in connection with the commencement of the chapter 11 cases.

**E.     The Adequate Protection Package is Justified under the Circumstances**

69.     As set forth in greater detail in the DIP Motion, the Debtors and Waterton have agreed that the Debtors will provide certain forms of adequate protection (the "Adequate Protection Package").  The Adequate Protection Package will adequately protect Waterton's interests in the Pre-Petition Collateral from diminution in value caused by the Debtors' use of the Cash Collateral, as well as for any decline in, or diminution of, the value of Waterton's liens or security interests under the Pre-Petition Credit Agreement.

70.     Further, the Debtors' preservation of estate assets through the use of Cash Collateral serves as its own form of adequate protection.  I believe that Waterton will inherently benefit from the Debtors' proposed use of the Cash Collateral, which will prevent diminution of the value of the Pre-Petition Collateral and enhance the likelihood of preserving and maximizing the Debtors' overall going concern value.  In light of the likely disruptive effects of any priming fight, as well as the Debtors' desire to administer these cases on a consensual basis, I believe that entering into the DIP Facility with the DIP Lender best maximizes estate value at this time and I, therefore, support authorization and approval of the priming liens and superpriority claims contemplated in the interim order approving the DIP Motion.

**F.     The DIP Facility Was Negotiated in Good Faith**

71.     The Debtors and their advisors have determined that the DIP Lender offered the most viable option for obtaining the postpetition financing the Debtors require.  I believe that the DIP Credit Agreement is the result of the Debtors' reasonable and informed determination that DIP Lender offered the most favorable terms on which to timely obtain needed postpetition financing, and reflective of arm's length, good faith negotiations between the Debtors and DIP Lender.

**G.** **The Debtors Require Immediate Access to Cash Collateral and the DIP Facility**

72.    The Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested in the DIP Motion is not granted, including authorizing the Debtors' use of Cash Collateral and borrowings on an interim basis under the DIP Credit Agreement. Without Court approval of the DIP Facility, the Debtors will not have sufficient cash to make timely payments that are required to preserve the value of the Debtors' assets.  Failure to pay these expenses would result in irreparable harm to the planned sale process.  The Debtors' ability to finance these chapter 11 cases and the availability to the Debtors of working capital and liquidity through the DIP Facility and use of Cash Collateral is vital to the preservation and maintenance of the going-concern value of the Debtors' estates.  The Debtors have an immediate need for access to liquidity to, among other things, make certain payments needed to preserve valuable mineral rights, pay employees, and satisfy other working capital and operational needs—all of which are necessary to preserve and maintain the Debtors' going-concern value and, ultimately, effectuate a successful restructuring.  Based on these circumstances, the Debtors require the interim funding provided by the DIP Facility to avoid immediate and irreparable harm to their operations, business and estates.

**V.    FIRST DAY PLEADINGS**

73.    Concurrently herewith, the Debtors filed a number of "first day" motions and applications (each, a "First Day Pleading" and, collectively, the "First Day Pleadings"),[5] seeking relief that the Debtors believe is necessary to enable them to operate in chapter 11 with minimal disruption.  I have reviewed each of the First Day Pleadings discussed below, and the

---

[5] Capitalized terms used but not defined in this Section shall have the meaning ascribed to them in the relevant First Day Pleading.

facts set forth in each First Day Pleading are true and correct to the best of my knowledge and belief with appropriate reliance on corporate officers and advisors.  If I were called upon to testify, I could and would, based on the foregoing, testify competently to the facts set forth in each of the First Day Pleadings.  Moreover, as a result of my first-hand experience, and through my review of various materials and information, discussions with other of the Debtors' remaining officers, and discussions with the Debtors' outside advisors, I have formed opinions as to the necessity of obtaining the relief sought by the Debtors in their First Day Pleadings, and the need for the Debtors to continue to effectuate a smooth transition into chapter 11 in order to sell their assets.

### A.      Debtors' Motion for an Order Directing Joint Administration of the Debtors' Related Chapter 11 Cases

74.      The Debtors are "affiliates" pursuant to section 101(2) of the Bankruptcy Code whose operations are largely interrelated, and seek entry of an order directing joint administration of the chapter 11 cases for procedural purposes only.  Joint administration of the chapter 11 cases will reduce parties' fees and costs by avoiding duplicative filings and objections and make the most efficient use of the Court's resources and the resources of all parties in interest.  Accordingly, I believe that joint administration of the Debtors' cases is in the best interests of the Debtors, their estates and creditors, and all parties in interest.

### B.      Debtors' Application for an Order Authorizing the Appointment of American Legal Claim Services, LLC as Claims and Noticing Agent

75.      The Debtors seek entry of an order pursuant to 28 U.S.C. § 156(c) approving the retention of American Legal Claim Services, LLC ("ALCS") as claims and noticing agent for the Debtors, effective *nunc pro tunc* to the Petition Date.  This application pertains only to the work to be performed by ALCS under the Clerk of the Court's delegation of

01:17464338.11

duties permitted by section 156(c) of the Judicial Code, Local Rule 2002-1(f), and the Claims Agent Protocol.

76.     At this point, the Debtors have an unknown number of potential parties in interest in the chapter 11 cases.  The Debtors have begun reviewing their books and records and identified well over 100 creditors, but their analysis is not yet complete and the Debtors suspect that they will discover a number of additional parties in interest that will need to be served at various points in the chapter 11 cases.  The Debtors selected ALCS because it is a sophisticated chapter 11 administration, solicitation, and balloting agent, and ALCS has expertise in facilitating other administrative aspects of chapter 11 cases.  ALCS also provides a competitive rate structure, and the Debtors selected ALCS after reviewing the qualification and pricing proposals of three separate firms.  I believe the employment of ALCS as claims and noticing agent in the chapter 11 cases is appropriate and is in the best interests of the Debtors, their estates and creditors, and all parties in interest.

**C.      Debtors' Motion for Entry of an Order Extending the Deadline to File Schedules and Statements of Financial Affairs**

77.     Pursuant to this motion, the Debtors seek entry of an order extending the time within which the Debtors must file their schedules of assets and liabilities and statements of financial affairs by thirty (30) days, without prejudice to the Debtors seeking further extensions of such time.

78.     As describe in detail in the motion, to prepare their Schedules, the Debtors must compile information from various books, records, and documents relating to a myriad of claims, assets, and contracts.  In addition, as set forth more fully herein and the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Pay Amounts Attributable to Pre-Petition (A) Wages, Salaries, and Other Compensation; (B) Reimbursable Employee Expenses; and (C)*

*Employee Benefits; (II) Authorizing the Debtors to Continue Their Existing Employee Compensation and Benefits Programs Post-Petition; and (III) Granting Related Relief*, described below, the Debtors have very few employees and very few resources to allot to preparation of the Schedules.  Thus, the Debtors' collection of the necessary information for the Schedules will require a significant expenditure of time and effort from the Debtors' few employees and by the Debtors' professional advisors.

79.     In view of the amount of work entailed in completing the Schedules, and the competing demands upon the Debtors' employees and professional advisors to assist in the Debtors' efforts to effectuate a sale of the Debtors' assets with a corresponding auction process during the initial post-petition period, the Debtors will not be able to properly and accurately complete the Schedules within the 14-day period following the Petition Date.  At present, the Debtors anticipate that they will require a thirty (30) day extension of the current deadline to file the Schedules.  The Debtors, therefore, request that the Court extend the time to file the Schedules through and including October 9, 2015.

80.     I believe that the relief requested in this motion is warranted and in the best interests of the Debtors' estates, their creditors, and all other parties in interest. Accordingly, on behalf of the Debtors, I respectfully submit that this motion should be approved.

**D.     Debtors' Motion for Entry of an Order (i) Authorizing the Debtors to (a) Continue Their Existing Cash Management System and (b) Maintain Existing Bank Accounts and Check Stock, (ii) Granting an Extension of Time to Comply with Section 345(b) of the Bankruptcy Code, and (iii) Authorizing the Debtors to Continue Intercompany Transactions and <u>Granting Administrative Expenses Status to Intercompany Claims</u>**

81.     The Debtors request authority to continue to use their existing cash management system, maintain their existing bank accounts, and continue to use existing business forms.  The Debtors further request that administrative priority status be granted to certain of

their intercompany claims and that the Debtors be allowed to continue to perform under certain intercompany arrangements and historical practices.

82.     If the Debtors were required to comply with the U.S. Trustee's Operating Guidelines for Chapter 11 Cases, the burden of opening new accounts, revising cash management procedures, and the immediate ordering of new checks with a "Debtor in Possession" legend would unnecessarily disrupt the attention of the Debtors' few employees from more critical matters during the initial period of these chapter 11 cases.  Moreover, the proposed DIP Facility currently contemplates the transfer of funds into the Debtors' pre-petition bank accounts. As a result, the amount of time necessary to close the prepetition bank accounts and open new accounts could unduly delay the funding of the DIP Facility.

83.     The Debtors respectfully submit that parties in interest will not be harmed by their maintenance of the existing cash management system, including their existing bank accounts, because the Debtors have implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred prior to the Petition Date.

**E.     Debtors' Motion for Entry of an Order (i) Authorizing the Debtors to Pay Amounts Attributable to Pre-Petition (a) Wages, Salaries, and Other Compensation; (b) Reimbursable Employee Expenses; and (c) Employee Benefits; (ii) Authorizing the Debtors to Continue Their Severance Program and Make Payments Thereunder; (iii) Authorizing the Debtors to Continue Their Existing Employee Compensation and Benefits Programs Post-Petition; and (iv) Granting Related Relief**

84.     The support of the Employees is essential to the success of the Debtors' planned sale process.  The Employees are already owed a significant amount in unpaid wages, and any additional delay or failure to pay Employee Obligations and Health and Welfare Benefits could irreparably damage the Employees' morale, dedication, confidence, and cooperation and could adversely affect the Debtors' relationship with the Employees at a time

when the Employees' support is critical.  The Debtors employ only four full-time Employees and two part-time Employees.  Accordingly, they cannot afford to lose any of them, each of whom plays a key role for the Debtors, while they pursue a sale.

85.    For the foregoing reasons, the Debtors submit, and I believe, the relief requested in this motion is in the best interest of the Debtors, their estates and their creditors, and therefore should be approved.

**F.    Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utilities From Altering, Refusing, or Discontinuing Utility Services on Account of Pre-Petition Invoices, (II) Deeming Utilities Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Adequate Assurance of Payment**

86.    The Debtors seek entry of interim and final orders:  (a) determining that the Utility Providers have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code; (b) approving the Debtors' proposed offer of adequate assurance and procedures governing the Utility Providers' requests for additional or different adequate assurance; and (c) prohibiting the Utility Providers from altering, refusing, or discontinuing services on account of pre-petition amounts outstanding and on account of any perceived inadequacy of the Debtors' proposed adequate assurance.

87.    If the Utility Providers are permitted to terminate services under section 366 of the Bankruptcy Code, the Debtors will not be able to maintain the Lordsburg Mill or Summit Mine, resulting in a severe diminution in the value of the Debtors' assets.  Such disruption and loss would, at a minimum, cause substantial harm to the Debtors' efforts to expeditiously sell their assets and, thus, would be detrimental to the estates and all of the Debtors' stakeholders.  Accordingly, it is essential that the Utility Providers continue to provide their services without interruption.

## **Conclusion**

88.     I believe that if the Court grants the relief requested in the First Day Pleadings, the prospect of achieving the Debtors' objective—the maximization of the value of their estates for the benefit of the Debtors' estates, creditors, and parties in interest—will be substantially enhanced.

89.     I submit this Declaration in support of the Debtors' Petitions and the First Day Pleadings.  I have reviewed the Petitions and the First Day Pleadings and participated in the preparation thereof.  I believe, to the best of my knowledge and with reliance on certain information provided by other executives affiliated with the Debtors, that the facts set forth in the Petitions and the First Day Pleadings are true and correct.  This representation is based upon information and belief and through my general review of various materials and information, as well as my experience and knowledge of the Debtors' operations and financial condition.  Based upon the foregoing, if called to testify, I could and would testify competently to the key facts set forth in each of the First Day Pleadings.

I certify under penalty of perjury that, based upon my knowledge, information, and belief as set forth in this Declaration, the foregoing is true and correct.

Executed this 26th day of August, 2015.

/s/ Jakes Jordaan
Jakes Jordaan
Chief Executive Officer