## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------x
                                  :

In re                             :    Chapter 11

                                 :

**SANTA FE GOLD CORPORATION,** *et al.*,    :    **Case No. 15-11761 (MFW)**

                                 :

               **Debtors.**[1]        :    **Joint Administration Requested**

                                 :

---------------------------------------------------------------x

## DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING, (II) AUTHORIZING THE USE OF CASH COLLATERAL, (III) GRANTING LIENS, INCLUDING PRIMING LIENS, AND SUPERPRIORITY CLAIMS, (IV) GRANTING ADEQUATE PROTECTION, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF

The debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors"), hereby move (the "Motion") for entry of an interim order (the "Interim Order") and a final order (the "Final Order"):  (i) authorizing the Debtors to enter into senior secured priming and superpriority post-petition financing (the "DIP Facility") with Waterton Global Value, L.P., by its investment manager, Altitude Management Limited, as lender under the DIP Credit Agreement (in such capacity, the "DIP Lender"); (ii) authorizing the Debtors to use "cash collateral," (the "Cash Collateral") as such term is defined in section 363 of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"); (iii) granting liens, including priming liens, and superpriority administrative claims pursuant to section 364 of the Bankruptcy Code; (iv) granting adequate protection to Waterton Global Value, L.P., in its capacity as provider of the Senior Pre-Petition Indebtedness (the "Senior Pre-Petition Lender")

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are:  Santa Fe Gold Corporation (4315); Azco Mica, Inc. (8577); The Lordsburg Mining Company (4474); and Santa Fe Gold (Barbados) Corporation (N/A).  The Debtors' mailing address is 1219 Banner Mine Road, Lordsburg, New Mexico 88045.

and Sandstorm Gold (Barbados) Ltd., in its capacity as provider of the Second Lien Pre-Petition Indebtedness ("Sandstorm Barbados" or the "Second Lien Pre-Petition Lender"); (v) scheduling a final hearing with respect to the relief requested herein pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and (vi) granting related relief.   In support of the Motion, the Debtors rely upon the *Declaration of Jakes Jordaan in Support of Chapter 11 Petitions and First Day Relief* (the "First Day Declaration") filed contemporaneously herewith and incorporated herein by reference, and respectfully state as follows:

## Jurisdiction

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Debtors consent pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory and legal predicates for the relief requested herein are sections 105, 361, 362, 363, 364, 507, and 552 of title 11 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rule 4001-2.

## Relief Requested[2]

3.       By this Motion, the Debtors request entry of the Interim Order, substantially in the form attached hereto as **Exhibit I**, and the Final Order (together with the Interim Order, the "<u>DIP Orders</u>") that, among other things:[3]

     a.     authorizes Santa Fe Gold Corporation (the "<u>Borrower</u>") to obtain, and each of the other Debtors (collectively, the "<u>Guarantors</u>", and the Borrower and Guarantors being referred to collectively as the "<u>Obligors</u>") to unconditionally guaranty, jointly and severally, the Borrower's obligations in respect of the DIP Facility, which if approved on a final basis would consist of post-petition financing in a total amount of $1,580,148, plus the Roll Up Loans, provided pursuant to the terms of (x) the Interim Order and, on a final basis, the Final Order, (y) that certain *Debtor-In-Possession Credit Agreement* (as the same may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms, the "<u>DIP Credit Agreement</u>"), a true and correct copy of which is attached to the Interim Order as **Exhibit B**, by and among the Borrower, the Guarantors, and the DIP Lender, and (z) any and all other Credit Documents (as defined in the DIP Credit Agreement, and together with the DIP Credit Agreement, collectively, the "<u>DIP Loan Documents</u>");

     b.     authorizes the use of the proceeds of the DIP Facility to, among other things, make payments, as permitted by the Approved Budget, for operating expenses, general and ordinary purposes of the Debtors, and for other administrative expenses, including budgeted professional fees, all subject to the conditions set forth in the final DIP Loan Documents and in the Interim Order;

     c.     approves borrowings between the entry of this Interim Order and the entry of the Final Order (as defined below) in an aggregate principal amount not more than $361,547 plus the Initial Roll Up Amount (defined below) (the "<u>Interim Amount</u>"), and authorizes the Guarantors to unconditionally guaranty such obligations jointly and severally;

     d.     approves the conversion of all outstanding obligations arising under or in connection with the Supplemental Advance, including, without limitation,

---

[2]       Capitalized terms used, but not yet defined, have the meaning given to them below. Those terms not defined herein have the meaning given to them in the DIP Loan Documents and the DIP Orders, as applicable.

[3]       The terms of the DIP Facility as described in this Motion are for illustrative purposes only. This Motion is not intended to modify or supersede any of the terms of the DIP Facility or the proposed Interim Order. In the event of any conflict or inconsistency between this Motion and either the DIP Loan Documents or the proposed Interim Order, then the DIP Loan Documents or the Interim Order, as applicable, shall be controlling.

outstanding principal and accrued interest and fees thereon (the "Initial Roll Up Amount") into Roll Up Loans;

e.    approves the terms of, and authorizes the Debtors to execute and deliver, and perform under, the DIP Loan Documents and authorizes and directs the Debtors to perform such other and further acts as may be required in connection with the DIP Loan Documents and the Interim Order;

f.    grants to the DIP Lender, (x) the DIP Liens on all of the DIP Collateral pursuant to sections 364(c)(1), 364(c)(2), and 364(d)(1) of the Bankruptcy Code, which DIP Liens are senior to and prime all other liens and (y) pursuant to section 364(c)(1) of the Bankruptcy Code, superpriority administrative claims having recourse to all pre-petition and post-petition property of the Debtors' estates, now owned or hereafter acquired and the proceeds of each of the foregoing, including, upon entry of the Interim Order, any Debtor's rights under section 549 of the Bankruptcy Code and the proceeds thereof, and upon entry of the Final Order, the proceeds of Avoidance Actions;

g.    authorizes the Debtors to use the Cash Collateral, including Cash Collateral in which the DIP Lender and the Senior Pre-Petition Lender have a lien or other interest, in each case whether existing on the date hereof (the "Petition Date"), arising pursuant to the Interim Order or otherwise;

h.    vacates the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and the Interim Order;

i.    grants the Senior Pre-Petition Lender and the Second Lien Pre-Petition Lender, as of the Petition Date and in accordance with the relative priorities set forth in the Interim Order, the Adequate Protection Liens and the Adequate Protection Priority Claims;

j.    schedules a final hearing on the DIP Motion (the "Final Hearing") to be held no later than thirty-five (35) calendar days after the entry of the Interim Order to consider entry of the Final Order that grants all of the relief requested in the DIP Motion on a final basis and which shall be in form and substance (including with respect to any subsequent modifications to the form or substance made in response to objections of other creditors or the Court) acceptable to the DIP Lender;

k.    waives, upon entry of the Final Order, certain rights of the Debtors to surcharge against collateral pursuant to section 506(c) of the Bankruptcy Code; and

l.      provides for the immediate effectiveness of the Interim Order and waives any applicable stay (including under Bankruptcy Rule 6004) to permit such immediate effectiveness.

## Background

### I.      Introduction and Case Background

4.      On the date hereof, the Debtors commenced their bankruptcy cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"). The Debtors are operating their respective businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases and no committees have been appointed or designated.

5.      Information regarding the Debtors, their corporate history, and their assets and liabilities are set forth in the First Day Declaration.

### II.      Pre-Petition Financing

6.      Prior to the Petition Date, the Debtors were involved in a number of secured and unsecured financing transactions.  These transactions, and the amount currently outstanding in connection therewith, are described below.

| Description | Approximate Amount Outstanding as of the Petition Date | Secured/Unsecured |
|---|---|---|
| Waterton Senior Secured Gold Stream Credit Agreement | $12.8 million | Secured, first priority lien on substantially all assets and stock of subsidiaries |
| Waterton Gold and Silver Supply Agreement | As of the Petition Date, the Debtors are still determining the amount of this obligation. | Secured, first priority lien on substantially all assets and stock of subsidiaries |
| Sandstorm Gold Supply Agreement | $6.5 million | Secured, second priority lien on gold production from the Summit-Silver Gold Project |
| IGS Senior Subordinated Convertible | $3.9 million | Unsecured |

| Notes | | |
|---|---|---|
| Tyhee Bridge Loan Agreement | $2.4 million | Unsecured |
| Individual Convertible Unsecured Notes | $556,300 | Unsecured |
| Canarc Bridge Loan Agreement | $250,000 | Unsecured |
| Convertible Unsecured Notes | $225,400 | Unsecured |

## A.    Waterton Senior Secured Gold Stream Credit Agreement

7.    On December 23, 2011, the Debtors entered into that certain *Senior Secured Gold Stream Credit Agreement* (the "Pre-Petition Credit Agreement") with the Senior Pre-Petition Lender.  The Pre-Petition Credit Agreement provided for $25.0 million in financing, consisting of two $10.0 million, non-revolving tranches and a $5.0 million, revolving working capital facility.  On December 23, 2011, the Debtors closed on the first $10.0 million tranche of the Pre-Petition Credit Agreement.  Proceeds from the initial $10.0 million tranche of the Pre-Petition Credit Agreement were used to retire the Debtors' $5.0 million senior secured bridge loan provided by Victory Park Capital Advisors, LLC, in addition to the payment of transaction fees and expenses.  The Debtors utilized the remaining net proceeds for operations and working capital for the Summit Silver-Gold Project.[4]  The second $10 million tranche was never drawn because it was earmarked to fund a strategic acquisition that the Debtors did not consummate.

8.    Pursuant to a series of guarantees, security agreements, deeds of trust, a mortgage, and a stock pledge agreement, the obligations under the Pre-Petition Credit Agreement are secured by a first-priority lien on the stock of Santa Fe's subsidiaries and liens covering substantially all of the Debtors' assets.

---

[4]    The Summit Silver-Gold Project consists of (a) a fully-permitted, underground silver-gold mine located in Grant County, New Mexico–near Duncan, Arizona–on the New Mexico-Arizona border (the "Summit Mine"), (b) a floatation ball mill in Hidalgo County, New Mexico near Lordsburg, New Mexico (the "Lordsburg Mill"), and (c) related property consisting of approximately 1,500 acres of wholly-owned patented, leased patented and unpatented mining claims.

9.     On October 9, 2012, the Debtors entered into an amendment to the Pre-Petition Credit Agreement, which modified the due dates of certain principal payments.  The amendment provided for principal payments of $1,082,955 in October of 2012; $500,000 in November of 2012; $0 in December of 2012; $0 in January of 2013; and $3,852,275 in February of 2013.  All other principal payments remained unchanged and interest payments continued to be due monthly.  The Debtors have not made the required principal or interest payments under the Pre-Petition Credit Agreement since February, 2013, and March, 2015, respectively.  Additionally, all amounts owed by the Debtors to the Senior Pre-Petition Lender that were not paid when due bear interest, from the date on which each such amount is due until each such amount is paid in full, payable on demand, at 14% per annum.

10.    On June 30, 2013, the Debtors signed a waiver of default letter (the "Waiver Letter") with the Senior Pre-Petition Lender whereby they agreed to sell, convey, assign, and transfer to the Senior Pre-Petition Lender certain accounts receivable as consideration for a waiver for non-payment under the Pre-Petition Credit Agreement, and also made certain representations, warranties, and covenants regarding such accounts receivable.  The accounts receivable transferred to the Senior Pre-Petition Lender were applied as payments towards outstanding interest payables first, with any remaining receivables transferred being treated as payment towards other indebtedness under the Pre-Petition Credit Agreement, including principal.  As of December 31, 2013, the valuation of receivables sold to the Senior Pre-Petition Lender under the Waiver Letter was finalized at $1,018,056.

11.    The Pre-Petition Credit Agreement was further amended on August 14, 2015 to, among other things, provide the Debtors with $200,000 in additional funding.

12.     As of the Petition Date, approximately $12.8 million (including accrued, unpaid, and penalty interest) is outstanding under the Pre-Petition Credit Agreement.

**B.    Waterton Gold and Silver Supply Agreement**

13.     Simultaneously with their entry into the Pre-Petition Credit Agreement, certain of the Debtors and the Senior Pre-Petition Lender entered into that certain *Gold and Silver Supply Agreement* (the "Pre-Petition Gold Supply Agreement") whereby the relevant Debtors would sell refined gold and silver to the Senior Pre-Petition Lender for the life the Summit Mine.  The gold subject to the Pre-Petition Gold Supply Agreement includes all gold originating from the Summit Mine that is not subject to the Sandstorm Gold Supply Agreement (defined below).  The sales price for refined gold and silver under the Pre-Petition Gold Supply Agreement is based upon a formulation that considers the London Bullion Market Association PM fix settlement price for each respective metal, less a discount of three percent for each metal, and a transaction cost of $1.75 per ounce for gold and $0.07 per ounce for silver.  The discount on gold and silver is only applicable until the latter of either three years after all outstanding amounts due under the Pre-Petition Credit Agreement have been repaid or the date on which the Company has sold 125,000 gold equivalent ounces under the Pre-Petition Gold Supply Agreement.

14.     As of the Petition Date, the Debtors are still in the process of determining their obligations under the Pre-Petition Gold Supply Agreement.  In connection with the Pre-Petition Credit Agreement, the Senior Pre-Petition Lender's claims against the Debtors pursuant to the Pre-Petition Gold Supply Agreement are secured by a first-priority lien on the stock of Santa Fe's subsidiaries and substantially all of the Debtors' assets.

**C.    Sandstorm Gold Supply Agreement**

15.     On September 9, 2009, the Debtors entered into that certain *Purchase Agreement* (the "Sandstorm Gold Supply Agreement") with Sandstorm Barbados to deliver to Sandstorm

Barbados a portion of the life-of-mine gold production (excluding all silver production) from the Summit Mine.  In connection therewith, Lordsburg Mining, but none of the other Debtors, granted Sandstorm Barbados a charge, as described in the Sandstorm Gold Supply Agreement, over all of the "assets, property and undertaking" in respect of the Summit Mine.  On December 23, 2011, Sandstorm Barbados, the Senior Pre-Petition Lender, Lordsburg Mining, and Santa Fe Barbados (the "Sandstorm Agreement Parties") executed that certain *Intercreditor Agreement* that provides that, among other things, Sandstorm Barbados' interests shall at all times remain inferior, junior, and subordinate to the Senior Pre-Petition Lender's liens and interests.

16.     Under the Sandstorm Gold Supply Agreement, certain of the Debtors received an upfront deposit of $4.0 million and would receive future ongoing payments equal to the lesser of $400 per ounce or the prevailing market price (the "Fixed Price") for each ounce of gold delivered pursuant to the DIP Credit Agreement for the life of the mine.  The Debtors purchase and deliver refined gold in order to satisfy the requirements of the Sandstorm Gold Supply Agreement and receive the Fixed Price per ounce in cash from Sandstorm Barbados.  The difference between the prevailing market price and the Fixed Price per ounce for gold delivered is credited against the upfront deposit of $4.0 million until that obligation is reduced to zero.

17.     On March 29, 2011, the Sandstorm Agreement Parties executed an amendment to the Sandstorm Gold Supply Agreement that extended the original completion guarantee date from April of 2011 to June 30, 2012, and put in place a completion guarantee test.  In exchange for the amended completion guarantee date, the Debtors agreed to deliver an additional 700 ounces of gold at equivalent sales terms over and above the original agreement.  Under the terms of the amendment, the delivery of the additional gold was to be made prior to June 30, 2011.

18.     On June 28, 2011, the Sandstorm Agreement Parties executed a second amendment to the Sandstorm Gold Supply Agreement that extended the delivery date for the additional 700 ounces of gold to October 15, 2011.  In exchange for the deferred delivery date, the Debtors agreed to pay a per diem of 3 ounces of gold for each day the additional gold under the first amendment remained outstanding past June 30, 2011, which could be no later than October 15, 2011.  On August 9, 2011, the Debtors satisfied the requirements of the second amendment by delivering 817 ounces of gold.  The net cost of delivering the gold after receiving payment from Sandstorm Barbados of $400 per ounce delivered was $1,075,785.

19.     On June 30, 2012, the Debtors calculated the completion guarantee payable provided by the first amendment to the Sandstorm Gold Supply Agreement.  Based upon the provisions of the Sandstorm Gold Supply Agreement and the related completion guarantee test, incremental financing charges totaling $504,049 were recognized and accrued at June 30, 2012. These accrued charges, combined with the remaining uncredited liability for the upfront deposit, totaled $3,359,873 as of March 31, 2015.

20.     Under the Sandstorm Gold Supply Agreement, as of March 31, 2015, the Company has a recorded obligation of 3,709 ounces of undelivered gold valued at approximately $2.9 million, net of the Fixed Price of $400 per ounce to be received upon delivery.

**D.     IGS Convertible Secured Notes**

21.     In October and November 2012, the Debtors received from International Goldfields Limited ("IGS") advances totaling $3.9 million (Australian), representing cash proceeds of $3,985,000 (Australian), in connection with a contemplated business combination with IGS, as discussed below in greater detail.  The funds were advanced by way of two convertible secured notes (each a "Convertible Secured Note").  The Convertible Secured Notes bear interest at a rate of 6% per annum and have a three-year term.

22.     In June 2013, the Debtors negotiated for an additional capital injection from IGS up to an additional $2.0 million (Australian).  In connection therewith, the Debtors issued a third Convertible Secured Note to IGS.  The third Convertible Secured Note bears interest at a rate of 10% per annum, has a maturity date of October 31, 2015, and is secured by the Debtors' contractual rights in certain real property; however, the Debtors' relevant contractual rights expired in November of 2014 and thus the obligations under the third Convertible Secured Note are unsecured.  Upon a refinancing of the funding provided under the Pre-Petition Credit Agreement, the third Convertible Secured Note is repayable in cash or stock of Santa Fe, at IGS's election.  The Debtors have received advances totaling $1,250,000 in connection with the third Convertible Secured Note.

23.     As of March 31, 2015, the total outstanding principal balance under the three Convertible Secured Notes is $2,998,710 and accrued interest was $436,642.

**E.      Tyhee Bridge Loan Agreement**

24.     In conjunction with a proposed merger with Tyhee Gold Corp. ("Tyhee"), described below, Tyhee and the Debtors entered into a bridge loan agreement (the "Tyhee Bridge Loan Agreement"), pursuant to which Tyhee was obligated to advance up to $3.0 million to the Debtors (the "Tyhee Bridge Loan").  However, Tyhee advanced only $1,745,092 under the Tyhee Bridge Loan.  The Tyhee Bridge Loan bears interest at 2% per month on the outstanding principal amount.  Tyhee has given purported notice to Santa Fe that the Company is in default under the Tyhee Bridge Loan, and has demanded that Santa Fe repay $1,745,082 in principal and $569,986 in accrued interest and merger expenses.

**F.      Individual Senior Subordinated Convertible Notes**

25.     On October 30, 2007, the Debtors completed the placement of $450,000 of 10% senior subordinated convertible notes (the "Individual Senior Notes").  The Individual Senior

Notes were placed with three accredited investors for $150,000 each and bear interest at 10% per annum.  The notes had a term of 60 months, at which time all remaining principal and interest were due.

26.    In connection with the Individual Senior Notes issuance, Santa Fe issued 180,000 five-year warrants, reflecting a warrant for each $2.50 invested in the Individual Senior Notes. Each warrant gave the relevant holder the right to purchase one share of common stock at a price of $1.25 per share.  At the option of the holders of the Individual Senior Notes, the outstanding principal and interest were convertible at any time into shares of the Company's common stock at a conversion price of $1.25 per share.  The Individual Senior Notes were to be automatically converted into common stock if the weighted average closing sales price of the stock exceeded $2.50 per share for ten consecutive trading days.

27.    On October 31, 2012, the Individual Senior Notes became due and payable.  On January 15, 2013, the maturity dates for the Individual Senior Notes were extended for a period of two years from the original maturity dates.  Additionally, the convertible price of the Individual Senior Notes was reduced to $0.40 and the automatic conversion price of $2.50 was reduced to $0.80.  In connection with the extension of the Individual Senior Notes, 562,500 warrants were issued with a strike price of $0.40 and term of two years from the original maturity dates.  On October 23, 2014, 375,000 of these warrants expired and, on November 20, 2014, the remaining 187,500 expired.

28.    As of March 31, 2015, the outstanding principal balance on the Individual Senior Notes was $450,000 and, along with any unamortized discount, is classified as current.  Both principal and interest on the Individual Senior Notes are currently due and payable.

### G.    Canarc Bridge Loan

29.    As described in greater detail below, on July 15, 2014, Santa Fe entered into a Share Exchange Agreement (the "Share Exchange Agreement") with Canarc Resource Corp., a British Columbia, Canada corporation whose common shares are listed on the TSX Exchange under the symbol CCM ("Canarc").  In connection with the Share Exchange Agreement the Debtors and Carnac entered into that certain interim financing facility pursuant to which Canarc advanced the Company $220,000.  The loan bears interest at a rate of 1% a month and was due and payable upon the closing of a gold bond financing by the Debtors or January 15, 2015, if the gold bond financing did not close.  As noted below, the financing failed to close and the entire amount of the loan is outstanding and in default.

### H.    Convertible Unsecured Notes

30.    Finally, the Debtors are a party to two agreements under which they have issued convertible unsecured notes.  As of the Petition Date, approximately $225,400 (including accrued and unpaid interest) is outstanding under convertible unsecured notes.

## III.    Negotiation of the DIP Facility

31.    As noted in the First Day Declaration, upon being made aware of the Debtors' restructuring efforts and the investment banking assistance contemplated by Canaccord Genuity Inc. ("Canaccord"), the Senior Pre-Petition Lender, the Debtors' most significant, and senior secured, prepetition lender offered to provide the Debtors with financing to support a sale process within the context of a chapter 11 proceeding, and proposed serving as a "stalking horse" bidder for the Debtors' assets in a sale under section 363 of the Bankruptcy Code.  Prior to this point, the Debtors and their advisors had considered potential sources of debtor-in-possession ("DIP") financing aside from the Senior Pre-Petition Lender, and even inquired as to whether the Senior Pre-Petition Lender would agree to allow a priming DIP loan provided by a third party

lender.  the Senior Pre-Petition Lender advised the Debtors that it would not consent to a priming DIP facility.  During the Debtors' efforts to identify alternative financing, the Debtors' advisors contacted several potential DIP lenders, including not only those that were familiar with the Debtors' assets and industry, but also certain financial investors with the ability to  promptly evaluate potential investment opportunities.  Unfortunately, despite these efforts, the Debtors were unable to obtain any alternative proposals for DIP financing.

32.     Accordingly, because of the expedited need to commence the Chapter 11 Cases in light of the Debtors' cash position, and the lack of interest from the numerous other financing options that had been consulted, the Debtors concluded that they would be unable to obtain any alternative proposals for DIP financing.

33.     The Debtors then engaged in good-faith, arm's length negotiations regarding the DIP Credit Agreement with the Senior Pre-Petition Lender.   During this time, the Debtors continued to explore whether additional financing might be available, other than the Senior Pre-Petition Lender, and those efforts were unavailing.

34.     During the course of the Debtors' negotiations with the Senior Pre-Petition Lender, the Debtors, among other things, explored the Senior Pre-Petition Lender's willingness to provide financing without the requested fees, milestones and other lender-protections that are included in the DIP Facility.  The Debtors' efforts culminated in the proposed DIP Facility, which is described below.  After the Debtors' good-faith and arm's length efforts, the Debtors believe that, under the circumstances of these cases and the Debtors' financial condition, the Debtors have obtained terms that are fair and reasonable and are the best available to the Debtors.  Equally important, the Debtors believe that the DIP Facility will provide the Debtors with the funds that are immediately needed in order to maintain and preserve the value of the Debtors' assets and also

will provide the Debtors' the necessary liquidity to conduct an open process to sell their assets and obtain maximum value for their stakeholders.

### The Proposed DIP Facility

35.    The significant terms of the DIP Credit Agreement and the other DIP Loan Documents to be executed in connection therewith and to which the DIP Facility refers are as follows:

| OVERVIEW OF THE DIP FACILITY | |
|---|---|
| **Borrower:** | Santa Fe Gold Corporation |
| **Guarantors:** | Santa Fe Gold (Barbados) Corporation, The Lordsburg Mining Company, Azco Mica Inc. |
| **DIP Lender:** | Waterton Global Value, L.P., by its investment manager, Altitude Management Limited |
| **DIP Facility:** | Upon the entry of the Final Order, senior secured priming and superpriority post-petition financing in a total amount of $1,580,148, plus the Roll Up Loans. |
| **Uses of Proceeds/Roll-Up:** | The DIP Facility will be used to, among other things, (i) make payments, as permitted by the Approved Budget, for operating expenses, general and ordinary purposes of the Debtors, and for other administrative expenses, including budgeted professional fees, all subject to the conditions set forth in the final DIP Loan Documents and in the Interim Order and (ii) convert the Initial Roll Up Amount into Roll Up Loans. Concurrent with the funding by the DIP Lender of the first draw under the Term Loan, the Initial Roll-Up Amount will be converted into Roll Up Loans.  Concurrent with the funding by the DIP Lender of the second draw under the Term Loan, the remaining Pre-Petition Obligations will be converted into Roll Up Loans |
| | The initial Approved Budget is attached to the Interim Order as **Exhibit A**. |
| | *Interim Order Recitals ii & iv and  DIP Credit Agreement § 2.3(b) & § 10.1(u)* |
| **Termination Date:** | The date that is the earliest of (i) the Maturity Date; (ii) the acceleration of all or any portion of the Obligations; (iii) thirty-five days after the entry by the Bankruptcy Court of the Interim Order, unless the Final Order shall have been entered and become effective prior thereto; (iv) the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code unless otherwise consented to in writing by the Lender; (v) the dismissal of any of the Chapter 11 Cases unless otherwise consented to in writing by the Lender; (vi) the effective date of any Debtor's plan of reorganization confirmed in the Chapter 11 Cases; (vii) the closing of a sale of substantially all the assets of the |

Debtors, (viii) the filing of a plan of reorganization in the Cases by any party other than the Debtors without the consent of the Lender; (ix) the Debtors seek or propose to sell all or substantially all the assets of the Debtors and such sale does not provide for payment in full of all the Obligations without the consent of the Lender, and (x) the exercise by Sandstorm Barbados of the "Assignment and Purchase Option" (as defined in the Intercreditor Agreement).

*Interim Order ¶ 14 and DIP Credit Agreement § 1.1*

| | |
|---|---|
| **Use of Cash Collateral; Entities with an Interest in Cash Collateral:** | The Debtors are authorized to use the Cash Collateral—including Cash Collateral in which the DIP Lender, the Senior Pre-Petition Lender and the Second Lien Pre-Petition Lender have a lien or other interest, in each case whether existing on the Petition Date, arising pursuant to the Interim Order or otherwise—to fund, in each case only to the extent specified in the Approved Budget (subject to the permitted variance), (a) operating expenses and other amounts for general and ordinary course purposes of the Credit Parties, (b) current interest and fees payable pursuant to the Credit Documents, (c) make adequate protection payments required under the Interim Order and the Final Order, and (d) such other administrative payments, including the budgeted professional fees, as may be authorized and approved by the DIP Lender under the Interim Order, the Final Order or any subsequent order of the Bankruptcy Court |

*Interim Order Recital vii and DIP Credit Agreement § 10.1(u)(i).*

| | |
|---|---|
| **Interest Rates/Default Rate:** | <u>Interest Rate</u>:  12% per annum. |
| | <u>Default Rate</u>:  The Interest Rate plus 2%. |

*DIP Credit Agreement §§ 1.1 & 3.2(c)*

| | |
|---|---|
| **Fees:** | <u>Structuring Fee</u>.  On the date of the First Drawing under the Term Loan, the Borrower shall pay to the Lender a one-time cash structuring fee in the amount of 2% of the Term Loan Commitment. |
| | <u>Termination Fee</u>.  On the Termination Date (or if sooner, the date of any prepayment of the Term Loan), the Borrower shall pay to the Lender a termination fee in the amount of 3% of the Term Loan Commitment. |
| | <u>Extension Fee</u>.  On any date which is at least 10 days but not more than 30 days prior to the Initial Maturity Date, the Lender and the Borrower may agree in writing to extend the Maturity Date to a date that is six months following the Initial Maturity Date, subject to (i) the written approval of the Lender, which approval shall be in its sole and absolute discretion and (ii) the payment to the Lender of a non-refundable fee in the amount of 2% of the aggregate principal amount of the Loans and Term Loan Commitment being extended (the "<u>Extension Fee</u>"), which fee shall be earned in full upon the granting of any such extension and be payable in full upon the Termination Date, without further application to or order of the Bankruptcy Court. |

*DIP Credit Agreement § 2.1 & 3.3*

<u>Professional Fees and Expenses</u>.  The Debtors are obligated to pay the professional fees and expenses of the Senior Pre-Petition Lender and the

DIP Lender.

*Interim Order ¶¶ 2(f) and 3(f)*

**Conditions to Borrowing:** Certain customary conditions precedent to extensions of credit, including, among other things, (a) execution of the DIP Loan Documents; (b) entry of the DIP Orders; (c) payment of certain fees and expenses required by the DIP Loan Documents; (d) receipt by the Lender of a Borrowing Notice; (e) entry by the Court of all "first day orders," each in a form and substance reasonably satisfactory to the DIP Lender; and (f) no Default shall have occurred or be existing.

*DIP Credit Agreement § 8.1(a) and 8.2(a)*

**DIP Collateral:** As identified in Section 7.1 of the Credit Agreement, each Debtor's right, title and interest in, to and under all property and assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of such Credit Party, whether owned or consigned by or to, or leased from or to, such Credit Party, and regardless of where located, but expressly excluding the "Excluded Collateral" as defined in Section 7.1 of the Credit Agreement, and all other "property of the estate" (as defined in section 541 of the Bankruptcy Code) of any kind or nature, real or personal, tangible, intangible, or mixed, now existing or hereafter acquired or created, and all rents, products, substitutions, accessions, profits, replacements, and cash and non-cash proceeds of all of the foregoing, in each case wherever located. For the avoidance of doubt, Avoidance Actions are Excluded Collateral but, after entry of the Final Order, the proceeds of Avoidance Actions will not be Excluded Collateral.

*Interim Order ¶ 2(h) & DIP Credit Agreement § 7.1*

**Liens and Priorities of DIP Obligations:** DIP Liens: As security for the DIP Obligations, effective as of the Petition Date, the following security interests and liens, which shall immediately and without any further action by any Person be valid, binding, permanent, perfected, continuing, enforceable, and non-avoidable upon the entry of the Interim Order, are granted by each Debtor to the DIP Lender, on all of its right, title and interest in, to and under the DIP Collateral:

(I)      pursuant to section 364(c)(2) of the Bankruptcy Code, a fully perfected, binding, continuing, enforceable, and non-avoidable first priority lien on all unencumbered DIP Collateral, including, subject to the entry of the Final Order, the proceeds of the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state or municipal law (collectively, the "Avoidance Actions", which for avoidance of doubt, excludes Debtors' claims and causes of action under section 549 of the Bankruptcy Code or similar state or municipal law and the proceeds of each of the foregoing), whether received by judgment, settlement, or otherwise;

(II)      pursuant to section 364(d)(1) of the Bankruptcy Code, a fully perfected, binding, continuing, enforceable and non-avoidable first priority, senior priming lien on all other DIP Collateral (including Cash

Collateral), which DIP Lien (x) shall be senior to the Adequate Protection Liens and (y) shall be senior to and prime any and all valid, perfected, enforceable and non-avoidable pre-petition and post-petition liens, tax liens or other non-consensual liens in existence as of the Petition Date and properly perfected prior to the Petition Date (the liens referenced in clauses (x) and (y), collectively, the "Primed Liens") and shall be subject only to the Carve-Out.

*Interim Order ¶ 2(h) and DIP Credit Agreement § 7.9*

Superpriority Administrative Claim Status:  In addition to the DIP Liens granted in the DIP Credit Agreement, effective immediately upon entry of the Interim Order, all of the DIP Obligations shall constitute allowed superpriority administrative claims pursuant to section 364(c)(1) of the Bankruptcy Code, which shall have priority, subject only to the Carve-Out in accordance with the Interim Order, over all administrative expense claims, adequate protection and other diminution claims (including the Adequate Protection Priority Claims (as defined below)), priority claims and other unsecured claims, and all other claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses or other claims of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, and 1114 or any other provision of the Bankruptcy Code or otherwise, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment (the "DIP Superpriority Claims").  The DIP Superpriority Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all pre-petition and post-petition property of the Debtors and all proceeds thereof, including, subject to the entry of the Final Order, Avoidance Actions and the proceeds thereof.  Other than as expressly provided in the DIP Credit Agreement and/or the Interim Order with respect to the Carve-Out, no costs or expenses of administration, including professional fees allowed and payable under sections 328, 330, or 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these proceedings, or in any Successor Cases, and no priority claims are, or will be, senior to, prior to, or on a parity with the DIP Superpriority Claims or the DIP Obligations, or with any other claims of the DIP Lender arising under the DIP Loan Documents and/or the Interim Order.

*Interim Order ¶ 2(i)*

**Carve-Out:**

Subject to the terms and conditions contained in the Interim Order, each of the DIP Liens, the DIP Superpriority Claims, the Waterton Pre-Petition Liens, the Sandstorm Pre-Petition Liens, the Adequate Protection Liens, and the Adequate Protection Claims shall be subject to payment of the Carve-Out in accordance with the terms of the Interim Order:

Carve-Out.  For purposes of the Interim Order, "Carve-Out" means the

sum of (i) the aggregate amount of any reasonable and unpaid fees, costs and expenses that were accrued or incurred prior to the Carve-Out Date by the professionals retained by the Debtors or any professionals retained by the Committee (collectively, the "Professionals") to the extent allowed by an order of the Bankruptcy Court and in compliance with the Approved Budget, plus (ii) those reasonable fees, costs and expenses incurred by Professionals after the Carve-Out Date and subsequently allowed by order of the Bankruptcy Court and in compliance with the Approved Budget, plus (iii) the Success Fee of Canaccord Genuity Inc. as set forth (and defined) in its engagement letter arising from of a sale of substantially all the assets of the Debtors to the extent such Success Fee is allowed by the Bankruptcy Court at any time, whether by interim order, procedural order or otherwise, plus (iv) fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee pursuant to 28 U.S.C. § 1930; provided that (x) the amounts described in items (i) and (ii) of this paragraph shall not exceed $350,000 in the aggregate (the "Carve-Out Cap") and (y) following the Carve-Out Date any amounts paid to Professionals by any means will reduce the Carve-Out on a dollar-for-dollar basis.

*Interim Order ¶ 8 and DIP Credit Agreement § 1.1*

| | |
|---|---|
| **Senior Pre-Petition Lender's and Second Lien Pre-Petition Lender's Adequate Protection:** | In consideration for the use of the Waterton Pre-Petition Collateral (including Cash Collateral) and the Sandstorm Pre-Petition Collateral,[5] and solely to the extent that the Debtors have value in the DIP Collateral, the Senior Pre-Petition Lender and the Second Lien Pre-Petition Lender shall receive, as applicable, the following adequate protection (collectively referred to as the "Pre-Petition Adequate Protection"): |

Senior Adequate Protection Liens. To the extent there is a diminution in value of the Senior Pre-Petition Lender's interests in the Waterton Pre-Petition Collateral (including Cash Collateral) from and after the Petition Date, whether or not resulting from the use, sale, or lease by the Debtors of the applicable Waterton Pre-Petition Collateral (including Cash Collateral), the granting of the DIP Superpriority Claims, the granting of the DIP Liens, the imposition of the Carve-Out, or the imposition or enforcement of the automatic stay of section 362(a) of the Bankruptcy Code (a "Diminution in Waterton Pre-Petition Collateral Value"), the Senior Pre-Petition Lender is granted, subject to the terms and conditions set forth below, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, replacement security interests in and liens and mortgages upon all of the DIP Collateral, including, subject to the entry

---

[5] All obligations of the Debtors to the Second Lien Pre-Petition Lender arising under the Sandstorm Gold Supply Agreement and the other agreements and documents executed or delivered in connection therewith (each as may be amended, restated, supplemented, or otherwise modified from time to time, the "Sandstorm Documents") are referred to herein as the "Second Lien Pre-Petition Indebtedness." Pursuant to the Sandstorm Documents, the Second Lien Pre-Petition Lender was granted a charge, as described in the Sandstorm Gold Supply Agreement, over all of the assets, property and undertaking of The Lordsburg Mining Company in respect of the Summit Mine to secure The Lordsburg Mining Company's guarantee obligations under the Sandstorm Gold Supply Agreement (the "Sandstorm Pre-Petition Collateral" and the liens securing the Sandstorm Pre-Petition Collateral, the "Sandstorm Pre-Petition Liens").

of the Final Order, the proceeds of Avoidance Actions (such adequate protection replacement Liens, the "<u>Senior Adequate Protection Liens</u>"), which Senior Adequate Protection Liens on such DIP Collateral shall be junior and subordinate only to the DIP Liens and the Waterton Pre-Petition Liens and subject to the Carve-Out.

<u>Second Lien Adequate Protection Liens</u>.   To the extent there is a diminution in value of the Second Lien Pre-Petition Lender's interests in the Sandstorm Pre-Petition Collateral from and after the Petition Date, whether or not resulting from the use, sale, or lease by the Debtors of the applicable Sandstorm Pre-Petition Collateral, the granting of the DIP Superpriority Claims, the granting of the DIP Liens, the subordination of the Sandstorm Pre-Petition Liens thereto, the imposition of the Carve-Out, or the imposition or enforcement of the automatic stay of section 362(a) of the Bankruptcy Code (a "<u>Diminution in Sandstorm Pre-Petition Collateral Value</u>"), the Second Lien Pre-Petition Lender is granted, subject to the terms and conditions set forth in the Interim Order, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, replacement security interests in and liens and mortgages upon the portion of the DIP Collateral solely to the extent of and in a manner that is consistent with the nature, type and scope of the Sandstorm Pre-Petition Collateral (such adequate protection replacement Liens, the "<u>Second Lien Adequate Protection Liens</u>" and, together with the Senior Adequate Protection Liens, the "<u>Adequate Protection Liens</u>"), which Second Lien Adequate Protection Liens on such DIP Collateral shall be junior and subordinate to the DIP Liens, the Senior Adequate Protection Liens and the Waterton Pre-Petition Liens, and subject to the Carve-Out.

<u>Senior Adequate Protection Priority Claims</u>.   To the extent of Diminution in Waterton Pre-Petition Collateral Value, the Senior Pre-Petition Lender is further granted allowed superpriority administrative claims (such adequate protection superpriority claims, the "<u>Senior Adequate Protection Priority Claims</u>"), pursuant to section 507(b) of the Bankruptcy Code, with priority over all administrative expense claims and priority over other unsecured claims against the Debtors or their estates, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to the entry of the Final Order to the extent provided in Paragraph 9), 507(a), 507(b), 546(c), 546(d), 726 , 1113, 1114 or any other provision of the Bankruptcy Code or otherwise, junior only to the DIP Superpriority Claims and subject to the Carve-Out, and payable from and having recourse to all pre-petition and post-petition property of the Debtors and all proceeds thereof (including, subject to entry of the Final Order, all proceeds of Avoidance Actions); <u>provided</u>, <u>however</u>, that the Senior Pre-Petition Lender shall not receive or retain any payments, property, or other amounts in respect of the Senior Adequate Protection Priority Claims unless and until all DIP Obligations have been paid in full.   Subject to the relative priorities set forth above, the Senior Adequate Protection Priority Claims against each Debtor shall be allowed and enforceable against each Debtor and its estate on a joint and

several basis.

Second Lien Adequate Protection Priority Claims.  To the extent of Diminution in Sandstorm Pre-Petition Collateral Value, the Second Lien Pre-Petition Lender is further granted allowed superpriority administrative claims (such adequate protection superpriority claims, the "Second Lien Adequate Protection Priority Claims" and, together with the Senior Adequate Protection Priority Claims, the "Adequate Protection Priority Claims"), pursuant to section 507(b) of the Bankruptcy Code, with priority over all administrative expense claims and priority over other unsecured claims, in each case solely against Debtor The Lordsburg Mining Company or its estate, now existing or hereafter arising, of any kind or nature whatsoever, including administrative expenses of the kind specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c) (subject to the entry of the Final Order to the extent provided in Paragraph 9), 507(a), 507(b), 546(c), 546(d), 726 , 1113, 1114 or any other provision of the Bankruptcy Code or otherwise, junior only to the DIP Superpriority Claims and the Senior Adequate Protection Priority Claims and subject to the Carve-Out, and payable from and having recourse to the pre-petition and post-petition property of Debtor The Lordsburg Mining Company and proceeds thereof; provided, however, that the Second Lien Pre-Petition Lender shall not receive or retain any payments, property, or other amounts in respect of the Second Lien Adequate Protection Priority Claims unless and until all DIP Obligations and Senior Adequate Protection Priority Claims have been paid in full.  Subject to the relative priorities set forth above, the Second Lien Adequate Protection Priority Claims against Debtor The Lordsburg Mining Company shall be allowed and enforceable only against Debtor The Lordsburg Mining Company.

Priority of Adequate Protection Liens and Adequate Protection Priority Claims.  The Adequate Protection Liens and the Adequate Protection Priority Claims (A) shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code or, subject to entry of the Final Order, section 506(c) of the Bankruptcy Code or the "equities of the case" exception of section 552 of the Bankruptcy Code, (B) shall not be subordinate to, or pari passu with, (x) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise or (y) any liens or claims of any Debtor or any direct or indirect subsidiary thereof against any Debtor or any of such Debtor's property, and (C) shall be valid, binding, perfected and enforceable against any trustee or any other estate representative elected or appointed in the Chapter 11 Cases or any Successor Cases, and/or upon the dismissal of any of the Cases.  The Adequate Protection Liens shall be junior to the DIP Liens and the Senior Pre-Petition Lender's liens arising under any Senior Pre-Petition Credit Documents, and senior to any other liens, including, without limitation, to any other adequate protection replacement liens.  Finally, for the avoidance of doubt the Second Lien Adequate Protection Liens and the Second Lien Adequate Protection Priority Claims may only be asserted against Debtor The Lordsburg Mining Company and shall be junior to the Senior Adequate Protection

Liens and the Senior Adequate Protection Priority Claims.

<u>Interest and Professional Fees</u>.  Without limiting any rights of the Senior Pre-Petition Lender under section 506(b) of the Bankruptcy Code, which rights are preserved by the Interim Order, and in consideration, and as a requirement, for obtaining the Senior Pre-Petition Lender's consent to the entry of the Interim Order and the Debtors' consensual use of Cash Collateral as provided in the Interim Order and as addition adequate protection, (i) the Senior Pre-Petition Lender's fees, costs, expenses, and charges (including the reasonable fees, costs, and expenses of counsel and financial advisors for the Senior Pre-Petition Lender) to the extent, and at the times, payable under the Senior Pre-Petition Credit Documents, including any unpaid fees, costs and expenses accrued prior to the Petition Date, and (ii) all of the interest accruing under the Senior Pre-Petition Credit Documents at the default rate(s) set forth therein, in the case of each of sub-clauses (i) and (ii) above, whether or not budgeted in the Approved Budget, and without further notice, motion, or application to, order of, or hearing before, the Court, shall accrue during these Chapter 11 Cases, shall be deemed to be included in the Senior Pre-Petition Indebtedness and, other than the Initial Roll Up Amount, subject to the entry of the Final Order, shall be converted into Roll Up Loans in accordance with the DIP Credit Agreement; <u>provided</u>, <u>however</u>, that any payment, accrual or conversion into Roll UP Loans of post-petition interest or reimbursement of post-petition fees, costs and expenses under the Senior Pre-Petition Credit Documents shall be reapplied to reduce the principal amount of the Senior Pre-Petition Indebtedness to the extent the Court determines in a final, non-appealable order that the Senior Pre-Petition Lender is not entitled to such payment, accrual or reimbursement pursuant to section 506(b) of the Bankruptcy Code.

<u>Right to Seek Additional Adequate Protection</u>.  The Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Senior Pre-Petition Lender to seek additional or alternative forms of adequate protection at any time; <u>provided</u> that any such additional or alternative adequate protection shall at all times be subordinate and junior to the claims and liens of the DIP Lender granted under the Interim Order and the DIP Loan Documents.

*Interim Order ¶ 3*

| | |
|---|---|
| **Financial, Reporting, and Other Covenants:** | Article 10 of the DIP Credit Agreement contains covenants customary and appropriate for DIP financings of this type and substantially similar to covenants set forth in the Senior Pre-Petition Credit Documents, including, but not limited to, (a) provision of and compliance with the Approved Budget, (b) reporting of financial information, (c) operation and maintenance of properties, (d) limitation on incurrence of indebtedness and disposition of assets, and (e) maintenance of and prohibitions against liens on properties. |

*DIP Credit Agreement Article 10*

| | |
|---|---|
| **Events of Default:** | (a)     Non-Payment.  A Credit Party fails to make payment of any Obligation (whether for principal, interest, costs, fees, expenses or any |

other amount due hereunder or under any other Credit Document) when due and payable pursuant to any of the terms of a Credit Document (whether on a payment date, by prepayment, on demand or otherwise);

(b)     Misrepresentation.   Any representation or warranty or certification made or deemed to be made by a Credit Party or any of its respective directors or officers in any Credit Document shall prove to have been incorrect, incomplete or misleading in any respect when made or deemed to be made;

(c)     Breach of Covenants.  A Credit Party fails to perform, observe or comply with:

> (i)     any of the covenants or any other provision or obligation contained in Section 10.1(n), Section 10.1(u), Section 10.1(v), Section 10.1(w), Section 10.1(x), Section 10.1(y) or Section 10.2 of the DIP Credit Agreement;

> (ii)    the covenant or any other provision or obligation contained in Section 10.1(cc) of the DIP Credit Agreement, and such failure continues for a period of twenty-five (25) days, provided in such case the Credit Party is proceeding diligently to remedy such failure; or

> (iii)   any other covenant or any other provision or obligation contained in any Credit Document to which it is a party and such failure is not capable of being remedied or, if capable of being remedied, continues for a period of five (5) Business Days, provided in such case the Credit Party is proceeding diligently to remedy such failure and the Lender is not prejudiced thereby;

(d)     Cross-Default.  A Credit Party (or any Subsidiary of any Credit Party) fails to pay the principal of, premium, if any, interest on, or any other amount relating to, any of its Debt entered into (x) Pre-Petition and which, subject to the entry of the Final Order, is rolled up after the Petition Date or is not subject to the automatic stay provisions of Section 362 of the Bankruptcy Code or (y) Post-Petition, the principal of which Debt exceeds $100,000 (or the equivalent amount in any other currency) when such amount becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise); or any other event occurs or condition exists if its effect is to accelerate, or permit the acceleration of such Debt; or any such Debt shall be (or may be) declared to be due and payable prior to its stated maturity;

(e)     Material Contracts.  A Credit Party fails to perform or observe any material term, covenant or agreement contained in any Material Contract on its part to be performed or observed (other than as a result of the Cases); or any Material Contract is amended without the prior written consent of the Lender and such amendment could have a Material Adverse Effect; or any Material Contract is terminated or revoked or permitted to lapse (other than in accordance with its terms and not as a result of default); or any party to any Material Contract delivers a notice of termination or revocation in respect of such Material Contract and such Material Contract is subsequently terminated or revoked, in each

case without the written consent of Lender;

(f)     Judgments.  Any judgment or order for the payment of money in excess of $100,000 (or the equivalent amount in any other currency) is rendered against a Credit Party (or any Subsidiary of any Credit Party);

(g)     Unenforceability of Pre-Petition Documentation.  Except as a result of an Effect of Bankruptcy (including the second conversion of the Roll Up Loan in accordance with the DIP Credit Agreement):

> (i)     any material provision of any Pre-Petition Credit Document shall cease to be in full force and effect;

> (ii)     any Pre-Petition Credit Document is revoked or terminated, becomes unlawful or is declared null and void by a Governmental Entity of competent jurisdiction; or

> (iii)     any Pre-Petition Credit Document becomes unenforceable, is repudiated or the enforceability thereof is contested or disaffirmed by or on behalf of any party thereto other than the Pre-Petition Lender.

(h)     Dissolution.  Any application is made for, or order, judgment or decree is entered against any Credit Party decreeing, the winding-up or dissolution, or any similar process of such Credit Party and, in the case of an application, such application remains undischarged or unstayed for any period or a resolution is passed for the winding-up, dissolution or liquidation of any of the Credit Parties (or any Subsidiary of any Credit Party);

(i)     Security Imperiled.  Any Credit Document is declared by a court or tribunal of competent jurisdiction to be void, invalid, illegal or unenforceable or the validity, legality or enforceability thereof is contested by any Credit Party or any other Person party thereto (other than the Lender), or any Credit Party or any other Person party thereto denies that it has any or further obligations thereunder;

(j)     Agreed Priority of Collateral.  If any one or more of the Credit Documents ceases to be in full force and effect or any DIP Lien is no longer effective to create in favor of the Lender, a legal, valid and perfected Lien in any Collateral with the Agreed Priority;

(k)     Change of Control.  A Change of Control occurs;

(l)     Material Adverse Effect.  Any event, circumstance or condition which could reasonably be expected to have a Material Adverse Effect has occurred;

(m)     Expropriation/Condemnation.   An Expropriation Event shall have occurred;

(n)     Regulatory Action.  Other than an order of the Bankruptcy Court pursuant to the Cases consented to by the Lender in writing, any Governmental Entity shall take or attempt to take any action with respect to a Credit Party, or with respect to any Mining Property or any Collateral subject to the Security Documents, which has, had or could reasonably be expected to have a Material Adverse Effect on a Credit

Party or the ability of the Borrower or any other Credit Party to satisfy its Obligations in a timely manner unless such action is set aside, dismissed or withdrawn within five days of its institution or such action is being contested in good faith, its effect is stayed during such contest, the Credit Parties are allowed to continue the development and operation of each Mining Property during such period, and the same would not be expected to have a Material Adverse Effect;

(o)      Project Operations.  Without the prior written consent of the Lender, any material Mining Property, or any portion thereof, shall be abandoned or terminated, or exploration not contemplated by the Approved Budget, development or operation of the Projects or any other material Mining Property shall be commenced;

(p)      Financial Statements.  The audited financial statements of any Credit Party (or any Subsidiary of any Credit Party) are qualified in any respect by such Credit Party's or such Subsidiary's independent auditors, other than as a result of the Cases.  For certainty, a qualification from an independent auditor that the Credit Party may not be able to remain a going concern due to a working capital deficit or the existence of the Cases, shall not constitute an Event of Default.

(q)      Reorganization Matters.  Any of the following occurs in any Chapter 11 Case:

(i)      the bringing of a motion or taking of any action by a Debtor:  (A) to obtain additional financing under Section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to the DIP Credit Agreement; (B) to grant any Lien other than Permitted Liens upon or affecting any Collateral; (C) except as provided in the Interim Order, Final Order or Approved Budget, as the case may be, to use cash collateral under Section 363(c) of the Bankruptcy Code without the prior written consent of the Lender;

(ii)      the entry of an order in any of the Chapter 11 Cases confirming a plan or plans of reorganization that does not contain a provision for termination of the DIP Facility and repayment in full in cash of all the Obligations on or before the effective date of such plan or plans;

(iii)      the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Credit Documents or the Interim Order or the Final Order without the written consent of the Lender or the filing by a Debtor of a motion for reconsideration with respect to the Interim Order or the Final Order;

(iv)      the Interim Order is not entered on or before the date that is three days after the Petition Date;

(v)      the Final Order is not entered on or before the date that is 35 days after the date of entry of the Interim Order;

(vi)      the payment of any Pre Petition claim unless

(A) reflected in the Approved Budget or (B) authorized pursuant to an order approved by the Bankruptcy Court and made with the written consent of the Lender, which consent shall not be unreasonably withheld;

(vii)    the allowance of any claim or claims under Sections 506(c) or 552(b) of the Bankruptcy Code or otherwise against the Collateral;

(viii)    the appointment of an interim or permanent trustee in any Chapter 11 Case or the appointment of a receiver or an examiner in any Chapter 11 Case with expanded powers to operate or manage the financial affairs, the business or reorganization of a Debtor;

(ix)    the sale, without the written consent of the Lender, of all or substantially all of a Debtor's assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Cases, or otherwise that does not provide for payment in full in cash of the Obligations;

(x)    the dismissal of any Chapter 11 Case, or the conversion of any Chapter 11 Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code or a Debtor shall file a motion or other pleading seeking the dismissal of any Chapter 11 Case under Section 1112 of the Bankruptcy Code or otherwise;

(xi)    the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code to allow any creditor other than the Lender to proceed against any assets of a Debtor with an aggregate value in excess of $20,000;

(xii)    the entry of an order in any Chapter 11 Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations;

(xiii)    the failure of a Debtor to perform any of its obligations under the Interim Order or the Final Order;

(xiv)    the entry of an order in any of the Chapter 11 Cases granting any other super-priority claim or Lien equal or superior to the DIP Lien of the Lender;

(xv)    a Debtor engages in or supports any challenge to the validity, perfection, priority, extent or enforceability of the DIP Facility or the Pre-Petition Obligations or the Liens on or security interests in the assets of such Debtor securing the DIP Facility or the Pre-Petition Obligations, including seeking to equitably subordinate or avoid the liens securing the Pre-Petition Obligations provided, however, it shall not constitute an Event of Default if a Debtor responds to diligence or discovery requests from, or provides basic loan information with respect to the Pre-Petition Obligations to, a party in interest or pursuant to an order of the Bankruptcy Court and provides prior written

notice to the Lender of its intention or obligation to do so;

(xvi)    a Debtor engages in or supports any investigation or asserts any claim or cause of action (or supports the assertion of the same) against the Lender or the Pre-Petition Lender; provided, however, it shall not constitute an Event of Default if a Debtor responds to diligence or discovery requests from, or provides basic loan information with respect to the Pre-Petition Obligations to a party in interest or pursuant to an order of the Bankruptcy Court and provides prior written notice to the Lender of its intention or obligation to do so;

(xvii)    any Person shall seek a Section 506(a) Determination with respect to the Pre-Petition Obligations that is unacceptable to the Pre-Petition Lender;

(xviii)   the entry of an order extending any exclusive right that any Debtor may have to propose a plan more than 120 days after the Petition Date, or to solicit votes or to seek confirmation of a plan on a date more than 180 days after the Petition Date, in either case without the written consent of the Lender;

(xix)    any Material Contract is rejected in any of the Cases without the prior consent of the Lender;

(xx)    the occurrence of the Termination Date; or

(xxi)    any Milestone is not achieved within the applicable time frame set forth in the definition of "Milestone", or the entry of an order of the Bankruptcy Court that precludes any such Milestone from being achieved within the applicable time frame.

*DIP Credit Agreement § 11.1*

**Milestones**

(a)    no later than 30 days following the Petition Date, the Debtors shall have filed with the Bankruptcy Court a motion including procedures for the sale of substantially all the assets of the Debtors, which procedures are reasonably likely to result in the consummation of such sale no later than the Maturity Date and are in form and substance acceptable to Lender;

(b)    no later than 30 days following the filing of the motion referred to in the foregoing clause (a), the Bankruptcy Court shall have entered a final order approving bid procedures for the sale of substantially all the assets of the Debtors, which procedures provide that (x) the Lender may credit bid all or any portion of the Obligations in connection with such sale pursuant to Section 363(k) of the Bankruptcy Code and (y) Lender shall have a right to act as a "stalking horse" bidder in such sale, and which procedures are otherwise in form and substance acceptable to Lender; and

(c)    no later than 55 days following the entry of the order referred to in the foregoing clause (b), the Bankruptcy Court shall have entered a final order approving the final sale of substantially all the assets of the Debtors and, if the Lender is not the successful bidder in such sale, the sale shall provide for the payment in full in cash of the Obligations;

(d)      no later than 21 days following the entry of the order referred to in the foregoing clause (c), the final sale of substantially all the assets of the Debtors shall have closed.

*DIP Credit Agreement § 1.1*

**Automatic Stay and Remedies:**

The automatic stay imposed under section 362(a) of the Bankruptcy Code is vacated and/or modified pursuant to the terms of the Interim Order and the DIP Loan Documents as necessary to (i) permit the Debtors to grant the Adequate Protection Liens and the DIP Liens and to incur all liabilities and obligations to the DIP Lender, under the DIP Loan Documents, the DIP Facility, and the Interim Order, (ii) authorize the DIP Lender and the Senior Pre-Petition Lender to retain and apply payments made in accordance with the DIP Loan Documents and the Senior Pre-Petition Credit Documents, (iii) to permit each of the DIP Lender and the Senior Pre-Petition Lender to perform any act authorized under the Interim Order and the DIP Loan Documents, and (iv) otherwise to the extent necessary to implement and effectuate the provisions of the Interim Order and the DIP Loan Documents.

*Interim Order ¶ 5*

(a)      If any Event of Default has occurred and is continuing, the Lender shall, notwithstanding the provisions of Section 362 of the Bankruptcy Code (the automatic stay of Section 362 of the Bankruptcy Code shall be deemed modified and vacated to permit the Lender to exercise its remedies under the DIP Credit Agreement and the Credit Documents), without any application, motion or notice to, hearing before, or order from, the Bankruptcy Court: (i) terminate the DIP Facility; (ii) reduce the Term Loan Commitment from time to time; (iii) declare all or any portion of the Obligations due and payable; (iv) increase the rate of interest applicable to the Obligations to the Default Rate; (v) direct any or all of the Credit Parties to sell or otherwise dispose of any or all of the Collateral on terms and conditions acceptable to the Lender pursuant to Sections 363, 365 and other applicable provisions of the Bankruptcy Code (and, without limiting the foregoing, direct any Credit Party to assume and assign any lease or executory contract included in the Collateral to the Lender's designees in accordance with and subject to Section 365 of the Bankruptcy Code); (vi) enter onto the premises of any Credit Party in connection with an orderly liquidation of the Collateral; and (vii) exercise any rights and remedies provided to the Lender the Credit Documents or at law or equity, including all remedies provided under the UCC and pursuant to the Interim Order and the Final Order.

(b)      Notwithstanding anything to the contrary contained in the DIP Credit Agreement, the Lender shall not be permitted to exercise any remedy (other than those described in clauses (i), (ii), (iii) and (iv) of Section 11.2(a) of the DIP Credit Agreement)  unless the Lender shall have given three Business Days written notice (the "Notice Period") to the Debtors, counsel to the Committee and the Office of the U.S. Trustee during which Notice Period the Debtors and the Committee may seek relief from the Bankruptcy Court to re-impose or continue the automatic

stay with respect to any remedy other than those described in clauses (i), (ii), (iii) and (iv) of Section 11.2(a) of the DIP Credit Agreement; *provided*, that in any hearing after the giving of the aforementioned notice, the only issue that may be raised by the Debtors and the Committee being whether, in fact, an Event of Default has occurred and is continuing.

*DIP Credit Agreement § 7.2*

| | |
|---|---|
| **Indemnification:** | The DIP Credit Agreement provides for the Debtors to indemnify and hold harmless each Indemnified Person for the liabilities more fully set forth in section 12.5 of the DIP Credit Agreement. |

*DIP Credit Agreement § 12.5*

| | |
|---|---|
| **Debtors' Stipulations and Challenge Period:** | Paragraph D of the Interim Order contains acknowledgements and stipulations by the Debtors regarding the extent, validity, enforceability and other matters related to the Senior Pre-Petition Indebtedness. |

These acknowledgements and stipulations are subject to a Challenge by certain parties in interest, subject to paragraph 15 of the Interim DIP Order, which, among other things, establishes the Challenge Deadline of (x) with respect to a Creditors' Committee, sixty (60) calendar days from the formation of a Creditors' Committee, and (y) with respect to other parties in interest with requisite standing other than the Debtors or a Creditors' Committee, seventy five (75) calendar days following the date of entry of the Interim Order.

*Interim Order ¶¶ D & 7*

| | |
|---|---|
| **Release:** | Subject only to Paragraph 7 of the Interim Order, entry of the Interim Order shall effectuate the following release:  The Credit Parties acknowledge, effective upon entry of the Interim Order and subject to the terms thereof, that the Credit Parties have no defense, counterclaim, offset, recoupment, cross complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all or any part of the Credit Parties' liability to repay Lender as provided in the DIP Credit Agreement or any other Credit Document or to seek affirmative relief or damages of any kind or nature from Lender.  Subject to the Orders, the Credit Parties, each in their own right on behalf of their bankruptcy estates, and on behalf of all their successors, assigns, and any Affiliates and any Person acting for and on behalf of, or claiming through them, fully, finally and forever release and discharge Lender, its Affiliates, and their respective past and present officers, directors, servants, agents, attorneys, assigns, heirs, parents, subsidiaries, and each Person acting for or on behalf of any of them of and from any and all past and present actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, |

consequential and punitive damages, including, without limitation, those payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to the DIP Credit Agreement, any other Credit Document, the Interim Order, the Final Order or the transactions contemplated by the DIP Loan Documents, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing. Notwithstanding anything in Section 7.13 of the DIP Credit Agreement to the contrary, nothing in the DIP Credit Agreement shall be deemed to be a release of the Lender from its obligations under the DIP Credit Agreement or any other Credit Document, and nothing in the DIP Credit Agreement shall be deemed to limit or modify any rights granted to third parties under the Orders.

*Interim Order ¶¶ 6 and DIP Credit Agreement § 7.13*

| | |
|---|---|
| **Section 506(c) and 552(b) Waivers; Marshalling:** | Subject to the entry of the Final Order, (i) no costs or expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral, the Waterton Pre-Petition Collateral or the Cash Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law without the prior written consent of the DIP Lender or the Senior Pre-Petition Lender, as applicable, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender or the Senior Pre-Petition Lender; and (ii) in no event shall the DIP Lender or the Senior Pre-Petition Lender be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Waterton Pre-Petition Collateral, as applicable. |

*Interim Order ¶ 9*

| | |
|---|---|
| **Lien on Avoidance Action Proceeds:** | The DIP Liens shall extend to the proceeds of Avoidance Actions immediately upon entry of the Final Order. Subject to entry of the Final Order, the Adequate Protection Liens shall extent to proceeds of Avoidance Actions. No liens are proposed to be granted on the Avoidance Actions themselves. |

*Interim Order ¶ 2(h), 3(a) and (b)*

### Local Rule 4001-2 Disclosures

36.     The Debtors believe that the following financing terms are required to be identified pursuant to Bankruptcy Rules 4001(b) and (c) and Local Rule 4001-2 and, as

discussed herein, are necessary and justified in the context of, and the circumstances relating to, the Chapter 11 Cases.

a.   <u>Stipulations to Validity, Perfection, and Amount of Pre-Petition Liens; Waiver of Pre-Petition Claims</u>.  Local Rule 4001-2(a)(i)(B) requires the disclosure of provisions or findings of fact that bind the estate with respect to validity, amount, or perfection of liens or a waiver of claims, without first giving certain parties in interest an opportunity to conduct an investigation.   Although the DIP Loan Documents include certain stipulations by the Debtors related to the validity, amount, and perfection of the Pre-Petition Obligations, the Interim Order provides for the earlier to occur of (a) the date that is seventy-five (75) days after entry of the Interim Order, and (b) the date that is sixty (60) days after the appointment of the official committee, if any, as the challenge period for such stipulations.  *See* Interim Order ¶¶ D & 7

b.   <u>Waiver of Section 506(c) Surcharge</u>.  Local Rule 4001-2(a)(i)(C) requires disclosure of provisions that seek to waive, without notice, whatever rights the estate may have under section 506(c) of the Bankruptcy Code.   The DIP Loan Documents provide for a waiver of rights under section 506(c) upon entry of the Final Order.  *See* Interim Order ¶ 9.

c.   <u>Liens on Avoidance Actions</u>.   Local Rule 4001-2(a)(i)(D) requires disclosure of provisions that immediately grant the prepetition secured creditor liens on avoidance actions.  Pursuant to the DIP Loan Documents, the DIP Lender is granted liens, subject to the entry of the Final Order, on the proceeds of claims and causes of action under sections 502(d), 544, 545, 547, 548, 550 and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state or municipal law and the proceeds of each of the foregoing (which for avoidance of doubt, excludes Debtors' claims and causes of action under section 549 of the Bankruptcy Code or similar state or municipal law and the proceeds of each of the foregoing), whether received by judgment, settlement, or otherwise upon the entry of the Interim Order.  *See* Interim Order ¶ 2(h)(I).

d.   <u>Roll-Up of First Lien Obligations</u>.  Local Rule 4001-2(a)(i)(E) requires disclosure of provisions that use post-petition loans to repay prepetition debt.   The DIP Loan Documents provide for the "roll-up" of the outstanding obligations arising under or in connection with the Supplemental Advance, including, without limitation, outstanding principal and accrued interest and fees, immediately upon entry of the Interim Order.  Upon the funding of the second draw under the DIP Facility following entry of the Final Order, the remaining Senior Pre-Petition Indebtedness shall be converted into the Roll-Up Loan.  In each instance, the amounts rolled up shall be subject to the Challenge Period

established under Paragraph 7 of the Interim Order.  *See* Interim Order ¶ 2(c); DIP Credit Agreement § 2.3(b).

e.  <u>Treatment of Professionals</u>.    Local Rule 4001-2(a)(i)(F) requires disclosure of provisions that provide disparate treatment to professionals retained by the creditors' committee from professionals retained by the Debtors.    The Carve-Out being provided for in the Interim Order is applicable to both the Debtors' and the official unsecured creditors' committee's professionals, if any.  *See* Interim Order ¶ 8(a).  Accordingly, all professionals retained by these estates will be treated equally, subject to the Approved Budget.  *Id.*

f.  <u>Priming Liens</u>.    Local Rule 4001-2(a)(i)(G) requires disclosure of provisions that prime any secured liens without the consent of the lienholder.  The DIP Lien shall be senior to and prime any and all valid, perfected, enforceable and non-avoidable pre-petition and post-petition liens, tax liens or other non-consensual liens in existence as of the Petition Date and properly perfected prior to the Petition Date including, for the avoidance of doubt, those of the Senior Pre-Petition Lender and the Second Lien Pre-Petition Lender.  *See* Interim Order ¶ 2(h)(II).  The Senior Pre-Petition Lender has consented to the DIP Lien priming its existing lien.  Even if the Second Lien Pre-Petition Lender has not expressly consented to the priming of its existing lien as of the entry of the Interim Order, the Sandstorm Pre-Petition Liens are adequately protected pursuant to the terms of the Interim Order. *See* Interim Order ¶ H.

g.  <u>Equities of the Case</u>.  Local Rule 4001-2(a)(1)(H) requires disclosure of provisions that seek to affect the Court's power to consider the equities of the case under Section 552(b)(1) of the Bankruptcy Code.  Upon entry of the Final Order, in light of the subordination of its liens and claims to the DIP Liens, and the imposition of the Carve-Out, the Senior Pre-Petition Lender is entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and, subject to the entry of the Final Order, the "equities of the case" exception shall not apply.  *See* Interim Order ¶ I.

37.    The provisions of the DIP Loan Documents as to which disclosure was required pursuant to Local Rule 4001-2 are all justified under the circumstances of the Chapter 11 Cases because (i) the Debtors' access to sufficient working capital and liquidity through the use of Cash Collateral and borrowing under the DIP Facility is vital to a successful sale and/or to otherwise preserve the value of the Debtors' estates and (ii) the Debtors will suffer immediate and irreparable harm if financing is not obtained and permission to use Cash Collateral is not

granted immediately, in each case in accordance with the terms of the Interim Order and the DIP

Loan Documents, as well as for all of the other reasons discussed below.

## **Basis for Relief Requested**

38.     As set forth above and in the First Day Declaration, the Debtors believe that the

DIP Facility is the best financing available to the Debtors under the circumstances and will

enable the Debtors, among other things, to continue to meet all obligations as they become due,

to make payroll, to satisfy other working capital and operational needs, to complete an orderly

marketing and sale process and to otherwise preserve the value of the Debtors' estates.  The

Debtors' access to sufficient working capital and liquidity through the use of Cash Collateral and

borrowing under the DIP Facility is vital to a successful sale and/or to otherwise preserve the

value of the Debtors' estates.  If immediate financing is not obtained and permission to use Cash

Collateral is not granted, in each case in accordance with the terms of the Interim Order and the

DIP Loan Documents, the Debtors and their estates will incur immediate and irreparable harm.

39.     For the reasons stated herein, the Debtors submit that they have satisfied the

requirements to access post-petition financing on a superpriority, secured basis pursuant to

section 364 of the Bankruptcy Code.  Section 364 of the Bankruptcy Code distinguishes among

(a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit

out of the ordinary course of business, and (c) obtaining credit with specialized priority or with

security.  If a debtor-in-possession cannot obtain sufficient post-petition credit on an unsecured

basis, section 364(c) of the Bankruptcy Code permits a bankruptcy court to authorize a debtor to

obtain credit or incur debt, repayment of which is (x) entitled to super-priority, administrative-

expense status or (y) is secured by a senior lien on unencumbered property or a junior lien on

encumbered property, or both.  Furthermore, section 364(d) of the Bankruptcy Code permits a

bankruptcy court to authorize a debtor to obtain post-petition credit secured by a senior or equal lien on encumbered property (*i.e.*, a priming lien) when a debtor is unable to obtain credit elsewhere and the interests of existing lienholders are adequately protected.[6]

40.     As further discussed herein, the DIP Facility is secured by substantially all of the assets of the Debtors' estates through super-priority claims, security interests, and secured liens pursuant to section 364.  The circumstances of the Chapter 11 Cases necessitate post-petition financing under section 364(c) and (d) of the Bankruptcy Code, and the DIP Facility reflects the sound exercise of the Debtors' business judgment.

## I.     **The Debtors Should Be Authorized to Obtain Post-Petition Financing Under Section 364(c) of the Bankruptcy Code.**

41.     Section 364(c) of the Bankruptcy Code provides that if a debtor is unable to obtain unsecured credit allowable as an administrative expense, the court may authorize the debtor to obtain credit or incur debt (a) on a super-priority administrative basis, (b) secured by a lien on the debtor's unencumbered assets, or (c) secured by a junior lien on the debtor's already encumbered assets.[7]  Section 364(c) financing is appropriate when the debtor in possession is unable to obtain unsecured credit allowable as an ordinary administrative claim.[8]

42.     Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

a.     The debtor is unable to obtain unsecured credit under section 364(b), i.e., by allowing a lender only an administrative claim;

b.     The credit transaction is necessary to preserve the assets of the estate; and

---

[6]   11 U.S.C. §§ 364(c), (d).

[7]   11 U.S.C. § 364(c).

[8]   *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37-29 (Bankr. S.D.N.Y. 1990) (debtor must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

    c.    The terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.[9]

43.    The Debtors propose to obtain the financing set forth in the DIP Credit Agreement by providing, among other things, super-priority claims, security interests, and liens pursuant to sections 364(c)(1)—(3) and section 364(d) of the Bankruptcy Code.  For the reasons set forth below, the Debtors submit that entry into the DIP Facility satisfies each of these factors.

## A.    The Debtors Could Not Obtain Unsecured Financing

44.    To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of sections 364(c) of the Bankruptcy Code.[10]  Thus, "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."[11]  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."[12]

45.    As set forth above and in the First Day Declaration, the Debtors do not believe that unsecured financing is available given that the entirety of the Debtors' assets are subject to the Waterton Pre-Petition Liens held by the Senior Pre-Petition Lender and the assets, property and undertaking of the silver gold deposit of The Lordsburg Mining Company in respect of the

---

[9]   *In re Ames Dep't Stores*, 115 B.R. at 37-39.

[10]   *Bray v. Shenandoah Fed. Sav. And Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986).

[11]   *Id.*, *see also In re Ames Dep't Stores*, 115 B.R. at 40 (holding that debtor made a reasonable effort to secure financing where it approached four lending institutions, was rejected by two, and selected the least onerous financing option from the remaining two lenders).

[12]   *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom. *Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); see also *In re Snowshoe Co.*, 789 F.2d 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met).

Summit Mine are subject to the Sandstorm Pre-Petition Liens held by the Second Lien Pre-Petition Lender.  The amount of this secured debt exceeds the implied value of the Debtors' assets and, therefore, there is likely no value to secure junior financing and the Senior Pre-Petition Lender made clear to the Debtors that it would not consent to being primed by a third party.  The economic conclusion that junior financing is not likely to be obtained is supported by the result of the Debtors' unsuccessful efforts to obtain alternative DIP financing and the multiple failed efforts to enter into various strategic transactions in the run-up to these cases that would provide the Debtors with much-needed liquidity.  Given these factors, obtaining the financing needed by the Debtors as unsecured debt or debt that would be secured by liens junior to the existing Waterton Pre-Petition Liens and Sandstorm Pre-Petition Liens is simply not a viable option.

46.     Accordingly, the Debtors have satisfied the requirement of sections 364(c) of the Bankruptcy Code that alternative credit on more favorable terms was unavailable to the Debtors.

**B.     Entry Into the DIP Facility Is Necessary to Preserve Assets of the Estates and Is In the Best Interests of Creditors.**

47.     A debtor's decision to enter into a post-petition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard.[13]  Courts grant a debtor considerable deference in acting in accordance with its sound business judgment.[14]  Further, to determine whether the business judgment standard is met, a court is "required to examine

---

[13]  *See In re Barbara K. Enters., Inc.*, 2008 WL 2439649 at *14 (Bankr. S.D.N.Y.  Mar. 5, 2009) (explaining that courts defer to a debtor's business judgment); *Ames Dep't Stores*, 115 B.R. at 38 (noting that financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business judgment).

[14]  *See, e.g., Barbara K. Enters.*, 2008 WL 2439649 at *14 (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to any party in interest.").

whether a reasonable business person would make a similar decision under similar circumstances."[15]

48.     The Debtors' decision to enter into the proposed DIP Credit Agreement is an exercise of their sound judgment that warrants approval by the Court.   The Debtors' management, Board of Directors, and professionals have reviewed their restructuring alternatives in detail.   These Chapter 11 Cases follow several unsuccessful attempts to consummate strategic transactions over the past several years and, more recently, the Debtors have explored alternative sources of capital and financing, including alternative forms of DIP financing.   The Debtors' management took the steps they deemed necessary and exercised their best business judgment in negotiating the DIP Facility.   The Debtors management and the Board of Directors ultimately concluded that the DIP Facility will provide immediate access to capital to pay their limited ongoing operating expenses while pursuing a sale of substantially all of the Debtors' assets, all on more favorable terms than any other reasonably available alternative.

49.     Without post-petition financing, the Debtors would be unable to expeditiously pursue a sale process, while satisfying their limited operating expenses, including post-petition wages and salaries, taxes, and facility maintenance costs.   At this time, the DIP Facility is the Debtors' best and only means of obtaining the liquidity necessary to effectuate a sale and, thereby, maximize the value of the Debtors' assets.   Therefore, by obtaining post-petition financing, the Debtors will be in a position to preserve the value of their assets for the benefit of all creditors.

---

[15]   *In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, at *272 (Bankr. D. Del. Aug. 15, 2007) (quoting *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006).

C.     **The Terms of the DIP Facility Are Fair and Reasonable Under the Circumstances.**

50.     In determining whether the terms of post-petition financing are fair and reasonable, courts consider the relative circumstances of both the debtor and the potential lender.[16]  Judged from that perspective, the terms of the DIP Facility are fair and reasonable.

51.     The DIP Facility provides the Debtors the liquidity they need to maintain their assets during the Chapter 11 Cases and allow the Debtors to pursue and effectuate a sale of the Debtors' assets.  The proceeds of the DIP Facility are sized to support the Debtors through the anticipated pendency of these Chapter 11 Cases and to preserve and promote the health and viability of the Debtors' assets, but nothing more.  Moreover, the financial terms and covenants of the DIP Facility are standard and reasonable for financing of this kind.

52.     Based on the Debtors' negotiations regarding the DIP Facility, the terms of the DIP Loan Documents constitute, on the whole, the most favorable terms the Debtors could achieve upon which the DIP Lender will extend the necessary post-petition financing.  Although the Debtors explored whether the DIP Lender would provide the DIP Facility without certain provisions, in the course of negotiations, the DIP Lender indicated it would not be willing to provide the DIP Facility without such terms.  In particular, the DIP Lender would not provide financing without the provisions requiring: (i) the achievement of certain sale milestones, including the filing of a sale motion shortly after the Petition Date, (ii) the roll-up of the Senior Pre-Petition Indebtedness, (iii) securing the DIP Facility with priming liens, and (iv) the various fees provided for under the DIP Facility.  These are key components of consideration for the DIP Lender without which it has indicated it is unwilling to provide the DIP Facility.

---

[16]     *In re Farmland*, 294 B.R. at 886-89; *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co., Inc.)*, 65 B.R. 358, 364-65 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard" bargains to acquire funds for its reorganization).

53.     Furthermore, although the Debtors explored alternative financing arrangements, including whether they could arrange financing provided by other potential DIP lenders, any such arrangement likely would have led to a lengthy and almost certain value-destroying priming fight given the Senior Pre-Petition Lender's position in the Debtors' capital structure and unwillingness to consent to being primed by a third party.  Accordingly, the Debtors, in consultation with their advisors—recognizing the absence of favorable competing proposals and the benefits to be provided under the DIP Facility—determined in their sound business judgment that the terms of the DIP Credit Agreement were superior to any other set of terms reasonably available to the Debtors at this time.  Therefore, the DIP Facility provides the Debtors with the best, most feasible, and value-maximizing financing option available at this time.

54.     Moreover, the Debtors have concluded that the economic terms of the DIP Facility are fair and reasonable and are consistent with what can be expected in a debtor-in-possession financing facility. In that regard, the various fees and charges associated with obtaining the DIP Facility are within the range of reasonableness.  Courts recognize that lender fees often are the only way to obtain financing, and routinely approve them.  After thorough analysis by the Debtors and their advisors, they have concluded that the terms of the DIP Facility are reasonable and appropriate under the circumstances.  The non-economic terms of the DIP Facility, including the Milestones, are also within the range of what can be expected for a debtor-in-possession financing facility, particularly considering the nature of the Debtors' assets and the immediate need to rehabilitate the Debtors' assets and business to stem further and precipitous declines in value.

55.     Likewise, the DIP Facility does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers by restricting the services for

which professionals may be paid in the Chapter 11 Cases.  Instead, the DIP Facility subjects the security interests and administrative expense claims granted to the DIP Lender to the Carve-Out for certain administrative and professional fees.  Carve-out expenses for professional fees have been found to be reasonable and necessary to ensure that statutory creditors' committees and debtors' estates are adequately assisted by counsel and other professionals.[17]

56.     For these reasons, in the Debtors' prudent business judgment, the terms of the DIP Facility are fair and reasonable in the circumstances of the Chapter 11 Cases and the Debtors could not obtain post-petition financing from any other lending source.

### D.     The Roll-Up Is Warranted

57.     Section 363(b) of the Bankruptcy Code permits a debtor to use, sell, or lease property, other than in the ordinary course of business, with court approval.  It is well settled in the Third Circuit that such transactions should be approved when they are supported by a sound business purpose.[18]  The business judgment rule shields a debtor's management from judicial second-guessing.[19]

58.     The DIP Lender has made clear to the Debtors that the roll-up is part of the overall package presented by the DIP Facility.  The DIP Facility, on the whole, is fair and reasonable under the circumstances, and more importantly, is the only option available to the Debtors that provides them essential liquidity, without which the Debtors' assets would be

---

[17]   *See In re Ames*, 115 B.R. at 38.

[18]   *See In re Abbots Dairies, Inc.*, 788 F.2d 143 (3d Cir. 1986) (holding that in the Third Circuit, a debtor's use of assets outside the ordinary course of business under section 363(b) should be approved if the debtor can demonstrate a sound business justification for the proposed transaction).

[19]   *In re Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("[T]he [Bankruptcy] Code favors the continued operation of a business by a debtor and a presumption of reasonableness attaches to a debtor's management decisions.").

immediately and irreparably harmed.  On these facts, the Debtors' business judgment in agreeing to the roll-up is well supported.

## II.      The Priming Liens Should be Approved Under Section 364(d)

59.      If a debtor is unable to obtain credit under the provisions of section 364(c) alone, the debtor may obtain credit secured by a senior or equal lien on property of the estate that is already subject to a lien, commonly referred to as a "priming lien."[20]  Section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of post-petition debt secured by senior or "priming" liens, provides that the court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

a.      The trustee is unable to obtain credit otherwise; and

b.      There is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.[21]

60.      To justify a priming lien, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) and (d) of the Bankruptcy Code.[22]  The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis.[23]  "Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its

---

[20]   11 U.S.C. § 364(d).

[21]   *Id.*

[22]   *See In re Snowshoe Co.*, 789 F.2d at 1088; *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).

[23]   *See In re Mosello*, 195 B.R. 277, 288 (Bankr. S.D.N.Y. 1996).

collateral during the reorganization process."[24]    However, consent by a secured creditor to priming obviates the need to show adequate protection.[25]

61.    As demonstrated above, the Debtors believe that the DIP Facility is the only likely source of post-petition financing.  In accordance with section 364(d)(1)(B) of the Bankruptcy Code, and consistent with the purposes underlying the provision of adequate protection, the proposed Interim Order provides the Senior Pre-Petition Lender and Second Lien Pre-Petition Lender with adequate protection as described above.  In addition, the Senior Pre-Petition Lender has affirmatively consented to the priming of its loans; which otherwise obviates the need to show adequate protection.[26]  If the Second Lien Pre-Petition Lender does not expressly consent to the entry of the Interim Order, the Sandstorm Pre-Petition Liens and security interests of the Second Lien Pre-Petition Lender will be adequately protected pursuant to the terms of the Interim Order.  Thus, the Senior Pre-Petition Lender has consented to the priming of its liens provided that the relief requested herein is granted and, even if the Second Lien Pre-Petition Lender does not consent to the priming of its liens, it will be adequately protected as set forth in paragraph 3 of the Interim Order.

## III.    Use of Cash Collateral

62.    Section 363 of the Bankruptcy Code governs the Debtors' use of property of the estates.  Section 363(c)(1) of the Bankruptcy Code provides that:

> If the business of the debtor is authorized to be operated under Section . . . 1108 . . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the

---

[24]    *Id.* (quoting *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)).

[25]    *See Anchor Savs. Bank FSB v*, 99 B.R. at 122 ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

[26]    *Id.*

estate in the ordinary course of business without notice or a hearing.[27]

63.     Section 363(c)(2) of the Bankruptcy Code, however, provides an exception with respect to "cash collateral" to the general grant of authority to use property of the estate in the ordinary course set forth in section 363 of the Bankruptcy Code.  Specifically, a trustee or debtor-in-possession may not use, sell, or lease "cash collateral" under subsection (c)(1) unless:

    a.    Each entity that has an interest in such collateral consents; or

    b.    The court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.[28]

64.     The Debtors need the proposed DIP Facility and the use of Cash Collateral in order to pursue a strategic sale of their Assets and to fund their ordinary course of business operations and administration in the interim.  As the DIP Facility is contingent upon the Debtors obtaining approval to use Cash Collateral, it is imperative that the Debtors obtain authority to use Cash Collateral subject to the terms of this Motion.  Accordingly, to obtain the financing under the DIP Facility and to avoid immediate and irreparable harm to the Debtors' business operations and their estates, the Debtors have an immediate need for authority to use Cash Collateral.

65.     The Debtors submit that, under the circumstances here, their request to use Cash Collateral should be approved.  The Senior Pre-Petition Lender and the DIP Lender affirmatively consent, and the Second Lien Pre-Petition Lender is adequately protected, as described above, with respect to the use of Cash Collateral provided that the relief requested herein is granted.  Absent such authority, the Debtors would not have access to any additional liquidity, which would imperil their ability to pursue a sale of their assets.  Any delay in pursuing a sale poses grave risk to the Debtors, and their ability to implement the strategy that will yield highest

---

[27]    11 U.S.C. § 363(c)(1).

[28]    11 U.S.C. § 363(c)(2).

recovery for their estates and their creditors. Accordingly, the proposed adequate protection is fair, reasonable, and sufficient to justify the requirements of sections 363(c)(2) and (3) of the Bankruptcy Code.

## IV.   **Interim Approval Should Be Granted**

66.     Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than fifteen (15) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the borrowers' estates.

67.     The Debtors request that the Court hold and conduct an interim hearing immediately to consider entry of the proposed Interim Order authorizing the Debtors from and after the entry of the Interim Order until the Final Hearing to borrow under the DIP Facility as provided therein. This relief will enable the Debtors to operate their businesses in a manner that will permit them to preserve and maximize value and therefore avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

### **Final Hearing & Notice**

68.     The Debtors further respectfully request that the Court schedule the Final Hearing and authorize it to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, by first-class mail upon: (i) the Office of the United States Trustee for the District of Delaware; (ii) counsel to Waterton Global Value, L.P., in its capacity as the Senior Pre-Petition Lender; (iii) counsel to Sandstorm Barbados, in its capacity as the Second Lien Pre-Petition Lender; (iv) counsel to Waterton Global Value, L.P., in its capacity as the DIP Lender; (v) those parties listed on the list of creditors holding the twenty (20) largest unsecured claims

against the Debtors (on a consolidated basis), as identified in their chapter 11 petitions; and (vi) all known holders of liens upon the Debtors' assets.  The Debtors request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001 and Local Rule 2002-1.

### Conclusion

WHEREFORE, the Debtors respectfully request that the Court enter (i) the Interim Order granting the relief requested herein, (ii) schedule a Final Hearing, (iii) enter the Final Order following a Final Hearing, and (iv) grant such other relief as is just and proper.

Dated: August 26, 2015    YOUNG CONAWAY STARGATT & TAYLOR, LLP
   Wilmington, Delaware

*/s/ Kenneth J. Enos*
Robert S. Brady (No. 2847)
Edmon L. Morton (No. 3856)
Kenneth J. Enos (No. 4544)
Ian J. Bambrick (No. 5455)
1000 N. King Street
Rodney Square
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

*Proposed Counsel to the Debtors and Debtors in Possession*