## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------x

|  |  |  |
|---|---|---|
| In re | : | **Chapter 11** |
|  | : |  |
| **SANTA FE GOLD CORPORATION**, *et al.*, | : | **Case No. 15-11761 (MFW)** |
|  | : |  |
| Debtors.[1] | : | **Jointly Administered** |

: Bid Procedures Obj. Deadline: October 9, 2015, at 4:00 p.m. (ET)
: Bid Procedures Hearing Date: October 19, 2015, at 4:00 p.m. (ET)
: Sale Obj. Deadline: December 11, 2015, at 4:00 p.m. (ET)
: Sale Hearing Date: December 18, 2015, at 11:30 a.m. (ET)

---------------------------------------------------------x

**MOTION FOR ENTRY OF: (A) AN ORDER (I) AUTHORIZING DEBTORS'
ENTRY INTO THE STALKING HORSE PURCHASE AGREEMENT FOR THE SALE
OF THE DEBTORS' PROPERTIES AND RELATED ASSETS; (II) APPROVING
BIDDING PROCEDURES AND EXPENSE REIMBURSEMENT; (III) SCHEDULING A
HEARING TO CONSIDER APPROVAL OF THE SALE OF ASSETS; (IV) APPROVING
FORM AND MANNER OF NOTICE OF THE SALE; AND (V) GRANTING RELATED
RELIEF AND (B) AN ORDER (I) APPROVING THE SALE OF THE
DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND
ENCUMBRANCES; (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT
OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES; AND (III) GRANTING RELATED RELIEF**

The debtors and debtors in possession in the above-captioned cases (collectively, the

"**Debtors**") hereby submit this motion (the "**Motion**"), pursuant to sections 105(a), 363, 365, and

503 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**"), and

Rules 2002, 6004, 6006, 9006, and 9014 of the Federal Rules of Bankruptcy Procedure (the

"**Bankruptcy Rules**") for entry of: (a) an order, substantially in the form annexed hereto as

Exhibit A (the "**Bidding Procedures Order**"), (i) authorizing the Debtors' entry into the stalking

horse purchase agreement (the "**Stalking Horse Purchase Agreement**") between the Debtors and

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Santa Fe Gold Corporation (4315); Azco Mica, Inc. (8577); The Lordsburg Mining Company (4474); and Santa Fe Gold (Barbados) Corporation (N/A). The Debtors' mailing address is 1219 Banner Mine Road, Lordsburg, New Mexico 88045.

Waterton Global Value, L.P. (or one of its affiliates) (the "***Stalking Horse Bidder***") substantially in the form attached hereto as <u>Exhibit B</u> with respect to a sale (the "***Sale***") of all or substantially all of the Debtors' properties and related assets (as more fully described in the Stalking Horse Purchase Agreement, the "***Acquired Assets***"); (ii) approving the proposed bidding procedures to be used (the "***Bidding Procedures***") and Expense Reimbursement (as defined below) to be provided in connection with the sale of the Acquired Assets; (iii) setting the dates for the Bid Deadline (as defined below), the auction of the Acquired Assets (the "***Auction***"), and the hearing for approving the Sale (the "***Sale Hearing***"), (iv) and approving all forms of notice and notice procedures related thereto (the "***Notice Procedures***"); (v) authorizing certain procedures related to the assumption and assignment of executory contracts and unexpired leases (the "***Assignment Procedures***"); and (vi) granting related relief and (b) an order, substantially in the form annexed hereto as <u>Exhibit C</u> (the "***Sale Order***"), (i) authorizing the Sale free and clear of all liens, claims, interests, and encumbrances, except for the Permitted Liens (as defined in the Stalking Horse Purchase Agreement) and Assumed Liabilities (as defined in the Stalking Horse Purchase Agreement), (ii) authorizing the assumption and assignment of certain related executory contracts and unexpired leases, and (iii) granting related relief.  In support of this Motion, the Debtors respectfully represent:

## <u>JURISDICTION</u>

1.     This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Debtors consent, pursuant to rule 9013-1(f) of the Local Rules of Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "***Local Rules***"), to the entry of a final order by the Court in connection with this

Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory and legal predicates for the relief requested herein are sections 105(a), 363, 365, and 503 of the Bankruptcy Code, as complemented by Bankruptcy Rules 2002, 6004, 6006, 9006, and 9014.

## GENERAL BACKGROUND

3.      On August 26, 2015 (the "**Petition Date**"), the Debtors commenced their bankruptcy cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**").  The Chapter 11 Cases are consolidated for procedural purposes only and are jointly administered pursuant to Rule 1015(b) of the Bankruptcy Rules and Local Rule 1015-1.  No trustee or examiner has been appointed in the Chapter 11 Cases.

4.      The events leading up to the Petition Date and the facts and circumstances supporting the relief requested herein are set forth in the *Declaration of Jakes Jordaan in Support of Chapter 11 Petitions and First Day Relief* (the "**First Day Declaration**") [Docket No. 2].

5.      On September 11, 2015, the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**") appointed an official committee of unsecured creditors (the "**Committee**") [Docket No. 54].

## RELIEF REQUESTED

6.      By this motion, the Debtors seek entry of (a) the Bidding Procedures Order (i) authorizing the Debtors' entry into the Stalking Horse Purchase Agreement; (ii) approving the Bidding Procedures and Expense Reimbursement; (iii) setting the dates for the Bid Deadline, the Auction, and the Sale Hearing; (iv) approving the Notice Procedures;

3

(v) approving the Assignment Procedures; and (vi) and granting related relief; and (b) the Sale Order: (i) authorizing the Sale of the Acquired Assets free and clear of all liens, claims, interests, and encumbrances, except for the Permitted Liens and Assumed Liabilities; (ii) authorizing the assumption and assignment of certain related executory contracts and unexpired leases; and (iii) granting related relief.

### THE ACQUIRED ASSETS, THE DEBTORS' MARKETING EFFORTS, AND THE ENTRY INTO THE STALKING HORSE PURCHASE AGREEMENT

**A.     The Acquired Assets**

7.     The Acquired Assets, which are substantially all of the Debtors' assets, are the properties, related mineral rights, and equipment underlying and utilized in the Summit Project (including the copper exploration initiative at the Lordsburg Mill site), the Black Canyon Mica Project, and the Planet MIO Project (collectively, the "***Mining Projects***"), each as described in greater detail below:

(a)     The Summit Project.  The Summit Project includes (a) a fully-permitted, underground silver-gold mine located in Grant County, New Mexico–near Duncan, Arizona–on the New Mexico-Arizona border (the "***Summit Mine***"), consisting of approximately 117.6 acres of and 520 patented and unpatented mining claims, (b) a floatation ball mill in Hidalgo County, New Mexico near Lordsburg, New Mexico (the "***Lordsburg Mill***"), and (c) related property consisting of approximately 1,500 acres of wholly-owned patented, leased, and unpatented mining claims.

(b)     The Black Canyon Mica Project.  The property at the Black Canyon Mica Project covers approximately 1,385 acres, in the aggregate, and consists of sixty-seven federal unpatented mining claims in Yavapai County, Arizona and nine federal unpatented mill site claims in Maricopa County, Arizona.

(c)     The Planet MIO Property.  The Debtors leased the property for the Planet MIO Project in 2002 for its potential to produce micaceous iron oxide.  The Planet MIO Property totals 523 acres and consists of thirty-one patented mining claims located in western Arizona.

**B.     The Debtors' Pre-Petition Marketing Efforts**

8.     As a consequence of chronic underfunding, constrained liquidity, an overly-leveraged balance sheet, operational and management challenges, and declining precious

metals prices, for the past several years the Debtors have pursued a strategic or financial partner. In this regard, prior to the Petition Date, the Debtors entered into several strategic transactions, all of which were subject to certain customary conditions. As detailed below, because in each instance one or more of the conditions in connection with the transactions were never completed, each of the transactions failed.

        i.        <u>*International Goldfields Limited*</u>

        9.        On February 15, 2013, the Debtors entered into an Agreement and Plan of Merger (the "***IGS Merger Agreement***") with International Goldfields Limited ("***IGS***"). Under the terms of the IGS Merger Agreement, the Debtors would have become a wholly-owned subsidiary of IGS. Completion of the merger with IGS was subject to IGS closing before March 14, 2013 an equity financing that would have resulted in IGS having at least $10,000,000 (Australian) in available cash (a "***Qualified Equity Financing***"). Because IGS was unable to consummate a Qualified Equity Financing, the IGS Merger Agreement terminated.

        ii.        <u>*Tyhee Gold Corp.*</u>

        10.        After termination of the IGS Merger Agreement, on September 13, 2013, the Debtors engaged Fairfax Securities Corporation D/B/A Jett Capital Advisors, New York ("***Jett Capital***") as its exclusive United States placement agent and exclusive corporate advisor in relation to capital raising, change of control transactions, and any other material corporate or asset transaction, including acquisition or divestment of a mining project, restructuring, spin-off, corporate acquisition, or joint venture. Jett Capital has represented to the Debtors that it reached out to over 100 qualified entities in its database, and in October 2013, Jett Capital introduced the Debtors to Tyhee Gold Corp. ("***Tyhee***").

        11.        On January 23, 2014, the Debtors entered into a definitive merger agreement (the "***Tyhee Merger Agreement***") with Tyhee. Completion of the merger was subject

5

to customary conditions, including (i) adoption of the Tyhee Merger Agreement by the required vote of the holders of outstanding Company common stock, (ii) obtaining certain approvals from the Securities and Exchange Commission, (iii) consummation of secured debt restructurings, (iv) receipt of the approval of the TSX Venture Exchange, and (v) Tyhee closing a qualified financing of at least $20 million (a "***Qualified Financing***").  On March 23, 2014, the Company terminated the Tyhee Merger Agreement as a result of Tyhee's failure to close the Qualified Financing.

   iii. *Canarc Resource Corp.*

   12. On July 15, 2014, the Debtors entered into a certain Share Exchange Agreement (the "***Share Exchange Agreement***") with Canarc Resource Corp. ("***Canarc***"). Under the terms of the Share Exchange Agreement, the Debtors were to issue 66,000,000 shares of its common stock to Canarc, and, in exchange, Canarc was to issue 33,000,000 shares of its common stock to the Debtors (the "***Share Exchange***").  Upon consummation of the Share Exchange Agreement, the Debtors were to own approximately 17 percent of Canarc's outstanding common shares and Canarc was to own approximately 34 percent of the Debtors' outstanding common shares.

   13. In connection with the Share Exchange, Bradford Cooke, Chairman and Founder of Canarc, was appointed as a director and Chairman of Santa Fe Gold Corporation; Catalin Chiloflischi, Chief Executive Officer of Canarc, was appointed President, Chief Executive Officer, and Director of Santa Fe Gold Corporation; and Garry Biles, President and Chief Operating Officer of Canarc, was appointed Chief Operating Officer of Santa Fe Gold Corporation.

   14. Significantly, in connection with the Share Exchange Agreement, the Debtors entered into a "best efforts" placement agency agreement with Euro Pacific Capital, Inc.

("***Euro Pacific***") pursuant to which Euro Pacific agreed to use its "best efforts" to complete the private placement of Convertible Gold Notes in the aggregate principal amount between $20 million to $25 million.  Euro Pacific did not place any securities or raise any capital for the Debtors.

15.    When the relevant transactions under the Share Exchange Agreement failed to close, the Share Exchange Agreement terminated pursuant to its terms on October 15, 2014.  Without any prior notice of their intention to resign, on October 16, 2014, the Debtors received the resignation letters of Messrs. Cooke, Chiloflischi, Biles, and Philip Yee, leaving the Debtors without any executive officers.  Furthermore, the Canarc affiliates left the Debtors with less than $100 in available cash.

iv.    *Recent Restructuring and Marketing Efforts*

16.    In the fourth quarter of 2014, following the failure of the most Canarc transaction, the Debtors changed their operational strategy from a mine restart plan to a resource drilling and engineering program.  Additionally, the Debtors formulated a copper exploration strategy at the Lordsburg Mill site.  The Debtors intended to execute this strategy with the assistance of a potential strategic or financial partner.  Accordingly, the Debtors conducted an extensive strategic process by inviting potential strategic partners, financial investors, private equity funds, hedge funds, and ultra-high net worth family offices to participate in either a minority or control investment or an acquisition.  Although the Debtors' copper project received limited interest from certain strategic investors, none of the strategic investors, financial investors, private equity funds, hedge funds, or ultra-high net worth family offices was willing to enter into a transaction that would have allowed the Debtors to continue as a going concern.

17.    Upon being made aware of the Debtors' efforts, the Stalking Horse Purchaser offered to provide the Debtors with a limited amount of debtor in possession financing

(the "***DIP Facility***") to support a sale process within the context of a chapter 11 proceeding. In addition, the Stalking Horse Purchaser offered to enter into a stalking horse purchase agreement and participate in an open market process for the sale of the Acquired Assets at an auction. The Debtors considered this offer and determined that the most prudent course of action was to obtain the DIP Facility and enter into the Stalking Horse Agreement so that they may conduct an expedited, yet orderly asset sale and wind-down of operations through the Chapter 11 Cases. Conducting the marketing, sale and, if necessary, auction process within the Chapter 11 Cases gives the Debtors a means to assess interest from other parties and make sure that an appropriate value is received.

18.     On September 3, 2015, the Debtors filed their *Application for Entry of an Order Authorizing the Retention and Employment of Canaccord Genuity Inc. as Investment Banker for the Debtors,* Nunc Pro Tunc *to the Petition Date* [Docket No. 39]. Canaccord Genuity Inc. ("***CGI***") has been assisting the Debtors with the marketing process with respect to the Sale. CGI's professionals have developed, and will implement, a marketing strategy that is designed to maximize the value of the Acquired Assets. As part of this process, CGI is establishing a data room populated with pertinent information and is undertaking the solicitation of potential interested parties.

## C.     Negotiation of the Stalking Horse Bid[2]

19.     The negotiations among the Debtors and the Stalking Horse Bidder have included extensive business discussions between and among senior management, the parties' legal teams, and the parties' other advisors. The negotiations culminated on September 25, 2015,

---

[2] The bid that is the subject of the Stalking Horse Purchase Agreement is referred to herein as the "***Stalking Horse Bid***."

when the Debtors and the Stalking Horse Bidder agreed to the terms of the Stalking Horse Purchase Agreement.[3]

20.     The Debtors and the Stalking Horse Bidder also extensively negotiated the Expense Reimbursement, which was necessary to induce the Stalking Horse Bidder to execute the Stalking Horse Purchase Agreement.  Based on (i) the Debtors' prepetition restructuring efforts and (ii) the negotiations between the Debtors and the Stalking Horse Bidder over the terms of the Stalking Horse Purchase Agreement, including the Expense Reimbursement, the Debtors, in consultation with their advisors, determined that entry into the Stalking Horse Purchase Agreement, subject to the Auction, is the best and most efficient way to maximize value for the Debtors, their estates, and all stakeholders.

21.     Having undertaken significant efforts prior to the Petition Date to pursue a strategic transaction, and spending significant time negotiating with the Stalking Horse Bidder, the Debtors are now prepared to move forward with an overbid process that they hope will culminate in a competitive auction process.  To facilitate the formal auction process, the Debtors have negotiated Bidding Procedures with the Stalking Horse Bidder that will subject the Stalking Horse Purchase Agreement to a market test following approval of this Motion.  In the event the Debtors receive one or more Qualified Bids (as defined below) in addition to the Stalking Horse Bid, the Debtors will conduct the Auction, subject to Court approval.

---

[3] The Debtors and the Stalking Horse Bidder are continuing to review and finalize the terms of the Stalking Horse Purchase Agreement and certain ancillary schedules and agreements.

01:17703442.5

## SUMMARY OF TRANSACTION DOCUMENTS

A.    **Material Terms of the Stalking Horse Purchase Agreement**[4]

22.    The Debtors have determined that the Stalking Horse Purchase Agreement represents the best opportunity for the Debtors to maximize the value of the Acquired Assets by serving as a basis for conducting an auction to seek higher or better offers.  The Stalking Horse Purchase Agreement contemplates the sale of the Acquired Assets, subject to higher or better bids, on the following material terms:

(a)    <u>Consideration</u>.  The aggregate consideration shall consist of: (i) (a) a credit bid in an amount equivalent to the obligations owed by the Sellers to Buyer under (x) the DIP Facility and (y) the Senior Secured Gold Stream Credit Agreement, dated December 23, 2011 between the Sellers and Waterton Global Value, L.P. in its capacity as provider of the Senior Pre-Petition Indebtedness (as amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms) collectively with any other agreements and documents executed or delivered in connection therewith, including the "***Credit Documents***" as defined in the Senior Secured Gold Stream Credit Agreement, each as may be amended, restated, supplemented or otherwise modified from time to time), (ii) the assumption at the Closing by the Buyer of the Assumed Liabilities from the Sellers as provided in Section 2.3 of the Stalking Horse Purchase Agreement, and (iii) any Cure Amounts required to be paid by the Buyer in accordance with the terms of the Stalking Horse Purchase Agreement (Stalking Horse Purchase Agreement, Section 3.2)

(b)    <u>Expense Reimbursement</u>.  In the event that the Stalking Horse Purchase Agreement is terminated pursuant to Sections 8.1(b), (e), (f), (g) or (h), the Sellers shall pay to the Buyer the Expense Reimbursement in cash, which shall be treated as a joint and several priority administrative claim in the Chapter 11 Cases against each Seller. (Stalking Horse Purchase Agreement, Section 6.9(a)(i))

(c)    <u>Credit Bidding</u>.  The Stalking Horse Bidder will credit bid an amount equivalent to the obligations owed by the Sellers to Buyer under (x) the DIP Facility and (y) the Senior Secured Gold Stream Credit Agreement, dated December 23, 2011 between the Sellers and Waterton Global Value, L.P. in its capacity as provider of the Senior Pre-Petition Indebtedness (as amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms) collectively with any other agreements and documents executed or delivered in connection therewith, including the "Credit Documents" as defined in the Senior Secured Gold Stream Credit Agreement, each as may be amended,

---

[4]  Capitalized terms used in this Section but not defined herein shall have the meanings ascribed to them in the Stalking Horse Purchase Agreement.  To the extent that there are inconsistencies between the summary description of the Stalking Horse Purchase Agreement contained herein and the terms and conditions of the Stalking Horse Purchase Agreement, the terms and conditions of the Stalking Horse Purchase Agreement shall control.

restated, supplemented or otherwise modified from time to time).  The Stalking Horse Bidder will have the right (but not the obligation) to credit bid all amounts due and owing to it under the DIP Facility and the Senior Pre-Petition Indebtedness and credit the amount of the Expense Reimbursement to its bid at each round of bidding in the event of an Auction (Stalking Horse Purchase Agreement, Section 3.2) (Bidding Procedures, p.7)

(d)     <u>Conditions to Closing</u>.   The Stalking Horse Purchase Agreement contains certain conditions that must be satisfied prior to the closing of the Sale.  Among other things, the Stalking Horse Bidder's obligation to consummate the Sale is subject to the satisfaction at or prior to the closing date of each of the following conditions:  (a) all representations and warranties of the Sellers are true and correct; (b) the Sellers shall have performed the covenants required under the Stalking Horse Purchase Agreement; (c) there shall be no Law that prohibits the transactions contemplated by the Stalking Horse Purchase Agreement; (d) the Bidding Procedures Order and Sale Order shall be in full force and effect; and (e) the Sale Order shall be non-appealable and not otherwise subject to review, reversal, modification, or amendment, by appeal or writ of certiorari, ***provided***, ***however***, that the parties may waive such condition but only to the extent that the Sale Order contains a finding that the Stalking Horse Bidder is a "Good Faith Purchaser" pursuant to Bankruptcy Code section 363(m); (f) certain parties shall have agreed to release certain Liens relating to the Acquired Assets; (g) no Material Adverse Effect shall have occurred; and (h) the Assumed Contracts shall have been assumed by the Sellers and assigned to the Stalking Horse Bidder.  (Stalking Horse Purchase Agreement, Section 7.1)

(e)     <u>Assumed Liabilities</u>.  The Assumed Liabilities shall include the following Liabilities, solely to the extent arising after the Closing: (a) all Liabilities arising out of or relating to the Acquired Assets or Buyer's ownership or operation of the Acquired Assets, including any Liabilities relating to Reclamation Obligations with respect to the Acquired Assets; (b) any Cure Amount; and (c) all Liabilities under each of the Assumed Contracts that arise after or relate to the period from and after the Closing and do not result from any breach or default by, or waiver or extension given by or to, any Seller.  The Buyer is not assuming, and the Assumed Liabilities shall not include, any Liabilities of any Seller that existed, occurred, or accrued on or before the Closing. (Stalking Horse Purchase Agreement, Section 2.3)

(f)     <u>Sale Free and Clear</u>.  The Acquired Assets to be transferred by the Sellers will be transferred free and clear of all liens, claims, interests, and encumbrances, except for Permitted Liens. (Stalking Horse Purchase Agreement, Section 2.1)

(g)     <u>Restrictions on Solicitation and Negotiation of Competing Bids</u>.  The Sellers shall not, and shall cause their respective Affiliates and Representatives not to, directly or indirectly, initiate, solicit, entertain, or encourage submission of any inquiries, proposals or offers, or enter into or continue discussions or negotiations with or provide any information to or enter into any agreements or understandings with any Person (other than the Buyer and its Affiliates and Representatives) with respect to any Competing Transaction or accept an offer or proposal from any Person (other than the Buyer and its Affiliates, agents and representatives) with respect to a Competing Transaction.  The

01:17703442.5

Sellers shall, and shall cause their respective Affiliates and Representatives to, discontinue all discussions with any Person other than the Buyer or any of its Affiliates or Representatives concerning any Competing Transaction. (Stalking Horse Purchase Agreement, Section 6.9(b))

**B.    Bidding Procedures[5]**

23.    In order to ensure that the Debtors receive the maximum value for the Acquired Assets, the Stalking Horse Bid is subject to higher or better offers.  The Debtors believe that a sale pursuant to the Bidding Procedures described below will provide the best opportunity to maximize the realizable value of the Acquired Assets.  The Bidding Procedures are attached as <u>Schedule 1</u> to the proposed Bidding Procedures Order.

24.    The key provisions of the Bidding Procedures to be employed with respect to the proposed sale of the Acquired Assets as set forth in the Stalking Horse Purchase Agreement (collectively, the "***Bidding Process***") include the following:

(a)    <u>Due Diligence</u>.  Until the Bid Deadline, the Debtors will afford any Potential Bidder such due diligence access or additional information as may be reasonably requested by the Potential Bidder that the Debtors determine in their discretion to be reasonable and appropriate under the circumstances.  The Debtors shall coordinate all reasonable requests for additional information and due diligence access from Potential Bidders.

(b)    <u>Provisions Governing Qualified Bids</u>.  A bid submitted will be considered, and the Potential Bidder will be authorized to participate in the Auction, only if the bid is submitted by a Potential Bidder and complies with all of the following (a "***Qualified Bid***"):

   i.    The bid must be a bulk bid to purchase all of the assets constituting the Acquired Assets at the purchase price and upon the terms and conditions set forth in an executed purchase agreement, a clean copy of which shall be submitted, together with a marked copy showing any proposed changes to the Stalking Horse Purchase Agreement.

   ii.    The bid must not be subject to any due diligence or financing contingency, must not be conditioned on any break-up fee, termination fee, or similar type of

---

[5]  Capitalized terms used in this Section but not defined herein shall have the meanings ascribed to them in the Bidding Procedures.  To the extent that there are inconsistencies between the summary description of the Bidding Procedures contained herein and the Bidding Procedures, the Bidding Procedures shall control.

01:17703442.5

payment or any expense reimbursement, must not be subject to any corporate (board, shareholder, or similar) consent or approval, or any regulatory contingencies. Any required governmental approvals identified in the bid may impact the evaluation of whether the bid is a Qualified Bid and shall be taken into account in the Debtors' determination of the highest and best bid for the Acquired Assets. By submitting a bid, the Potential Bidder waives the right to pursue a substantial contribution claim under 11 U.S.C. § 503 related in any way to the submission of its bid or the Bidding Process.

iii.     The purchase price in such bid must be a higher and better offer for the Acquired Assets as compared to the offer of the Stalking Horse Bidder. Such offer shall not be considered a Qualified Bid unless such bid provides for: (i) cash consideration equal to the Purchase Price in the Stalking Horse Purchase Agreement; plus (ii) an amount of cash equal to the Expense Reimbursement; plus (iii) an amount of cash equal to $250,000.

iv.     The Debtors must receive the bid by **December 10, 2015** at 5:00 p.m. (ET) (the "***Bid Deadline***").

v.     The bid must be accompanied by a cash deposit in the amount of ten percent (10%) of the purchase price of the bid.

vi.     The bid must include a comprehensive list of all executory contracts and unexpired leases that the Potential Bidder seeks to take assignment of.

vii.     A Potential Bidder shall accompany its bid with each of the following: (a) written evidence of available cash, a commitment for financing or ability to obtain a satisfactory commitment if selected as the Successful Bidder, or such other evidence of ability to consummate the sale of the Acquired Assets as the Debtors may request; (b) a copy of a board resolution or similar document demonstrating the authority of the Potential Bidder to make a binding and irrevocable bid on the terms proposed; and (c) any pertinent factual information regarding the Potential Bidder's operations that would assist the Debtors in their analysis of issues arising with respect to any applicable antitrust laws, governmental regulatory approvals, national security laws, foreign investment laws, or other aspects of the bid and with respect to any conditions contained in the bid.

(c)     Provisions Governing Qualifications of Bidders. Each Potential Bidder that the Debtors determine, upon consultation with the Committee, to have submitted a Qualified Bid will be considered a "***Qualified Bidder***."

(d)     Evaluation of Competing Bids. A Qualified Bid will be valued by the Debtors based upon factors such as: (a) the purported amount of the Qualified Bid, including any benefit to the Debtors' bankruptcy estates from any assumption of liabilities of the Debtors; (b) the fair value to be provided to the Debtors under the Qualified Bid; (c) the length of time expected to close the proposed purchase of the Acquired Assets; (d) the ability of the Potential Bidder to obtain all necessary antitrust, governmental, national security, foreign

13

investment, or other regulatory approvals for the proposed purchase of the Acquired Assets; and (e) any other factors the Debtors may deem relevant. Within one (1) calendar day after the Debtors determine that a bid is a Qualified Bid, the Debtors shall distribute a copy of such bid to counsel to the Stalking Horse Bidder by e-mail, hand delivery, or overnight courier. The Debtors may reject any bid if, among other things, the Debtors determine such bid is on terms that are in their totality materially more burdensome or conditional than the terms of the Stalking Horse Purchase Agreement.

(e)     <u>No Qualified Bids</u>. If no Qualified Bids are received for the Acquired Assets other than the Qualified Bid that is the subject of the Stalking Horse Purchase Agreement, then the Stalking Horse Purchase Agreement shall be designated as the Successful Bid, there shall be no Auction, and the Debtors shall seek approval of the sale of the Acquired Assets to the Stalking Horse Bidder in accordance with the Stalking Horse Purchase Agreement at the Sale Hearing.

(f)     <u>Auction Process</u>. If the Debtors timely receive one or more Qualified Bids in addition to the Stalking Horse Purchase Agreement, the Debtors will conduct the Auction, beginning at **10 a.m. (ET)** on **<u>December 15, 2015</u>**, at the offices of Young Conaway Stargatt & Taylor, LLC, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801 or such other location as shall be timely communicated to all entities entitled to attend the Auction. The Auction shall run in accordance with the following procedures:

   i.     Only the Debtors and their representatives, the Committee and its representatives, the Stalking Horse Bidder and its representatives, the United States Trustee and its representatives, any other Qualified Bidder that has timely submitted a Qualified Bid, and creditors providing written notice of their intention to attend the Auction to Debtors' counsel at kenos@ycst.com on or before the Bid Deadline shall be permitted to attend the Auction in person, and only the Stalking Horse Bidder and other Qualified Bidders shall be entitled to make any Subsequent Bids (as defined below) at the Auction.

   ii.     Each Qualified Bidder shall be required to confirm that it has not engaged in any impermissible collusion.

   iii.     At least one (1) Business Day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Debtors whether it intends to attend the Auction; *provided*, *however*, that if a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until the date of the selection of the Successful Bidder and the Back Up Bidder (each as defined below). Prior to the commencement of the Auction, the Debtors shall provide notice to the Stalking Horse Bidder and each other Qualified Bidder of (i) the Qualified Bid that the Debtors believe, in their reasonable business judgment, is the highest and best offer for the Acquired Assets (the "***Starting Bid***") and (ii) the identities of each other Qualified Bidder that has informed the Debtors of its intent to participate in the Auction.

14

iv. All Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids at the Auction with the understanding that the true identity of each Qualified Bidder at the Auction will be fully disclosed to all other Qualified Bidders at the Auction and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction; *provided*, *however*, that all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder attending the Auction.  All proceedings at the Auction shall be conducted before and transcribed by a court stenographer.

v. After consultation with the Stalking Horse Bidder and the Committee, the Debtors may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction; provided, however, that such rules are (i) not inconsistent with the Bankruptcy Code or any order of the Bankruptcy Court or any other applicable court entered in connection herewith, (ii) reasonably acceptable to the Stalking Horse Bidder and (iii) disclosed to each Qualified Bidder at the Auction.

vi. The Debtors reserve their right, in their reasonable business judgment, to make one or more adjournments of the Auction to, among other things: (i) facilitate discussions between the Debtors and the Qualified Bidders, (ii) allow individual Qualified Bidders to determine how they wish to proceed, (iii) consider and determine the current highest and best Subsequent Bid at any given time during the Auction, (iv) afford Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment, may require that the Qualified Bidder (other than the Stalking Horse Bidder) has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the prevailing Subsequent Bid amount.

vii. No Qualified Bidder shall consult with any other Qualified Bidder prior to the conclusion of the Auction, or submit at any time a "joint bid" with any other Qualified Bidder, without the express consent of the Debtors.

viii. Bidding at the Auction will begin with the Starting Bid and continue, in one or more rounds of bidding, so long as during each round at least one bid is submitted by a Qualified Bidder that (i) improves upon such Qualified Bidder's immediately prior Qualified Bid (each a "***Subsequent Bid***") and (ii) the Debtors determine is (a) for the first round, a higher and better offer than the Starting Bid, and (b) for subsequent rounds, a higher and better offer than the Leading Bid (as defined below).  Each Subsequent Bid at the Auction shall provide net value to the Debtors' estates of at least $100,000 over the Starting Bid or the Leading Bid (as defined below), as the case may be, with respect to the Acquired Assets.  After the first round of bidding and between each subsequent round of bidding, the Debtors shall announce the bid that they believe to be the highest and best offer (each a "***Leading Bid***").  A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full

knowledge of the Leading Bid.  Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by any Subsequent Bid (including any Subsequent Bid by the Stalking Horse Bidder), the Debtors will, upon consultation with the Committee, at each round of bidding, give effect to the Expense Reimbursement, the Stalking Horse's credit bid of the DIP Facility and Pre-Petition Indebtedness that may be payable to the Stalking Horse Bidder under the Stalking Horse Purchase Agreement or Subsequent Bid by the Stalking Horse and take into account any additional liabilities to be assumed by a Qualified Bidder and any additional costs which may be imposed on the Debtors by such Qualified Bid in the Debtors' discretion.  The Debtors reserve their right to place time restrictions on each round of bidding at the Auction, or, upon the length of time that any Bidder has to submit a bid at the Auction

(g)     Credit Bidding.  Pursuant to section 363(k) of the Bankruptcy Code, the Stalking Horse Bidder has the right (but not the obligation) to credit bid any and all amounts due and owing to it under the DIP Facility  plus  any unpaid amounts of the Senior Prepetition Indebtedness due and owing to the Stalking Horse Bidder (or its affiliates) as of the Bid Deadline, *provided, however,* that such right shall be subject to a successful challenge brought pursuant to the Final DIP Order that results in a final, non-appealable order restricting the Stalking Horse Bidder's right to credit bid the Senior Pre-Petition Indebtedness.  In addition, the Stalking Horse Bidder shall be entitled to a dollar-for-dollar credit for the Expense Reimbursement for any Subsequent Bid submitted by the Stalking Horse Purchaser.  To the extent that a successful challenge brought subject to the Final DIP Order results in a final, non-appealable order  restricting the Stalking Horse Bidder's right to credit bid the Senior Pre-Petition Indebtedness, the Stalking Horse Bidder shall have the right (but not the obligation) to credit bid any and all amounts due and owing to it under the DIP Facility plus any unpaid amounts of the Senior Pre-Petition Indebtedness due and owing to the Stalking Horse Bidder (or its affiliates) as of the Bid Deadline that are not subject to such an order.

Any and all bids, other than those submitted by or on behalf of the Stalking Horse Bidder or another Qualified Bidder holding secured claims against the Debtors (but only to the extent of such allowed secured claims), shall be in cash unless otherwise provided in these Bidding Procedures

(h)     The Successful Bid.  Immediately at the conclusion of the Auction, the Debtors, upon consultation with the Committee, shall (a) determine, consistent with the Bidding Procedures, which bid constitutes the highest and best bid (such bid, the "***Successful Bid***" and the bidder making such bid, the "***Successful Bidder***") and (b) communicate to the Stalking Horse Bidder and the other Qualified Bidders the identity of the Successful Bidder and the details of the Successful Bid.  At such time, the Debtors shall also determine which bid constitutes the second-highest and best bid, and may, in their discretion, deem such second-highest and best bid a back-up bid (such bid, the "***Back Up Bid***" and the party submitting the Back Up Bid, the "***Back Up Bidder***") and communicate to the Stalking Horse Bidder and other Qualified Bidders the identity of the Back Up Bidder and the details of the Back Up Bid.  Within one (1) Business Day of determining the Successful Bid, the Debtors shall file on the Court's docket a notice disclosing the

16

identity of the Successful Bidder and the identity of the Back Up Bidder, if any (the "***Successful Bidder Notice***").  The Stalking Horse Bidder shall only serve as the Back Up Bidder with the consent of the Stalking Horse Bidder in its sole and absolute discretion; *provided, however,* that if the Stalking Horse Bidder submits a Subsequent Bid for the Acquired Assets, the Debtors may deem such Subsequent Bid the Back Up Bid and the Stalking Horse Bidder the Back Up Bidder; *provided, further, however,* that the Stalking Horse Bidder reserves the right to structure any Subsequent Bid to contain such terms or conditions as the Stalking Horse Bidder deems appropriate, and the Debtors reserve the right to evaluate such bid in accordance with the terms of the Bidding Procedures.

(i)  <u>Return of Deposits</u>.  The Deposit submitted by the Back Up Bidder will be held by the Debtors until forty-eight (48) hours after the Back Up Bid has been terminated in accordance with the Bidding Procedures.  As to all other bidders (except for the Successful Bidder), Deposits will be returned promptly after conclusion of the Sale Hearing.

## C.    Expense Reimbursement

25.    The Stalking Horse Bidder and its advisors have expended, and will continue to expend, considerable time, energy, and resources pursuing the purchase of the Acquired Assets, and have engaged in extended, good faith negotiations with the Debtors to facilitate such transaction.  Among other things, the Stalking Horse Bidder and its professionals inspected the documents pertaining to the Acquired Assets (including land deeds, title documents, and geology reports) and heavily negotiated and drafted the Stalking Horse Purchase Agreement as well as the forms of Bidding Procedures, Bidding Procedures Order, and Sale Order, all of which advance negotiations with any other bidders.  In recognition of this expenditure of time, energy, and resources, the Debtors, in accordance with Section 6.9(a)(i) of the Stalking Horse Purchase Agreement, have agreed to pay the Stalking Horse Bidder an amount of up to $350,000 in cash in reasonable, actual, and documented expenses incurred in connection with the transactions contemplated by the Stalking Horse Purchase Agreement (the "***Expense Reimbursement***").

26.    The Debtors and their advisors believe that a sale of the Acquired Assets requires a stalking horse bid and, if Qualified Bids are received, the Auction in order to ensure a

01:17703442.5

respectable return to the Debtors' estates.  The Expense Reimbursement is necessary in order to obtain the commitment of the Stalking Horse Bidder and compensate it for the time and effort of investigating the Acquired Assets.  Notably, the Stalking Horse Bidder has committed to keep its bid open, subject to the terms of the Stalking Horse Purchase Agreement through at least the close of the Auction, without any assurance that the Debtors' marketing efforts will not yield a higher or better offer.  This alone justifies the Expense Reimbursement and shows that providing it to the Stalking Horse Purchaser is necessary and beneficial to the estate.  Further justifying the Expense Reimbursement, the Bidding Procedures recognize the Debtors' fiduciary obligations to maximize value, and, as such, do not impair the Debtors' ability to consider all Qualified Bids, and preserve the Debtors' right to modify the Bidding Procedures as necessary (subject to certain limits) or appropriate to maximize value for their estates in consultation with the Committee and Stalking Horse Bidder as set forth therein.

27.     The presence and commitment of the Stalking Horse Bidder should assuage some of the concerns of potential bidders regarding the delay and uncertainties inherent in a bankruptcy sale, compared to alternative sales.  Further, the Stalking Horse Bid sets a minimum price floor for bidding on the Acquired Assets while, at the same time, avoiding the possibility of an unsuccessful sale.  While minimizing significant downside risk, the Stalking Horse Bid avoids the need to pay any broker commission to the Stalking Horse Bidder from the proceeds of the Sale, to the benefit of the Debtors' estates.

28.     The Stalking Horse Purchase Agreement reflects the market reality that (i) the Debtors need a stalking horse bidder and (ii) the payments required by the Stalking Horse Bidder are the minimum the Stalking Horse Bidder would accept to go forward with the

18

purchase of the Acquired Assets in light of the fact that the Debtors will have the opportunity to test the Stalking Horse Bid against potential higher and better offers.

**D.     The Notice Procedures**

29.     The Debtors propose to give notice of the Auction and the Sale Hearing in the form attached to the Bidding Procedures Order as <u>Schedule 2</u> (the "***Notice of Auction and Sale Hearing***") no later than three (3) business days after the entry of the Bidding Procedures Order to:  (a) all entities that assert any lien, claim or interest in the Acquired Assets; (b) all parties to the Executory Contracts and Unexpired Leases (as defined below); (c) all governmental taxing authorities that have or as a result of the Sale of the Acquired Assets may have claims, contingent or otherwise, against the Debtors; (d) all state and local taxing authorities having jurisdiction over any of the Acquired Assets, including the Internal Revenue Service; (e) all state and local governmental agencies and environmental agencies in any jurisdiction where the Debtors own or have owned or used real property; (f) the Environmental Protection Agency; (g) all parties that filed requests for notices under Bankruptcy Rule 9010(b) or were entitled to notice under Bankruptcy Rule 2002; (h) all known creditors (whether liquidated, contingent or unmatured) of the Debtors; (i) all interested governmental, pension, environmental and other regulatory entities; (j) the Office of the Attorney General of New Mexico; (k) the Office of the Attorney General of Delaware; (l) the Office of the Attorney General of Arizona; (m) any other applicable state attorneys general; (n) the Office of the United States Trustee for the District of Delaware; (o) the United States Department of Justice; (p) all entities that, within the eighteen months prior to the Petition Date, expressed to the Debtors an interest in purchasing all or a substantial portion of the Acquired Assets; (q) counsel to the Stalking Horse Bidder and all other notice parties requested by the Stalking Horse Bidder; and (r) counsel to the Committee.  In addition to the foregoing, (i) electronic notification of the

19

Motion, the Bidding Procedures Order, and the Notice of Auction and Sale Hearing will be posted on (a) the Court's website, http://www.deb.uscourts.gov, and (b) the case website maintained by the Debtors' claims and noticing agent, American Legal Claim Services, LLC, https://www.americanlegal.com/santafegold; and (ii) no later than three (3) business days after entry of this Order, the Debtors will, subject to applicable submission deadlines, publish the Notice of Auction and Sale Hearing in *The Wall Street Journal* (National Edition) and *The Mining Journal*.

**E.      The Assignment Procedures**

            30.      The Debtors propose the following procedures for notifying counterparties to executory contracts and unexpired leases (collectively, the "***Executory Contracts and Unexpired Leases***") of potential cure amounts and adequate assurance information in the event such Executory Contracts and Unexpired Leases are assumed by the Debtors and assigned to the Stalking Horse Bidder or another successful bidder at the Auction (a "***Successful Bidder***"):

(a)      <u>Notice of Potential Assumption and Assignment</u>.  No later than three (3) business days after entry of the Bidding Procedures Order, the Debtors shall serve a notice of potential assumption, assignment, and/or transfer of Executory Contracts and Unexpired Leases, substantially in the form attached to the Bidding Procedures Order as <u>Schedule 3</u> (a "***Notice of Potential Assumption and Assignment***"), on all non-Debtor parties to the Executory Contracts and Unexpired Leases.  The Notice of Potential Assumption and Assignment will include the cure amounts that the Debtors believe must be paid to cure all defaults outstanding under the Executory Contracts and Unexpired Leases as of such date.

(b)      <u>Objection Period</u>.  Any objections to the assumption and/or assignment of any Executory Contracts or Unexpired Leases identified on a Notice of Potential Assumption and Assignment, including to the cure amount set forth on such notice, must be in writing, filed with the Court, and be *<u>actually</u> <u>received</u>* by the Notice Parties, as defined below, no later than November 23, 2015, at 4:00 p.m. (Eastern Time), or, to the extent that the Stalking Horse Bidder is not the Successful Bidder, but solely with respect to the proposed assumption, assignment, and/or transfer of such Executory Contract or Unexpired Lease to the Successful Bidder, by the Sale Hearing (the "***Cure Amount/Assignment Objection Deadline***").

20

(c)     Assignment Notice.  No later than five (5) calendar days prior to the closing of the Sale, the Debtors shall serve a notice, substantially in the form attached to the Bidding Procedures Order as Schedule 4 (the "**Assignment Notice**"), identifying the Executory Contracts and Unexpired Leases that will be assumed and assigned to the Successful Bidder as of the closing of the Sale.

(d)     Excluded Contracts.  The Successful Bidder may decide to exclude any Executory Contract or Unexpired Lease (each an "**Excluded Contract**") from the list of Acquired Assets at any time prior to the closing of the Sale.  The Debtors shall notify the non-Debtor party or parties to any Excluded Contract of such exclusion by written notice as soon as practicable after such determination, which may be after the Sale Hearing.

**F.     Request to Set a Date and Objection Procedures for the Sale Hearing**

31.     To the extent that the Debtors hold the Auction and select the bid that constitutes the highest and best bid (the "**Successful Bid**"), within one (1) business day of determining the Successful Bid, the Debtors shall file on the Court's docket a notice disclosing the identity of the Successful Bidder and the identity of the entity that made the second-highest and best bid, if any.  The Debtors intend to present the Successful Bid for approval by the Court pursuant to sections 105, 363, and 365 of the Bankruptcy Code at the Sale Hearing to be scheduled by the Court and currently proposed as December 18, 2015.  The Debtors reserve the right to request the adjournment of the Sale Hearing after consultation with the Committee and the consent of the Stalking Horse Bidder (which consent shall not be unreasonably withheld). The Debtors shall be deemed to have accepted a bid only when the Court has approved the bid at the Sale Hearing.

**G.     Objections**

32.     The Debtors respectfully request that this Court require that all objections to the Sale:  (i) be in writing; (ii) be signed by counsel or attested to by the objecting party; (iii) be in conformance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules; (iv) state with particularity the legal and factual basis for the objection and the specific grounds therefor; (v) be filed with the Clerk of the Bankruptcy Court, 824 Market Street, Wilmington,

Delaware 19801 by no later than 4:00 p.m. (prevailing Eastern Time) on **December 11, 2015** (the "*Sale Objection Deadline*"); and (vi) be served in accordance with the Local Rules so as to be actually received on or before the Sale Objection Deadline by the following (the "*Notice Parties*"):  (i) counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington Delaware 19801 (Attn: Kenneth J. Enos, Esq.); (ii) co-counsel to the Stalking Horse Bidder, (a) Sidley Austin LLP, One South Dearborn Street, Chicago, IL 60603 (Attn: Jessica C.K. Boelter, Esq.) and (b) Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, DE 19801 (Attn: Mark D. Collins, Esq.); and (iii) co-counsel to the Committee, (a) Squire Patton Boggs (US) LLP, 30 Rockefeller Plaza, 23rd Floor, New York, NY 10112 (Attn: Norman N. Kinel, Esq.) and (b) Polsinelli PC, 222 Delaware Ave., Ste. 1101, Wilmington, DE 19801 (Attn:  Christopher A. Ward, Esq.)

33.     The failure of any objecting person or entity to file its objections by the Sale Objection Deadline and in accordance with the procedures outlined above, should act as a bar to the assertion, at the Sale Hearing or thereafter, of any objection, and should be deemed to constitute consent to entry of the Sale Order and consummation of the Sale and all transactions related thereto for purposes of section 363(f)(2) of the Bankruptcy Code.

**H.      Sale Free and Clear of Liens, Claims, Interests, and Encumbrances**

34.     The Debtors have agreed to sell, transfer, and assign, pursuant to section 363 of the Bankruptcy Code, the Debtors' right, title, and interest in the Acquired Assets and the Acquired Assets themselves free and clear of any and all liens, claims, interests, and other encumbrances other than Assumed Liabilities and Permitted Liens.  Without the assurance that the Acquired Assets would be sold free and clear of all liens, claims, interests, and other encumbrances other than Assumed Liabilities and Permitted Liens, the Stalking Horse Bidder would not have agreed to the terms of the Stalking Horse Purchase Agreement and would not

consummate the transactions contemplated thereby.  As a result, the sale, transfer, and assignment of the Acquired Assets free and clear of all liens, claims, interests, and other encumbrances (other than the Assumed Liabilities and Permitted Liens) benefits the Debtors' estates by providing a baseline purchase price and ensuring the commitment of significant capital by at least one Qualified Bidder prior to the Auction.  Accordingly, the Debtors seek a finding by the Court that, upon the closing of the Sale, the Successful Bidder shall not be liable for any liens, claims, interests, or other encumbrances other than the Assumed Liabilities and Permitted Liens.

## AUTHORITY FOR REQUESTED RELIEF

**A.      The Bidding Procedures are Appropriate Under the Circumstances**

35.      A debtor may sell, after notice and a hearing, its assets outside the ordinary course of business.  11 U.S.C. § 363(b)(1).  Generally, to obtain approval of a proposed sale of assets, a debtor must demonstrate that the proposed purchase price is the highest and best offer under the circumstances of the case.  *See*, *e.g.*, *In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004) (holding that debtors have a "fiduciary duty to protect and maximize the estate's assets"); *Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-65 (8th Cir. 1997) (holding that in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Integrated Res.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . Debtors' duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting *Cello Bay Co. v. Champion Int'l Corn. (In re Atlanta Packaging Prods., Inc.)*, 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)).

36.      The implementation of bidding procedures to facilitate the sale of a debtor's assets outside of the ordinary course of a debtor's business is routinely approved by

bankruptcy courts as a means of ensuring that such sale will generate the highest and best return for a debtor's estate.  The Debtors submit that the opportunity for bidding embodied in the Bidding Procedures will generate the highest or otherwise best offer for the Acquired Assets and, therefore, is designed to maximize the value of the Acquired Assets.

37.     As set forth above, the Debtors believe that the Sale is the best way to maximize the value of the Acquired Assets for the benefit of their estates, creditors, and other stakeholders as the Debtors are not able to monetize the Acquired Assets through operations. Accordingly, the Debtors, in their business judgment, have concluded that (i) a sale of the Acquired Assets is the best way to maximize value for the Debtors' estates and (ii) the proposed Bidding Procedures described herein are fair, reasonable, and appropriate and are designed to maximize recovery with respect to the sale of the Acquired Assets.

**B.     Sale of the Acquired Assets is a Product of the Debtors' Reasonable Business Judgment**

38.     Section 363(b)(1) of the Bankruptcy Code provides:  "[t]he Trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  Section 105(a) of the Bankruptcy Code provides in relevant part:  "[t]he Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

39.     A proposed sale of assets of a debtor under section 363 of the Bankruptcy Code outside the ordinary course of business and prior to the confirmation of a plan of reorganization should be approved if a court finds that the transaction represents a reasonable business judgment on the part of the trustee or debtor in possession.  *See In re Abbotts Dairies of Pa.*, 788 F.2d 143 (3d Cir. 1986); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (holding that the following non-exclusive list of factors may be considered by a court in

determining whether there is a sound business purpose for an asset sale: "the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the effect of the proposed disposition of [sic] the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the property; and whether the asset is decreasing or increasing in value"); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a section 363 sale in a chapter 11 case are "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith").

40.    The "sound business reason" test requires a trustee or debtor-in-possession to establish four elements:  (1) that a sound business purpose justifies the sale of assets outside the ordinary course of business; (2) that accurate and reasonable notice has been provided to interested persons; (3) that the trustee or the debtor in possession has obtained a fair and reasonable price; and (4) that the trustee or debtor in possession acted in good faith.  *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991); *In re Titusville Country Club*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Sovereign Estates, Ltd.*, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); *Phoenix Steel Corp.*, 82 B.R. at 335-36; *see also Stephens Indus. Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983).

41.    The Bidding Procedures meet the "sound business reason" test.  First, sound business purposes justify the Sale.  Operating the Mining Projects would demand a significant investment of time and capital contribution, which the Debtors do not have.  On the other hand, the Sale process will maximize the value of the Mining Projects, to the benefit of all of the Debtors' stakeholders.

42.     The proposed procedures for the Sale also meet the other factors of the "sound business reason" test.   As part of this motion, the Debtors have sought to establish procedures for notice to creditors and other prospective bidders.   Under the circumstances of the Chapter 11 Cases, the Debtors submit that the notice periods proposed (i) satisfy the requirements of the Bankruptcy Rules and (ii) provide sufficient time for (a) parties in interest to submit objections to the proposed sale and (b) bidders to formulate and submit competing proposals.   The timing of the Auction was specifically negotiated to afford bidders adequate time to conduct inspections of the Mining Projects.

43.     In addition, the Stalking Horse Bid represents a fair and reasonable price for the Acquired Assets.   The Stalking Horse Bid was negotiated at arm's-length and was the best and only proposal that the Debtors received for the Mining Projects after significant efforts. Further, the Bidding Procedures will allow the Debtors to test the Stalking Horse Bid against other potential bids in a competitive process, providing further assurance that the Debtors will obtain the best possible price for the Mining Projects.

44.     Finally, the Bidding Procedures satisfy the good faith requirement established by *Abbotts Dairies*.   The Debtors submit that the results of the Sale process will be the product of good faith, arm's-length negotiations with respect to the price and other terms of the Sale between the Debtors and the highest and best bidder at the conclusion of the Sale process.

45.     As set forth above, the Debtors have demonstrated compelling and sound business justifications for authorizing the Bidding Procedures and the Sale.   The Sale pursuant to the Bidding Procedures will provide the Debtors' estates an opportunity to maximize creditor recoveries.   Accordingly, the Debtors request that the Court approve the Bidding Procedures,

26

approve the Sale presented to the Court at the Sale Hearing, and authorize the Debtors to take such other steps as are necessary to consummate the Sale.

## C.     The Expense Reimbursement is Necessary Under the Circumstances

46.     The Debtors have formulated a bidding process that the Debtors believe will induce prospective competing bidders to expend the time, energy, and resources necessary to submit a bid, and which the Debtors believe is fair and reasonable and will provide a benefit to the Debtors' estates and creditors.  The Debtors have concluded that the provision of the Expense Reimbursement is warranted under the circumstances at hand.

47.     The use of bid protections such as the Expense Reimbursement enables a debtor to ensure a sale at a minimum price that the debtor believes is fair, while providing the debtor with the potential of obtaining an enhanced recovery through an auction process. Historically, bankruptcy courts have approved bidding incentives solely by reference to the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment.  *See*, *e.g.*, *In re 995 Fifth Ave. Assocs.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (holding that bidding incentives may "be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking" and upholding the fee where the creditors' committee closely scrutinized the fee, the fee was not unreasonable in relation to the size of the sale, and the work and expense involved in negotiating the transaction were significant) (citation omitted); *In re Marrose Corp.*, Nos. 89 B 12171-12179 (CB), 1992 WL 33848, at *5 (Bankr. S.D.N.Y. Feb. 15, 1992) ("[bidding incentives] are meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers"); *see also In re Integrated Res.*, 147 B.R. at 657-58.

01:17703442.5

48.    The United States Court of Appeals for the Third Circuit Court, through its decision in *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999), clarified that in the bankruptcy context, while a debtor's business judgment is relevant, a debtor also must show that bidding incentives, as administrative expenses under section 503(b) of the Bankruptcy Code, provide a benefit to the debtor's estate.  *Id.* at 533.

49.    The *O'Brien* opinion identified at least two instances in which bidding incentives may provide a benefit to the estate.  First, a benefit may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited."  *Id.* at 537.  Second, where the availability of bidding incentives induced a bidder to research the value of the debtor and submit a bid that serves as a minimum or floor bid on which other bidders can rely, "the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth."  *Id.*

50.    The Expense Reimbursement is wholly in line with—and indeed less than—protections approved by other bankruptcy courts in comparable circumstances.[6]  As such, the Expense Reimbursement is consistent with the "business judgment rule" and satisfies the Third Circuit's "administrative expense" standard.  The Stalking Horse Bidder is unwilling to pursue the Stalking Horse Purchase Agreement—while subjecting it to higher or better offers—absent approval of the Expense Reimbursement.  The Expense Reimbursement is warranted to induce the Stalking Horse Bidder to continue to participate in the auction process, and that

---

[6]  *See generally* J. Samet, Use of Break-Up and Topping Fees in Corporate and Bankruptcy Asset Sales. 918 Nuts and Bolts of Corp. Bankr. 351 (Nov-Dec. 2009).

without the Expense Reimbursement, bidding on the Acquired Assets may be reduced or nonexistent, leaving the Debtors with the risk of insufficient interest in the Acquired Assets.

51.     The Debtors have concluded that the Expense Reimbursement is warranted based on the specific facts and circumstances including, without limitation, the extensive negotiations leading up to the Stalking Horse Purchase Agreement and the due diligence performed by the Stalking Horse Bidder.    Moreover, the Stalking Horse Bidder negotiated the Stalking Horse Purchase Agreement without a broker and, thus, there will be no commission payable from the Sale proceeds.    Accordingly, the Debtors respectfully request (i) authority to pay the Expense Reimbursement in accordance with the Stalking Horse Purchase Agreement and (ii) that the Debtors' obligations to make such payment be accorded administrative expense status under sections 503(b) and 507(a) of the Bankruptcy Code.

**D.    Sale of the Acquired Assets Should be Free and Clear of Liens, Claims, Interests, and Encumbrances**

52.     Pursuant to section 363(f) of the Bankruptcy Code, the Debtors seek authority to sell and transfer the Debtors' right, interest, and title in the Acquired Assets to the Successful Bidder free and clear of all liens, claims, interests, and other encumbrances other than the Assumed Liabilities and Permitted Liens, with such other liens, claims, interests, and other encumbrances to attach to the proceeds of the sale of the Acquired Assets, subject to any rights and defenses of the Debtors and other parties in interest with respect thereto.    Section 363(f) of the Bankruptcy Code provides, in pertinent part:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –
>
> (1)    applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)    such entity consents;

29

(3)      such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4)      such interest is in bona fide dispute; or

(5)      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see also In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988) (holding that since section 363(f) of the Bankruptcy Code was written disjunctively, a court may approve a sale "free and clear" provided at least one of the requirements is met).

53.      The Sale free and clear of liens, claims, interests, and other encumbrances, if any, other than the Assumed Liabilities and Permitted Liens is necessary to maximize the value of the Acquired Assets.  A sale of the Acquired Assets other than one free and clear of all interests except for Assumed Liabilities and Permitted Liens would yield substantially less value for the Debtors' estates, with less certainty than a transaction free and clear of all interests except for the Assumed Liabilities and Permitted Liens.  Therefore, the Sale contemplated by the Stalking Horse Purchase Agreement is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

**E.    A Successful Bidder Should be Granted the Protection of Section 363(m) of the Bankruptcy Code**

54.      As will be set forth in further detail at the Sale Hearing, the Debtors also maintain that the Stalking Horse Bidder, or any other Successful Bidder arising from the Auction, is or would be entitled to the protections afforded by section 363(m) of the Bankruptcy Code.

55.      Specifically, section 363(m) of the Bankruptcy Code provides that:

[t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such

authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

56.    While the Bankruptcy Code does not define "good faith," the Third Circuit in *Abbotts Dairies* held that:

> [t]he requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F.2d at 147 (citations omitted); *see generally Marin v. Coated Sales, Inc., (In re Coated Sales, Inc.)*, No. 89-3704 (KMW), 1990 WL 212899, at * 2, (S.D.N.Y. Dec. 13, 1990) (holding that a party, to show lack of good faith, must demonstrate "fraud, collusion . . . or an attempt to take grossly unfair advantage of other bidders"); *see also In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (quoting *In re Bel Air Assocs., Ltd.*, 706 F.2d 301, 305 (10th Cir. 1983)); *In re Pisces Leasing Corp.*, 66 B.R. 671, 673 (E.D.N.Y. 1986) (examining facts of each case, concentrating on "integrity of [an actor's] conduct during the sale proceedings" (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)).

57.    In addition, as will be set forth in further detail at the Sale Hearing, the Stalking Horse Purchase Agreement has been negotiated and proposed by the Debtors and the Stalking Horse Bidder without collusion, in good faith, and from arm's-length bargaining positions, with give and take on both sides.  Further, neither the Debtors nor the Stalking Horse Bidder have engaged in any conduct that would cause or permit the Stalking Horse Purchase Agreement to be avoided.  Under the circumstances, this Court should find that the Stalking

31

Horse Bidder (or any other Successful Bidder) is entitled to all of the protections of section 363(m) of the Bankruptcy Code.

**F.      The Stalking Horse Purchase Agreement is Not the Subject of Collusive Bidding Under Section 363(n) of the Bankruptcy Code**

58.      As set forth above and as will be set forth in further detail at the Sale Hearing, the Stalking Horse Purchase Agreement with the Stalking Horse Bidder has been negotiated and proposed by the Debtors and the Stalking Horse Bidder without collusion, in good faith, and from arm's-length bargaining positions.  Therefore, neither the Debtors nor the Stalking Horse Bidder have engaged in any conduct that would cause or permit the Stalking Horse Purchase Agreement to be avoided under section 363(n) of the Bankruptcy Code.

**G.      Notice of the Proposed Sale is Reasonable**

59.      The Debtors submit that the Notice Procedures as set forth above are appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Bidding Procedures.  This motion has been filed and served in accordance with Bankruptcy Rule 2002, and the Notice of Auction and Sale Hearing will provide all interested parties with further notice of the Bidding Procedures, the Sale Objection Deadline, and the Sale Hearing.

**H.      The Assignment Procedures for the Assumption and Assignment of the Executory Contracts and Unexpired Leases Should be Authorized**

60.      Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or [unexpired] lease of the debtor."  11 U.S.C. § 365(a).  The standard governing bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection.  *See*, *e.g.*, *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003)

(finding that a debtor's decision to assume or reject an executory contract is governed by the business judgment standard and can only be overturned if the decision was a product of bad faith, whim or caprice); *see also In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (finding that assumption or rejection of a lease "will be a matter of business judgment by the bankruptcy court").

61.     The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption] or rejection of the contract will benefit the estate." *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987).  Any more exacting scrutiny would slow the administration of the debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially.  *See Richmond Leasing Co. v. Capital Bank*, 762 F.2d 1303, 1311 (5th Cir. 1985).  Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for "actual pecuniary loss" relating to such default.  11 U.S.C. § 365(b)(1).

62.     Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract.  *See In re Rickel Home Center, Inc.*, 209 F.3d 291, 299 (3d Cir. 2000) ("The Code generally favors free assignability as a means to maximize the value of the debtor's estate."); *see also In re Headquarters Dodge, Inc.*, 13 F.3d 674, 682 (3d Cir. 1994) (noting that the purpose of section 365(f) is to assist the trustee in realizing the full value of the debtor's assets).

63.     Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction."  *In re DBSI, Inc.*, 405 B.R. 698, 708 (Bankr. D. Del. 2009); *see also In re Decora Indus.*, 2002 U.S. Dist. LEXIS 27031, at *23 (D. Del. May 20, 2002) ("[A]dequate assurance falls short of an absolute guarantee of payment.").  Adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See*, *e.g.*, *In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (finding that adequate assurance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business to give it strong likelihood of success).

64.     The Debtors request approval under section 365 of the Bankruptcy Code of the Assignment Procedures governing the Debtors' assumption and assignment of the Executory Contracts and Unexpired Leases to the Stalking Horse Bidder, any other Successful Bidder, or such other Successful Bidder's designee.  The Debtors further request that the Sale Order provide that, subject to the Assignment Procedures, the Executory Contracts and Unexpired Leases will be transferred to, and remain in full force and effect for the benefit of, the Stalking Horse Bidder, any other Successful Bidder, or such other Successful Bidder's designee notwithstanding any provisions in the Executory Contracts or Unexpired Leases, including those described in sections 365(b)(2), (f)(1), and (f)(3) of the Bankruptcy Code, that would prohibit such assignment.

65.     To the extent that a counterparty to an Executory Contract or Unexpired Lease objects to the assumption and assignment of its respective Executory Contract or Unexpired Lease, the Debtors will present facts at a hearing to show the financial credibility, willingness and ability of the Stalking Horse Bidder, any other Successful Bidder, or such other Successful Bidder's designee to perform under such Executory Contract or Unexpired Lease. The hearing will afford the Court and other interested parties the opportunity to evaluate the ability of the Stalking Horse Bidder, any other Successful Bidder, or such other Successful Bidder's designee to provide adequate assurance of future performance under the Executory Contract(s) or Unexpired Lease(s), as required under section 365(b)(1)(C) of the Bankruptcy Code.  Further, as set forth above, the Debtors will give notice to all non-Debtor counterparties to the Executory Contracts and Unexpired Leases (and their counsel of record, if known).  This notice will include the amounts the Debtors believe are necessary to cure any defaults in accordance with section 365(b) Bankruptcy Code.  Accordingly, the Debtors submit that implementation of the proposed Assignment Procedures is appropriate in these cases.

## WAIVER OF BANKRUPTCY RULES 6004(h) AND 6006(d)

66.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  The Debtors request that the Bidding Procedures Order and Sale Order be effective immediately by providing that the fourteen day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

01:17703442.5

## NOTICE

67.     No trustee or examiner has been appointed in these Chapter 11 Cases. Notice of this Motion has been provided to:  (a) the U.S. Trustee; (b) proposed counsel to the Committee; (c) counsel to Waterton Global Value, L.P., in its capacity as the Senior Pre-Petition Lender; (d)  Sandstorm Gold (Barbados) Ltd., in its capacity as the second lien pre-petition lender; (e) counsel to Waterton Global Value, L.P., by its investment manager, Altitude Management Limited, in its capacity as the DIP Lender; (f) counsel to the Stalking Horse Bidder; and (g) all parties that, as of the filing of this Motion, have requested notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that this Court (i) grant this motion and the relief requested herein; (ii) enter the proposed orders attached hereto; and (iii) grant such other and further relief as it deems just, proper, and equitable.

Dated: September 25, 2015
      Wilmington, Delaware

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Kenneth J. Enos*
Robert S. Brady (No. 2847)
Edmon L. Morton (No. 3856)
Kenneth J. Enos (No. 4544)
Ian J. Bambrick (No. 5455)
1000 N. King Street
Rodney Square
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253

*Proposed Counsel to the*
*Debtors and Debtors in Possession*

36

01:17703442.5