**<u>EXHIBIT B</u>**

**Stalking Horse Purchase Agreement**

ASSET PURCHASE AGREEMENT[1]

dated as of [____], 2015

by and among

SANTA FE GOLD CORPORATION,

SANTA FE GOLD (BARBADOS) CORPORATION,

THE LORDSBURG MINING COMPANY,

AZCO MICA, INC.,

and

[WATERTON ENTITY]

---

[1] This Asset Purchase Agreement is a draft agreement.  Completion and closing under this Asset Purchase Agreement are subject to, among other things, receipt by Buyer of satisfactory schedules, exhibits, closing documents and other materials that are responsive to certain questions in respect of the representations.

# TABLE OF CONTENTS

**Page**

ARTICLE 1 DEFINITIONS ..................................................................... 1
    1.1     Defined Terms ............................................................. 1
    1.2     Interpretation ............................................................. 10

ARTICLE 2 TRANSFER OF ASSETS AND ASSUMPTION OF LIABILITIES ................... 11
    2.1     Assets to be Acquired ................................................. 11
    2.2     Excluded Assets ........................................................ 13
    2.3     Liabilities to be Assumed by the Buyer .............................. 13
    2.4     Excluded Liabilities ................................................... 14
    2.5     Exclusion of Assumed Contracts ...................................... 15
    2.6     Consents ................................................................ 15

ARTICLE 3 CLOSING; CONSIDERATION ....................................................... 16
    3.1     Closing; Transfer of Possession; Certain Deliveries ................. 16
    3.2     Consideration .......................................................... 17
    3.3     Allocation of Consideration .......................................... 17

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF THE SELLERS .................. 18
    4.1     Organization ........................................................... 18
    4.2     Due Authorization, Execution and Delivery; Enforceability ........... 18
    4.3     Consents ................................................................ 18
    4.4     No Conflicts ............................................................ 18
    4.5     Taxes ................................................................... 18
    4.6     Real Property; Acquired Assets ....................................... 19
    4.7     Machinery and Equipment ............................................. 22
    4.8     Environmental Matters ................................................ 22
    4.9     Compliance with Other Laws and Permits ............................. 22
    4.10    Financial Advisors .................................................... 23
    4.11    Seller Security ......................................................... 23
    4.12    Litigation ............................................................... 23
    4.13    No Known Claims ...................................................... 23
    4.14    Intellectual Property ................................................... 23
    4.15    Contracts .............................................................. 23
    4.16    Operational Matters ................................................... 24
    4.17    Insurance ............................................................... 25
    4.18    Bank Accounts ......................................................... 25
    4.19    Full Disclosure ........................................................ 25

ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF THE BUYER ................... 25
    5.1     Organization ........................................................... 25
    5.2     Due Authorization, Execution and Delivery; Enforceability ........... 25

5.3     Consents ................................................................................26
5.4     No Conflicts ..........................................................................26
5.5     Financial Capability .............................................................26
5.6     Financial Advisors ...............................................................26

ARTICLE 6 COVENANTS OF THE PARTIES ......................................... 26
6.1     Conduct of Business Pending the Closing ...........................26
6.2     Access ...................................................................................27
6.3     Public Announcements .........................................................27
6.4     Tax Matters ..........................................................................28
6.5     Regulatory Approvals ..........................................................28
6.6     Further Assurances ...............................................................29
6.7     Nature of Transaction ..........................................................30
6.8     Permits Covenant. ................................................................30
6.9     Bankruptcy Matters..............................................................30

ARTICLE 7 CONDITIONS TO OBLIGATIONS OF THE PARTIES ...................................... 32
7.1     Conditions Precedent to Obligations of the Buyer .............32
7.2     Conditions Precedent to the Obligations of the Sellers ......33

ARTICLE 8 TERMINATION ....................................................................... 34
8.1     Termination of Agreement....................................................34
8.2     Consequences of Termination...............................................36

ARTICLE 9 MISCELLANEOUS ................................................................. 36
9.1     Expenses ...............................................................................36
9.2     Assignment ...........................................................................36
9.3     Parties in Interest.................................................................36
9.4     Notices ..................................................................................36
9.5     Choice of Law; Jurisdiction and Venue...............................37
9.6     Entire Agreement; Amendments and Waivers .....................37
9.7     Schedules ..............................................................................38
9.8     Counterparts; Facsimile and Electronic Signatures ...........38
9.9     Severability ..........................................................................38
9.10    WAIVER OF RIGHT TO TRIAL BY JURY....................38
9.11    NO CONSEQUENTIAL DAMAGES................................38
9.12    Survival ................................................................................38
9.13    Non-Recourse ......................................................................39
9.14    Seller Representative ...........................................................39

ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT is dated as of [___], 2015 (the "*Effective Date*"), by and among SANTA FE GOLD CORPORATION, a Delaware corporation, THE LORDSBURG MINING COMPANY, a New Mexico corporation, AZCO MICA, INC., a Delaware corporation, (each a "*U.S. Seller*" and, collectively, the "*U.S. Sellers*"), SANTA FE GOLD (BARBADOS) CORPORATION, a Barbados corporation (the "*Barbados Seller*" and, collectively, with the U.S. Sellers, the *"Sellers")*, SANTA FE GOLD CORPORATION, in its capacity as representative of the Sellers ("*Seller Representative*") and [WATERTON ENTITY], a [____] (the "*Buyer*"). The Sellers and the Buyer are each referred to herein as a "*Party*" and, collectively, as the "*Parties*."

WHEREAS, the Sellers will, as of the Closing, hold certain assets, permits, contracts and other rights currently used or held for use in the ownership and operation of the Mining Properties;

WHEREAS, on August 26, 2015, the Sellers filed voluntary petitions ("*Petitions*") for relief (commencing the "*Chapter 11 Cases*") under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*") in the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*"); and

WHEREAS, upon the terms and subject to the conditions contained in this Agreement, and as authorized under sections 105, 363 and 365 of the Bankruptcy Code, the Sellers wish to sell to the Buyer and the Buyer wishes to purchase from the Sellers all of the right, title and interest of the Sellers as of the Closing Date in the Acquired Assets and to assume from the Sellers the Assumed Liabilities.

NOW, THEREFORE, in consideration of the premises, representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and, intending to be legally bound hereby, the Parties agree as follows:

**ARTICLE 1**
**DEFINITIONS**

1.1   <u>Defined Terms</u>.   As used herein, the terms below shall have the following meanings:

"*Acquired Assets*" has the meaning set forth in <u>Section 2.1</u>.

"*Acquired Permits*" has the meaning set forth in <u>Section 2.1(d)</u>.

"*Affiliate*" means, (x) with respect to any Person, any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with, the Person specified and (y) with respect to Buyer, Waterton Precious Metals Fund II Cayman, LP.  For purposes hereof, "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of a Person, through ownership of voting securities or rights, by contract, as trustee, executor or otherwise.

1

"***Agreed Allocations***" has the meaning set forth in <u>Section 3.3</u>.

"***Agreement***" means this Asset Purchase Agreement, together with all exhibits hereto and the Schedules.

"***Applicable Accounting Principles***" means in respect of the Sellers, generally accepted accounting principles in the United States set forth from time to time in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the accounting profession), including the FASB Accounting Standards Codification™, which are applicable to the circumstances as of the date of determination.

"***Assignment and Assumption Agreement***" means an assignment and assumption agreement, in form and substance reasonably acceptable to the Buyer, pursuant to which the Sellers will convey all Acquired Assets to the Buyer, other than any Acquired Assets transferred pursuant to a Bill of Sale or Deed and Conveyance, and the Buyer will accept such Acquired Assets and assume the Assumed Liabilities.

"***Assumed Contracts***" has the meaning set forth in <u>Section 2.1(c)</u>.

"***Assumed Liabilities***" has the meaning set forth in <u>Section 2.3</u>.

"***Bankruptcy Code***" has the meaning set forth in the recitals.

"***Bankruptcy Court***" has the meaning set forth in the recitals.

"***Bankruptcy Rules***" means the Federal Rules of Bankruptcy Procedure, as in effect from time to time.

"***Barbados Seller***" has the meaning set forth in the preamble.

"***Bid Procedures***" means the bidding procedures, in the form set forth in <u>Exhibit A</u>, with modifications, if any, to be in form and substance satisfactory to the Buyer.

"***Bid Procedures Order***" means an Order of the Bankruptcy Court, in the form set forth in <u>Exhibit B</u>, with modifications, if any, to be in form and substance satisfactory to the Buyer that, among other things, approves the Bid Procedures, designates the Buyer as a "stalking horse bidder" and authorizes the Sellers to pay the Expense Reimbursement in accordance with this Agreement and the Bid Procedures.

"***Bill of Sale***" means a bill of sale for the Owned Machinery and Equipment, in form and substance reasonably acceptable to the Buyer.

"***Business Day***" means any day other than a Saturday, Sunday or a legal holiday on which banking institutions in the State of New York are not required to open.

"***Buyer***" has the meaning set forth in the preamble.

2

"***Chapter 11 Cases***" has the meaning set forth in the recitals.

"***Claims***" means all rights or causes of action (whether in law or equity), Proceedings, obligations, demands, restrictions, warranties, guaranties, indemnities, consent rights, options, contract rights, rights of recovery, setoff, recoupment, indemnity or contribution, covenants and interests of any kind or nature whatsoever (known or unknown, matured or unmatured, accrued or contingent and regardless of whether currently exercisable), whether arising prior to or subsequent to the commencement of the Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity or otherwise, including all "claims" as defined in section 101(5) of the Bankruptcy Code.

"***Closing***" has the meaning set forth in Section 3.1(a).

"***Closing Date***" has the meaning set forth in Section 3.1(a).

"***Code***" means the Internal Revenue Code of 1986.

"***Competing Transaction***" has the meaning set forth in Section 6.9(b).

"***Consent***" has the meaning set forth in Section 4.3.

"***Consideration***" has the meaning set forth in Section 3.2.

"***Contract***" means any written or oral contract, lease (including the Real Property Leases), license, purchase order, sales order or other agreement, arrangement, understanding or commitment that is binding upon a Person or its property.

"***Cure Amount***" means the amount payable in order to cure all defaults existing under the Assumed Contracts and to effectuate the assumption by the Sellers of the Assumed Contracts and the assignment to the Buyer pursuant to section 365 of the Bankruptcy Code as provided in the Sale Order or other Order of the Bankruptcy Court.

"***Cut-Off Date***" has the meaning set forth in Section 2.5.

"***Deed and Conveyance***" means the special warranty deed and conveyances to be delivered by the Sellers at Closing, in form and substance mutually acceptable to the Parties, pursuant to which the Sellers will convey to the Buyer any Owned Real Property, Mining Claims and Leased Real Property.

"***DIP Credit Agreement***" means the Debtor-In-Possession Credit Agreement (as may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms) by and among Santa Fe Gold Corporation as borrower, the other Sellers as guarantors, and Waterton Global Value, L.P., by its investment manager, Altitude Management Limited, as lender.

"***DIP Facility***" means the post-petition financing provided pursuant to the terms of (i) the DIP Credit Agreement, and (ii) any and all other Credit Documents (as defined in the DIP Credit Agreement).

"***Effective Date***" has the meaning set forth in the preamble.

"***Environmental Law***" means any Law relating to the environment, health and safety, Hazardous Materials (including the use, handling, transportation, production, disposal, discharge or storage thereof), industrial hygiene, protection of natural resources and threatened and endangered species and environmental conditions on, under, or migrating to or from any real property owned, leased or operated at any time by any Seller, including soil, groundwater, and indoor and ambient air conditions or the reporting or remediation of environmental contamination.

"***ERISA***" means the *Employee Retirement Income Security Act of 1974*, as amended, together with the regulations thereunder, in each case as in effect from time to time.

"***Excluded Assets***" has the meaning set forth in <u>Section 2.2</u>.

"***Excluded Liabilities***" has the meaning set forth in <u>Section 2.4</u>.

"***Expense Reimbursement***" means a reimbursement to the Buyer of the Buyer's actual, documented expenses incurred in connection with the transactions contemplated by this Agreement, including professional fees; *provided, however*, that such reimbursement shall not exceed $350,000 in the aggregate.

"***Filing***" has the meaning set forth in <u>Section 4.3</u>.

"***Governmental Entity***" means any federal, state, provincial, local, municipal, foreign or other (a) government; (b) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official or entity and any court or other tribunal); or (c) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power of any nature.

"***Hazardous Materials***" means any material, waste, substance, chemical, pollutant or contaminant that is regulated  or for which Liabilities or standards of care are imposed under applicable Environmental Laws due to hazardous or toxic properties, including:  (a) any type of crude oil, petroleum or petroleum distillate, or fraction or by-product thereof; and (b) all substances falling within the definitions of "hazardous substances," "hazardous materials," "toxic substances," "radioactive materials," "hazardous chemicals," "toxic chemicals," or "hazardous waste," as set forth in any applicable Environmental Law.

"***Intellectual Property***" means the following and all worldwide rights, arising out of or associated therewith: (a) all patents and applications therefor and all reissues, divisions, renewals, extensions, provisionals, continuations and continuations-in-part thereof, (b) all inventions (whether patentable or not), improvements, trade secrets, and know-how and other proprietary information which derives independent economic value from not being generally known to the public, (c) all works of authorship (whether copyrightable or not), all copyrights, copyright registrations and applications therefor, and all other rights corresponding thereto, (d) all internet uniform resource locators, domain names, trade names, trade dress, common law trademarks and service marks, trademarks and service marks, and trade dress, together with the goodwill connected with the use of and symbolized by, and all registrations, applications, and

4

renewals for, any of the foregoing, and (e) any similar, corresponding or equivalent rights to any of the foregoing anywhere in the world including royalties, fees, income, payments and other proceeds now or hereafter due or payable with respect to any and all of the foregoing, and claims and causes of action, with respect to any of the foregoing, whether accruing before, on or after the date hereof, including all rights to and claims for damages, restitution and injunctive relief for infringement, dilution, misappropriation, violation, misuse, breach or default, with the right but no obligation to sue for such legal and equitable relief, and to collect, or otherwise recover, any such damages.

"*Interim Period*" has the meaning set forth in <u>Section 6.1</u>.

"*Law*" means any federal, state, provincial, local or foreign statute, law, ordinance, regulation, rule, code, Order, principle of common law, judgment or decree enacted, promulgated, issued, enforced or entered by any Governmental Entity or other requirement or rule of law.

"*Leased Machinery and Equipment*" has the meaning set forth in <u>Section 2.1(c)</u>.

"*Leased Mining Claims*" has the meaning set forth in <u>Section 4.6(c)(ii)</u>.

"*Leased Real Property*" has the meaning set forth in <u>Section 4.6(b)</u>.

"*Liabilities*" means, as to any Person, adverse Claims, liabilities, commitments, responsibilities, and obligations of any kind or nature whatsoever, direct or indirect, absolute or contingent, whether accrued, vested or otherwise, whether known or unknown and whether or not actually reflected, or required to be reflected, in such Person's balance sheet or other books and records.

"*Lien*" means any lien (statutory or otherwise), Claim, pledge, option, charge, right of first refusal, hypothecation, encumbrance, royalty, easement, lease or sublease, security interest, right-of-way, encroachment, mortgage, deed of trust, restriction on transferability or other similar restriction, whether imposed by agreement, Law or otherwise and whether of record or otherwise.

"*Machinery and Equipment*" has the meaning set forth in <u>Section 2.1(c)</u>.

"*Material Adverse Effect*" means any change, event, circumstance, development or effect that is or would reasonably be expected to be materially adverse to the Acquired Assets or to the Sellers' ability to perform its obligations under this Agreement in a timely fashion or to consummate the transactions contemplated hereby in a timely fashion, excluding any change, event, circumstance, development or effect resulting or arising from: (a) any circumstance generally affecting the international, national or regional mining industry; (b) any change in economic, financial market, regulatory or political conditions, including any engagements of hostilities, acts of war or terrorist activities, or changes imposed by a Governmental Entity associated with additional security; (c) changes or prospective changes in Law, Applicable Accounting Principles or official interpretations of the foregoing; (d) changes attributable to the announcement of this transaction or the identity of the Buyer, including any loss, diminution or disruption, whether actual or threatened, of existing or prospective customer, distributor, supplier

or other relationships resulting therefrom; (e) the failure in and of itself by any Seller to meet any projections or estimates, including internal projections or estimates of revenue, earnings or performance (it being understood that the underlying causes of the failure to meet such projections shall be taken into account in determining whether a Material Adverse Effect has occurred); or (f) the pendency of the Chapter 11 Cases and any action approved by, or motion made before, the Bankruptcy Court.

"*Mill*" means that certain structure or building for the crushing, grinding, treatment, processing and concentration of ores, minerals and other materials as further described in Schedule 1.1(m), together with all related and associated fixtures, improvements and equipment, and all additions, repairs, renovations, upgrades, constructions, replacements, and new facilities, in whole or in part, whether now or hereafter existing.

"*Mining Claims*" means, collectively, the Leased Mining Claims and the Owned Mining Claims.

"*Mining Properties*" has the meaning set forth in Section 2.1(a).

"*Non-Party Affiliates*" has the meaning set forth in Section 9.13.

"*Notices*" has the meaning set forth in Section 9.4.

"*Operating Records and Other Information*" means all data, information (including tangible and intangible information such as drill core, drill logs, assays, metallurgical test work, mine plans and similar information, core samples and core data), technical, engineering and permitting information and reports, geological, metallurgical, geophysical, geochemical and analytical data and reports, files, books (including accounting books and records), operating records, operating, safety and maintenance manuals, engineering and design plans, blueprints and as-built plans, specifications, drawings, reports, procedures, facility compliance plans, test records and results, other records and filings made with Governmental Entities, environmental procedures and similar records, in each case, to the extent relating to the Acquired Assets described in Sections 2.1(a) through 2.1(f) and Sections 2.1(h) through 2.1(m).

"*Order*" means any judgment, order, injunction, writ, ruling, decree, stipulation or award of any Governmental Entity.

"*Outside Date*" has the meaning set forth in Section 8.1(b).

"*Owned Machinery and Equipment*" has the meaning set forth in Section 2.1(c).

"*Owned Mining Claims*" has the meaning set forth in Section 4.6(c)(i).

"*Owned Real Property*" has the meaning set forth in Section 4.6(a).

"*Party*" has the meaning set forth in the preamble.

"*Permits*" means permits, licenses, registrations, certificates of occupancy, approvals, consents, clearances and other authorizations issued by any Governmental Entity.

6

"***Permitted Liens***" means: (a) title of a lessor under a capital or operating lease that is an Assumed Contract; (b) such Liens, imperfections in title, easements or restrictions that are due exclusively to zoning or subdivision, entitlement, and other land use Laws or regulations; (c) Liens that arise exclusively by reason of acts of the Buyer or with the prior written approval of the Buyer; or (d) all covenants, conditions, restrictions, easements, charges, rights of way, or other similar encumbrances on title, but excluding royalties or any similar interests, in each case, that are filed of record in the real property records in the jurisdiction in which the affected Acquired Asset is located or are filed with the state office of the Bureau of Land Management or with the Division of Water Resources (or similar agency) in the jurisdiction in which the affected Acquired Asset is located, and that do not materially affect the value of the real property or interfere with the use of such affected Acquired Asset; *provided, however*, that Permitted Liens shall not include Liens for Taxes (other than Liens for Transfer Taxes arising with respect to the transactions contemplated by this Agreement).

"***Person***" means an individual, a partnership, a joint venture, a corporation, a business trust, a limited liability company, a trust, an unincorporated organization, a joint stock company, a labor union, an estate, a Governmental Entity or any other entity.

"***Petition Date***" means August 26, 2015.

"***Petitions***" has the meaning set forth in the recitals.

"***Plan***" means at a particular time, any employee benefit plan that is covered by ERISA and in respect of which a Seller is (or, if such plan were terminated at such time, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"***Prepaid Expenses***" means all prepaid charges and expenses of a Seller to the extent such charges and expenses (a)(i) were deposited or paid pursuant to Assumed Contracts and (ii) relate to goods or services to be performed to or for the benefit of the Buyer or any of its Affiliates at any time after the Closing and (b) cash deposits paid by any Sellers under any Assumed Contracts that will be transferred to the Buyer or any of its Affiliates at Closing.

"***Proceeding***" means any claim, action, arbitration, audit, known investigation (including a notice of preliminary investigation or formal investigation), notice of violation, hearing, litigation or suit (whether civil, criminal or administrative), other than the Chapter 11 Cases, commenced, brought, conducted or heard by or before any Governmental Entity or arbitrator.

"***Property Rights***" has the meaning set forth in Section 2.1(b).

"***Real Property Instrument***" means any deed or instrument evidencing ownership in Owned Real Property or Mining Claims and any lease, sublease or similar agreement for the Leased Real Property.

"***Real Property Leases***" means all written leases, lease guaranties, subleases and similar agreements, whether written or oral, for the leasing, use or occupancy of, or otherwise granting a right in or relating to the Leased Real Property, including all amendments, terminations and modifications thereof and all subordination, non-disturbance and attornment agreements and estoppel certificates with respect thereto.

"*Reclamation Obligation*" means any and all reclamation actions required during, or following cessation of, any exploration, mining or processing activities conducted by or in connection with the Acquired Assets, or required at or on the Acquired Assets, that is required by Law, Permit, Contract or Real Property Instrument.

"*Release*" means any spilling, leaking, emitting, discharging, escaping, or disposing of any Hazardous Material, or any migration thereof, into indoor or outdoor environmental media (including soil, surface waters, groundwater, sediments or air).

"*Remedial Action*" means any investigation, analysis, study, evaluation, monitoring, testing, assessment, correction or remediation of a Release required pursuant to applicable Environmental Law or by a Governmental Entity.

"*Representative*" means, with respect to any Person, such Person's officers, directors, managers, employees, agents, representatives and financing sources (including any investment banker, financial advisor, accountant, legal counsel, agent, representative or expert retained by or acting on behalf of such Person or its subsidiaries).

"*Sale Hearing*" means the hearing conducted by the Bankruptcy Court to approve the transactions contemplated by this Agreement.

"*Sale Order*" means an Order or Orders of the Bankruptcy Court issued pursuant to sections 105, 363, and 365 of the Bankruptcy Code, in substantially the form set forth in Exhibit C hereto, authorizing and approving, among other things, (a) the sale, transfer and assignment of the Acquired Assets to the Buyer in accordance with the terms and conditions of this Agreement, free and clear of all Claims and Liens, (b) the assumption and assignment of the Assumed Contracts in connection therewith, (c) that the Buyer shall be liable for any Cure Amount but is not otherwise obligated to cure any defaults, known or unknown, arising prior to Closing under any Assumed Contract and (d) that Buyer is a "good faith" purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code.

"*Schedules*" means the disclosure schedules delivered in connection with the execution of this Agreement.

"*Sellers*" has the meaning set forth in the preamble.

"*Seller Representative*" has the meaning set forth in the preamble.

"*Seller Security*" has the meaning set forth in Section 4.11.

"*Senior Pre-Petition Indebtedness*" means all obligations arising under (i) the Senior Secured Gold Stream Credit Agreement, dated December 23, 2011 between the Sellers and Waterton Global Value, L.P. in its capacity as provider of the Senior Pre-Petition Indebtedness (as amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms) collectively with any other agreements and documents executed or delivered in connection therewith, including the "Credit Documents" as defined in the Senior Secured Gold Stream Credit Agreement, each as may be amended, restated, supplemented or otherwise modified from time to time), and (ii) the Gold and Silver Supply Agreement entered into

between certain of the Sellers and Waterton Global Value, L.P. in its capacity as provider of the Senior Pre-Petition Indebtedness, collectively with any other agreements and documents executed or delivered in connection therewith.

"*Tax*" means any and all taxes, assessments, levies, duties or other governmental charge imposed by any Governmental Entity, including any income, alternative or add-on minimum, accumulated earnings, franchise, capital stock, environmental, profits, windfall profits, gross receipts, sales, use, value added, transfer, registration, stamp, premium, excise, customs duties, severance, real property, personal property, ad valorem, occupancy, license, occupation, unclaimed property liabilities, employment, payroll, social security, disability, unemployment, withholding, corporation, inheritance, stamp duty reserve, estimated or other similar tax, assessment, levy, duty (including duties of customs and excise) or other governmental charge of any kind whatsoever, including any payments in lieu of taxes or other similar payments, chargeable by any Tax Authority together with all penalties, interest and additions thereto, whether disputed or not.

"*Tax Authority*" means any Governmental Entity (whether within or outside the United States) competent to impose Tax.

"*Tax Return*" means any and all returns, declarations, reports, documents, claims for refund, or information returns, statements or filings that are required to be supplied to any Tax Authority or any other Person, including any schedule or attachment thereto, and including any amendments thereof.

"*Transfer Tax*" means any sales, use, transfer, conveyance, documentary transfer, stamp, recording or other similar Tax imposed upon the sale, transfer or assignment of property or any interest therein or the recording thereof, and any penalty, addition to Tax or interest with respect thereto, including any filing fees to be paid to the Bureau of Land Management or similar state agency and any Taxes under the agricultural deferral, but such term shall not include any Tax on, based upon or measured by, the net income, gains or profits from such sale, transfer or assignment of the property or any interest therein.

"*UCC*" means the Uniform Commercial Code as in effect from time to time in the State of New York; *provided*, *however*, that if a term is defined in Article 9 of the Uniform Commercial Code differently than in another Article thereof, the term shall have the meaning set forth in Article 9; *provided*, *further* that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or nonperfection, of a security interest in any collateral or the availability of any remedy with respect thereto is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "UCC" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or nonperfection or availability of such remedy, as the case may be.

"*U.S. Sellers*" has the meaning set forth in the preamble.

"*Water Rights*" has the meaning set forth in <u>Section 2.1(b)</u>.

1.2    <u>Interpretation</u>.

(a)    Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."

(b)    Words denoting any gender shall include all genders.

(c)    A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and permitted assigns.

(d)    A reference to any Law or to any provision of any Law shall include any amendment, modification or re-enactment thereof and any Law substituted therefor.

(e)    All references to "$" and dollars shall be deemed to refer to United States currency.

(f)    All references to any financial or accounting terms shall be defined in accordance with Applicable Accounting Principles, unless otherwise defined herein.

(g)    The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and section, schedule and exhibit references are to this Agreement, unless otherwise specified.  All article, section, paragraph, schedule and exhibit references used in this Agreement are to articles, sections, paragraphs, schedules and exhibits to this Agreement, as they may be modified by the Schedules, unless otherwise specified.

(h)    The meanings given to terms defined herein shall be equally applicable to both singular and plural forms of such terms.

(i)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day.

(j)    If a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(k)    A reference to any agreement or document (including a reference to this Agreement) is to the agreement or document as amended, restated, supplemented or otherwise modified from time to time in accordance with its terms, except to the extent prohibited by this Agreement or that other agreement or document.

(l)    Exhibits, Schedules, annexes and other documents referred to as part of this Agreement are hereby incorporated herein and made a part hereof and are an integral part of this Agreement.  Any capitalized terms used in any exhibit, Schedule or annex but not otherwise defined therein shall be defined as set forth in this Agreement.

(m)    The table of contents and the headings of the Articles and Sections herein are inserted for convenience of reference only and shall not be a part of, or affect the meaning or interpretation of, this Agreement.

(n)    This Agreement is the result of the joint efforts of the Sellers and the Buyer, and each provision hereof has been subject to the mutual consultation, negotiation and agreement of the Parties and there is to be no construction against any Party based on any presumption of that Party's involvement in the drafting thereof.

## ARTICLE 2
## TRANSFER OF ASSETS AND ASSUMPTION OF LIABILITIES

2.1    <u>Assets to be Acquired</u>.  Subject to the terms and conditions of this Agreement and the Sale Order, and upon entry of the Sale Order, at the Closing, the Sellers shall sell, convey, assign, transfer and deliver to the Buyer, free and clear of all Liens (other than Permitted Liens) as provided in the Sale Order and the Buyer shall purchase, acquire and accept from the Sellers, all of the Sellers' right, title and interest in and to the following assets, tangible or intangible, real or personal (the "***Acquired Assets***"), which, in each case, shall not include the Excluded Assets:

(a)    all lands and real property rights and interests (including all fee and leasehold interests and option rights), minerals, patented and unpatented mining claims (lode and placer), unpatented millsites, tunnel sites and rights, mining leases or concessions, royalties and other real property interests (whether surface, underground mineral or other), including those identified on <u>Schedule 2.1(a)</u> (the "***Mining Properties***");

(b)    all water, water rights (whether vested, certificated, permitted or otherwise, whether or not adjudicated and whether or not with a place of use or point of diversion on the Mining Properties), historical water use rights, statements of claim, statements of claimant, grandfathered rights, water rights applications, reservoirs and reservoir rights, ditches and ditch rights, irrigation systems and irrigation rights, wells, well permits and other rights of use and all wells, pumps, pumping stations, machinery and equipment associated therewith, and all shares of stock or similar interest, if any, evidencing reservoir, ditch, irrigation or other water rights or rights of use (collectively, the "***Water Rights***") and all surface use rights, access rights or agreements, easements and rights of way, tunnels, drifts, power lines, pipelines and roads, including those listed on <u>Schedule 4.6(a)</u>, <u>Schedule 4.6(c)</u> and <u>Schedule 4.6(d)</u> (collectively with the Water Rights, the "***Property Rights***");

(c)    all (i) owned equipment (including cars, trucks, forklifts and other industrial vehicles), machinery (whether mobile or otherwise), drilling rigs and equipment, mineral processing equipment, materials, furniture, fixtures, improvements, rolling stock, tooling and other tangible property (the "***Owned Machinery and Equipment***"), (ii) leased equipment (including any cars, trucks, forklifts and other industrial vehicles), machinery (whether mobile or otherwise), drilling rigs and equipment, mineral processing equipment, materials, furniture, fixtures, improvements, rolling stock, tooling and other tangible property that is leased pursuant to an Assumed Contract (the "***Leased Machinery and Equipment***" and, collectively with the Owned Machinery and Equipment, the "***Machinery and Equipment***") and (iii) warranties,

11

express or implied, and licenses received from manufacturers, sellers and lessors of the Machinery and Equipment;

(d)    the Mill;

(e)    all buildings, structures, mills, crushers, facilities, offices, shops, tanks, pipelines, fixtures and other improvements, howsoever designated (in each case other than the Mill);

(f)    all Contracts that are executory and unexpired as of the Closing Date set forth on Schedule 2.1(f) (collectively, the "*Assumed Contracts*");

(g)    all Permits but only to the extent that such Permits are transferable by the Sellers to the Buyer by assignment or otherwise (including those that will pass to the Buyer as successor in title to the Acquired Assets by operation of Law) (the "*Acquired Permits*"), and all Seller Security, to the extent permitted to be transferred to the Buyer by the Governmental Entity for whose benefit such Seller Security has been posted;

(h)    subject to the right of the Sellers to retain copies for legal or tax reasons, the Operating Records and Other Information;

(i)    any royalty or similar interest held by the Sellers;

(j)    all gold, silver and other ores, minerals, metals, mineral elements and compounds, dore, concentrate, veins, lodes and mineral deposits including "As-Extracted Collateral" as defined in the UCC;

(k)    all Intellectual Property of the Sellers;

(l)    all Prepaid Expenses and rights to receive rental payments or other charges;

(m)    all marketable securities, certificates of deposit, security entitlements, instruments and other investments and all bank accounts and securities accounts;

(n)    all trade accounts receivable, notes receivables, deposits and security deposits, royalties and other rights to payment (other than intercompany receivables); *provided, however*, that all Tax (other than VAT) and related assets shall be excluded from such trade accounts receivable; and

(o)    all Claims to the extent related to the Acquired Assets described in Section 2.1(a) through 2.1(n) or the Assumed Liabilities, including all Claims arising under Chapter 5 of the Bankruptcy Code (i) against landlords, vendors or other counterparties who are party to (or Affiliates of a party to) any Assumed Contract, (ii) otherwise arising under or related to the Acquired Assets, or (iii) against the Buyer (or the Buyer's Affiliates).

2.2     Excluded Assets.  The Acquired Assets do not include, and the Sellers hereby reserve and exclude from the transaction contemplated by this Agreement, the following assets (collectively, the "***Excluded Assets***"):[2]

(a)     except as provided in Sections 2.1(g), (l) and (m), all cash and cash equivalents,

(b)     any prepayments made with regard to insurance policies and any Prepaid Expenses to the extent relating to any other Excluded Asset or any Excluded Liability;

(c)     subject to Sections 2.5 and Section 6.6, any Contract that is not an Assumed Contract;

(d)     all Claims other than those set forth in Section 2.1(o);

(e)     any claims of any of the Sellers' estates under Article 5 of the Bankruptcy Code or analogous state statutes including claims under section 547, 548, 549 or 550 of the Bankruptcy Code, but excluding Claims expressly included in Section 2.1(o);

(f)     all Permits that are not transferrable by the Sellers to the Buyer by assignment or otherwise and all Seller Security to the extent not permitted to be transferred to the Buyer by the Governmental Entity for whose benefit such Seller Security has been posted; and

(g)     any other asset that is not an Acquired Asset.

2.3     Liabilities to be Assumed by the Buyer.  Subject to the terms and conditions of this Agreement, at the Closing, the Sellers shall assign to the Buyer, and the Buyer shall assume from the Sellers and pay, perform and discharge, when and as due in accordance with their respective terms, without duplication, the following Liabilities of any Seller or any Affiliate of any Seller solely to the extent arising after the Closing (collectively, the "***Assumed Liabilities***"):

(a)     all Liabilities arising out of or relating to the Acquired Assets or Buyer's ownership or operation of the Acquired Assets, including any Liabilities relating to Reclamation Obligations with respect to the Acquired Assets;

(b)     any Cure Amounts; and

(c)     all Liabilities under each of the Assumed Contracts that arise after or relate to the period from and after the Closing and do not result from any breach or default by, or waiver or extension given by or to, any Seller.

Notwithstanding anything to the contrary in this Agreement, the Buyer is not assuming, and the Assumed Liabilities shall not include, any Liabilities of any Seller that existed, occurred or accrued on or before the Closing.

---

[2] Note: Sandstorm Streaming Agreement TBD.

2.4     Excluded Liabilities.  The Buyer shall not assume, and the Sellers hereby retain, any Liability of any Seller or any of its Affiliates not expressly assumed by the Buyer, including Liabilities relating to or arising out of any of the following (collectively, the "***Excluded Liabilities***"):

(a)     any indebtedness for borrowed money;

(b)     all costs and expenses incurred or to be incurred by the Sellers in connection with this Agreement and the consummation of the transactions contemplated hereby;

(c)     any Liabilities relating to the Excluded Assets;

(d)     any Liabilities, whether occurring or accruing before, at, or after the Closing Date, (i) arising under or associated with noncompliance with Environmental Laws (including fines, penalties, damages, and remedies), the environmental condition of any Acquired Assets as of the Closing Date or the failure to undertake or complete Reclamation Obligations required as of the Closing Date; (ii) arising under the Federal Mine Safety and Health Act of 1977, 30 U.S.C. §§ 810 *et. seq.* or its associated regulations and/or (iii) assessed by the United States Department of Labor's Mine Safety and Health Administration; in each case, relating to pre-Closing operations or ownership of the Acquired Assets;

(e)     any Liabilities for or related to Taxes imposed on income, franchise or profits of any Seller or any of its Affiliates and any Liabilities for or related to ad valorem or property Taxes relating to the ownership of the Acquired Assets in respect of the period prior to Closing;

(f)     any Liabilities arising from or relating to accounts payable accrued in the ownership, maintenance or operation of the Acquired Assets prior to Closing;

(g)     any Liabilities for Transfer Taxes arising with respect to the transactions contemplated by this Agreement, if any;

(h)     all Liabilities arising out of or with respect to the current or former employees of the Sellers or their Affiliates, including for compensation or reimbursement for work performed relating to the Acquired Assets, and all Liabilities related to or arising under any employee benefit plan, express or implied contract, wages, bonuses, commissions or severance benefits of the Sellers or their Affiliates;

(i)     all Liabilities to the extent relating to any employment arrangement entered into with any employees of any Sellers or any of its Affiliates prior to Closing, whether the payment obligation thereunder occurs before or after Closing;

(j)     all Liabilities to the extent relating to any Plan or any employee benefit plan, policy or arrangement maintained by a Seller or any of its Affiliates prior to Closing, whether any payment or benefit obligation thereunder occurs before or after Closing, relating to, or accrued as a result of employment by a Seller or any of its Affiliates prior to Closing, and any vesting or payment of cash or equity awards granted to employees under any Plan prior to Closing;

14

(k)     all intercompany payables and loans among the Sellers and any of their Affiliates;

(l)     all Liabilities arising out of events relating to any workers' compensation claims occurring prior to Closing, including those claims occurring prior to Closing but reported after Closing even if any payment or benefit obligation thereunder occurs after Closing; and

(m)     any Liabilities that are not Assumed Liabilities.

2.5     <u>Exclusion of Assumed Contracts</u>.  From the date hereof until one (1) Business Day prior to the Sale Hearing (the "***Cut-off Date***"), the Buyer shall have the right, upon Notice to Seller Representative, to exclude any Contract from the Assumed Contracts, or supplement the list of Assumed Contracts to include any Contract that should have been listed on <u>Schedule 2.1(d)</u> (in each case, subject to the requirements of sections 365(a) and 365(f) of the Bankruptcy Code), for any reason.  Any Contract so excluded by the Buyer shall be deemed to no longer be an Assumed Contract and shall be deemed an Excluded Asset.  Any Schedules hereto shall be amended to reflect any changes made pursuant to this <u>Section 2.5</u> and the Buyer shall have no obligation to pay the Cure Amount (if any) associated with any Contract that is excluded from the Assumed Contracts pursuant to this <u>Section 2.5</u>.  For the avoidance of doubt, any such exclusion or addition of any Assumed Contract shall not result in a change to the amount of the Cure Amount.

2.6     <u>Consents</u>.  Nothing in this Agreement or any document delivered in connection herewith nor the consummation of the transactions contemplated hereby or thereby shall be construed as an attempt or agreement to assign any Acquired Asset, including any Assumed Contract, Acquired Permit, certificate, approval, authorization or other right, which by its terms or by Law is nonassignable without the consent of a third party or a Governmental Entity or is cancelable by a third party or Governmental Entity in the event of an assignment, in each case, other than any required consent that the Bankruptcy Court determines is not enforceable ("***Nonassignable Assets***"), unless and until (a) such consent shall have been obtained or (b) the Bankruptcy Court has entered a final Order, which may include the Sale Order, providing that such consent is not required or that the Acquired Asset subject to such consent shall be assigned or transferred regardless of any such necessary consent and that there shall be no breach or adverse effect on the rights of Buyer thereunder for the failure to obtain any such consent.  Each Seller shall, and shall cause its Affiliates to, use their best efforts to obtain such consents promptly after the Effective Date.  In the event consents to the assignment of a Nonassignable Asset cannot be obtained and the condition in clause (b) above is not satisfied, then such Nonassignable Asset shall be excluded from the Acquired Assets and shall become Excluded Assets for all purposes under this Agreement and the Consideration shall be reduced by an amount to be agreed upon by Seller Representative and Buyer, acting in good faith.  If the Parties are unable to agree on such reduction to the Consideration, the Parties will engage a mutually agreeable, nationally recognized investment bank with experience in valuing assets similar to the Nonassignable Asset to determine the fair market value of such Nonassignable Asset.  The investment bank shall be authorized to select only the fair market value presented by either Seller Representative (on the one hand) or Buyer (on the other hand) based on which position, in its judgment, is the closest to being in conformity with the fair market value of such Nonassignable

Asset. The costs and expenses of the investment bank shall be borne by the Sellers, if Buyer's position is selected, or by Buyer, if Seller Representative's position is selected.

## ARTICLE 3
## CLOSING; CONSIDERATION

3.1     Closing; Transfer of Possession; Certain Deliveries.

(a)     The consummation of the transactions contemplated herein (the "*Closing*") shall take place on the second (2nd) Business Day after all of the conditions set forth in Article 7, other than those conditions that by their nature are to be satisfied at the Closing, have been either satisfied or waived by the Party entitled to waive such condition or on such other date as the Parties shall mutually agree.  The Closing shall take place electronically via email or facsimile at 10:00 a.m., New York time, unless the Parties otherwise agree.  The actual date of the Closing is the "*Closing Date*".  For purposes of this Agreement, from and after the Closing, the Closing shall be deemed to have occurred at 12:00 a.m. on the Closing Date.

(b)     At the Closing, the Sellers shall deliver to the Buyer:

(i)     a true and correct copy of the Sale Order;

(ii)     a duly executed Bill of Sale;

(iii)     a duly executed Assignment and Assumption Agreement;

(iv)     duly executed Deed and Conveyances in sufficient counterparts to facilitate recordation in the necessary jurisdictions;

(v)     duly executed Water Rights Deeds for the Water Rights;

(vi)     duly executed affidavits of the [U.S.] Sellers, prepared in accordance with U.S. Treasury Regulations section 1.1445-2(b), certifying as to the [U.S.] Sellers' non-foreign status;[3] and

(vii)     such other documents, instruments and certificates as the Buyer may reasonably request.

(c)     At the Closing, the Buyer shall:

(i)     deliver to the Sellers the Consideration;

(ii)     deliver to the Seller Representative a duly executed Assignment and Assumption Agreement; and

---

[3] Note: Subject to ongoing tax review.

(iii)    deliver to the Sellers such other documents, instruments and certificates as the Seller Representative may reasonably request.

3.2    <u>Consideration</u>.  The aggregate consideration (the "<u>Consideration</u>") payable by Buyers for the sale, transfer, assignment, conveyance and delivery by the Seller to the Buyer of the Acquired Assets shall consist of the following:

(a)    A credit bid in an amount equivalent to the obligations owed by the Sellers to Buyer under (x) the DIP Facility and (y) the Senior Secured Gold Stream Credit Agreement, dated December 23, 2011 between the Sellers and Waterton Global Value, L.P. in its capacity as provider of the Senior Pre-Petition Indebtedness (as amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms) collectively with any other agreements and documents executed or delivered in connection therewith, including the "Credit Documents" as defined in the Senior Secured Gold Stream Credit Agreement, each as may be amended, restated, supplemented or otherwise modified from time to time);[4] *plus*

(b)    the assumption at the Closing by the Buyer of the Assumed Liabilities from the Sellers as provided in <u>Section 2.3</u>; *plus*

(c)    any Cure Amounts required to be paid by Buyer in accordance with the terms hereof.

3.3    <u>Allocation of Consideration</u>.  Seller Representative and the Buyer shall cooperate in good faith following the Effective Date to determine an appropriate allocation of the Consideration and any other amounts required to be taken into account as part of the purchase of any of the Acquired Assets from a Seller among the Acquired Assets (the "***Agreed Allocations***"). Each of the Parties shall (a) file all Tax Returns (including Internal Revenue Service Form 8594, if applicable) and other filings with Governmental Entities consistent with any Agreed Allocation and (b) notify and provide the other Party with reasonable assistance in the event of an examination, audit or other proceeding relating to Taxes or any other filing with a Governmental Entity regarding the appropriate allocation of the Consideration among the Acquired Assets.  Notwithstanding the preceding sentence, the Parties may settle any proposed deficiency or adjustment by any Tax Authority based upon or arising out of the allocation of the Consideration among the Acquired Assets, and neither the Buyer nor the Sellers shall be required to litigate before any court any proposed deficiency or adjustment by any Tax Authority or Governmental Entity challenging any Agreed Allocation. Notwithstanding anything in this Agreement to the contrary, this <u>Section 3.3</u> shall survive the Closing Date without limitation.

---

[4] The Buyer reserves the right to further credit bid any or all of the remaining obligations owed under the Senior Pre-Petition Indebtedness.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

The Sellers hereby jointly and severally represent and warrant to the Buyer as follows:

4.1     <u>Organization</u>. Except as set forth on <u>Schedule 4.1,</u> each Seller is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization.  Each Seller has all necessary power and authority to own or lease and maintain its assets and to carry on the business conducted by it in the manner conducted on Effective Date.

4.2     <u>Due Authorization, Execution and Delivery; Enforceability</u>.  Each Seller has the requisite power and authority to enter into, execute and deliver this Agreement and the other agreements contemplated hereby and subject to the Sale Order having been entered by the Bankruptcy Court to perform its obligations hereunder and thereunder and has taken all necessary action required for the due authorization, execution, delivery and performance by it of this Agreement and the transactions contemplated hereby.  This Agreement constitutes the legally valid and binding obligation of each Seller, enforceable against it in accordance with its terms, except as enforceability may be limited by applicable insolvency or similar Laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

4.3     <u>Consents</u>.  Subject to the Sale Order having been entered by the Bankruptcy Court, none of the execution, delivery or performance of this Agreement by any Seller will require any material consent, approval, license, Permit, Order or authorization (each, a "***Consent***") of or from, or registration, notice, declaration or filing (each, a "***Filing***") with or to, any Governmental Entity or any third party.

4.4     <u>No Conflicts</u>.  The execution, delivery and performance of this Agreement by each Seller and the consummation of the transactions contemplated hereby do not and will not (a) conflict with or result in any breach of any provision of the articles of incorporation or bylaws or similar organizational documents of any Seller, (b) conflict with or result in a breach of any provision of or constitute (with or without due notice, lapse of time or both) a default under, or give rise to any right of termination, cancellation or acceleration under, any Assumed Contract, (c) violate any Law applicable to the Sellers with respect to the Acquired Assets or (d) result in, or require the creation or imposition of, any Lien on any of the Acquired Assets other than a Permitted Lien.

4.5     <u>Taxes</u>.  Except as set forth on <u>Schedule 4.5</u>:

(a)     each Seller has timely and properly filed all Tax Returns required to be filed, and all such Tax Returns are true, correct and complete in all respects;

(b)     each Seller has timely paid in full all Taxes (whether or not shown on any Tax Return) due and payable with respect to the ownership, maintenance or operation of the Acquired Assets, and no Seller is currently under audit or examination with respect to any Taxes;

(c)     each Seller has timely satisfied all withholding Tax requirements that could result in a Lien on the Acquired Assets, or a Tax for which the Buyer may be liable as a result of the transactions contemplated by this Agreement;

18

(d)     there is no waiver or extension of any statute of limitations with respect to Taxes that could result in a Lien on any of the Acquired Assets or a Tax for which the Buyer may be liable as a result of the transactions contemplated by this Agreement;

(e)     no claim for unpaid Taxes that could result in a Lien on any of the Acquired Assets or a Tax for which the Buyer may be liable as a result of the transactions contemplated by this Agreement has been made by any Governmental Entity, and there are no pending audits or examinations with respect to any such Taxes; and

(f)     none of the Acquired Assets is subject or owned pursuant to an arrangement treated as a partnership and subject to Subchapter K of Chapter 1 of Subtitle A of the Code (for which no election is in place to exclude such arrangement from the application of Subchapter K of Chapter 1 of Subtitle A of the Code).

4.6     Real Property; Acquired Assets.

(a)     *Owned Real Property*.  Part 1 of Schedule 4.6(a) sets forth a true and complete list and true and complete legal description of all Mining Properties (other than Mining Claims) owned by any Seller ("***Owned Real Property***") and such Seller's respective interest in such Owned Real Property.  Except as set forth in Part 2 of Schedule 4.6(a): (i) the Sellers have good and indefeasible title in fee simple to the Owned Real Property set forth (or required to be set forth) on Schedule 4.6(a), free and clear of all Liens other than Permitted Liens; (ii) there is no pending or, to the knowledge of the Sellers, threatened condemnation of any Owned Real Property by any Governmental Entity (or any other Person with the right to impose eminent domain) that would materially interfere with the ownership and maintenance of the Acquired Assets as currently owned and maintained and (iii) there are no leases, subleases, Permits, Liens or other Contracts granting to any party or parties right of use or occupancy of any portion of the Owned Real Property and none of the leases, subleases, Permits, Liens or Contracts set forth in Part 2 of Schedule 4.6(a) have a material adverse impact on the Sellers' ownership or maintenance of the Owned Real Property; and (iv) to the knowledge of the Seller, none of such Owned Real Property, or the current use thereof, contravenes or violates any building or zoning Law, or any administrative, occupational safety and health or other applicable Law, in each case, in any material respect (whether or not permitted on the basis of prior nonconforming use, waiver or variance).

(b)     *Leased Real Property*.  Part 1 of Schedule 4.6(b) sets forth a true and complete list and true and complete legal description of all Mining Properties (other than Mining Claims) leased or subleased to any Seller, together with the reference information for each of the Real Property Leases related thereto ("***Leased Real Property***").  Except as set forth in Part 2 of Schedule 4.6(b): (i) the Sellers have a valid, binding and enforceable leasehold interest in each of the Leased Real Properties set forth (or required to be set forth) on Schedule 4.6(b), free and clear of all Liens other than Permitted Liens; (ii) there are no tenants or other parties, other than the Sellers, in possession of any Leased Real Property, and the Sellers have not received written notice of any pending or threatened condemnation proceeding that would preclude or materially impair the use of any Leased Real Property for which it is currently used by the applicable Seller; and (iii) there are no subleases, Permits, Liens or other Contracts granting to any party or parties right of use or occupancy of any portion of the Leased Real Property and none of the

subleases, Permits, Liens or Contracts set forth in Part 2 of Schedule 4.6(b) have a material adverse impact on the applicable Sellers' right to use or maintain the Leased Real Property; and (iv) to the knowledge of the Seller, none of such Leased Real Property, or the current use thereof, contravenes or violates any building or zoning Law, or any administrative, occupational safety and health or other applicable Law, in each case, in any material respect (whether or not permitted on the basis of prior nonconforming use, waiver or variance).

(c)     *Mining Claims*.

(i)     Schedule 4.6(c)(i) sets forth a true and complete list of all mining claims included in the Mining Properties that are owned by any Seller (the "***Owned Mining Claims***") and identifies in such schedule which claims are patented and unpatented and the number of  acres covered by each such Owned Mining Claim.  The Sellers own good and marketable title to all of the patented Mining Claims set forth (or required to be set forth) on Schedule 4.6(c)(i) and own and possess in compliance with all applicable Laws, subject to the paramount title of the United States, all of the unpatented Mining Claims set forth (or required to be set forth) on Schedule 4.6(c)(i), in each case, free and clear of all Liens other than Permitted Liens, pursuant to valid, subsisting and enforceable title documents or other recognized and enforceable agreements or instruments.

(ii)     Schedule 4.6(c)(ii) sets forth a true and complete list of all mining claims included in the Mining Properties that are leased or subleased by any Seller (the "***Leased Mining Claims***"), identifies in such schedule which claims are patented and unpatented and the number of acres covered by each such Leased Mining Claim and identifies the Contract by which such Leased Mining Claim is leased or subleased.  The Sellers have a valid, binding and enforceable leasehold interest in each of the patented Leased Mining Claims set forth (or required to be set forth) on Schedule 4.6(c)(ii) and have a valid, binding and enforceable leasehold interest in and possess in compliance with all applicable Laws, subject to the paramount title of the United States, all of the unpatented Leased Mining Claims set forth (or required to be set forth) on Schedule 4.6(c)(ii), in each case, free and clear of all Liens other than Permitted Liens, pursuant to valid, subsisting and enforceable title documents or other recognized and enforceable agreements or instruments.

(iii)     Except as set forth on Schedule 4.6(c)(iii):

(A)     the Sellers are not in default, in any material respect, under any documents, agreements and instruments by which Seller claims title to any Mining Claim, and, to the knowledge of the Sellers, there exists no condition or event that, with or without notice or lapse of time or both, would constitute a default under any of such documents, agreements and instruments by any Seller, other than, in each case, any default or breach resulting from the filing of the Petitions, the pendency of the Chapter 11 Cases, or any action approved by, or motion made before, the Bankruptcy Court;

(B)     all Mining Claims were and are validly located and recorded and have been maintained, in each case, in accordance with the Laws of the United States and the state and county in which such Mining Claim is located;

(C)     the Sellers do not have any liability or obligation to pay any commission, royalty, license fee or similar payment to any person with respect to any Mining Claims;

(D)     there is no material adverse Claim against or challenge to the title of the Sellers with respect to any Mining Claim that, if determined adversely to the Sellers, would materially and adversely affect the ability of the Sellers to make use of, transfer or otherwise exploit such Mining Claim;

(E)     no other person has any material interest in any Mining Claim or the production from any of the underlying properties or mineral deposits (or any right to acquire any such interests) that would affect the interest of the Sellers in the Mining Claims

(F)     there are no back-in rights, earn-in rights, rights of first refusal or similar provisions that would affect the interest of Sellers in the Mining Claims, and no Seller has entered into streaming agreements, royalty agreements or any similar types of agreements or first rights agreements related to streaming agreements, royalty agreements or any similar types of agreements;

(G)     no Seller has received any written notice or, to the knowledge of the Sellers, oral notice, from any Governmental Entity of any revocation or intent to revoke any Seller's interest in any of the Mining Claims; and

(H)     the Sellers have provided the Buyer with access to full and complete copies of all exploration information and data within its possession or control, including all geological, geophysical and geochemical information and data (such as drill, sample and assay results and maps) and all technical reports, feasibility studies and other similar reports and studies concerning the Mining Claims.

(d)     Schedule 4.6(d) sets forth a true and complete list of all Water Rights included in the Acquired Assets.  The Acquired Assets include all such Property Rights as are necessary for the Sellers to own and maintain the other Acquired Assets substantially as currently owned and maintained, except for imperfections (including gaps, defects and irregularities) as would reasonably be anticipated to exist, based on industry practices, in assets similar to the Acquired Assets or as would not, individually or in the aggregate, materially interfere with the ownership or maintenance of the Acquired Assets as currently owned and maintained.  The Sellers have valid title as the easement holder to any easements or rights of way included in the Acquired Assets, which title is not encumbered by any Liens other than Permitted Liens.  No Seller is in default or breach, in any material respect, of any Property Right, except as would not, individually or in the aggregate, reasonably be expected to materially interfere with the ownership or maintenance of the Acquired Assets as currently owned and maintained.

(e)     Schedule 4.6(e) sets forth a true and complete list of all mining projects currently owned or leased by any Seller and a true and complete list of all mining projects that have been forfeited, abandoned, released or disposed of by the Sellers within the past five years.

(f)      No Subsidiary or Affiliate of Santa Fe Gold Corporation other than the other Sellers owns any interest in any assets that, if owned by a Seller, would constitute Acquired Assets.

4.7      <u>Machinery and Equipment</u>.  <u>Schedule 4.7</u> sets forth a true and complete list of all material Machinery and Equipment included in the Acquired Assets, specifying which Machinery and Equipment is owned and which is leased.  The Sellers own good title to the Owned Machinery and Equipment and have a valid leasehold interest in the Leased Machinery and Equipment, in each case, free and clear of all Liens other than Permitted Liens.  The Machinery and Equipment constitutes all of the personal property used or held for use in connection with the ownership and maintenance of the Acquired Assets.

4.8      <u>Environmental Matters</u>.

(a)      The operations of each Seller with respect to the Acquired Assets are, and for the past five (5) years have been, in compliance with all applicable Environmental Laws in the respective jurisdictions in which the Acquired Assets are located.

(b)      There are no Proceedings pending, and no Seller is subject to any outstanding Orders respecting (i) non-compliance with Environmental Laws, (ii) Remedial Action or (iii) any Release or threatened Release of a Hazardous Material.

(c)      No Seller has received any written communication or any other notice, alleging, with respect to any Acquired Asset, the violation of or Liability (including strict liability) under any Environmental Law, and no Seller has knowledge of any facts or circumstances that would be reasonably likely to give rise to any such violation or Liability.

(d)      None of the Acquired Assets owned, leased or previously operated by the Sellers is the subject of any federal or state Proceeding regarding a Release of Hazardous Materials, nor, to the knowledge of the Sellers, have any Hazardous Materials been stored, used or Released, in a quantity or manner at or on the Acquired Assets, or at any off-site location to which such Hazardous Materials were sent by any Seller, which would reasonably be expected to result in any Liability under Environmental Laws, including any obligation to pay for or perform any Remedial Action.

(e)      No Seller has any Liability to pay for or perform any Remedial Action in excess of bonded amounts.

4.9      <u>Compliance with Other Laws and Permits</u>.

(a)      <u>Schedule 4.9</u> sets forth a true and complete list of all material Permits issued by any Governmental Entity under any Laws and to which any Seller is a party as of the Effective Date.  The Permits held by the Sellers are all of the material Permits required under any Laws for the maintenance of the Mining Properties, and each Seller is in compliance with such Permits and with applicable Laws (other than Environmental Laws).  Each such Permit has been validly issued and is in full force and effect and all applicable appeal periods challenging any such issuance have expired, and no such Permit will be subject to suspension, modification, revocation or non-renewal as a result of the transactions contemplated by this Agreement.

(b)    Each Seller is, and for the past five (5) years has been, in compliance with all applicable Laws that affect the Mining Properties.  No Seller has received any written notice, or to the knowledge of Sellers, any other notice, of any alleged violation of applicable Law or any Permit that remains unresolved, and no Seller has knowledge of any facts or circumstances that would be reasonably likely to give rise to any such violation.

(c)    The Sellers are not subject to any Order with respect to any such Laws (other than Environmental Laws) that has not been fulfilled and is outstanding.

4.10    <u>Financial Advisors</u>.  Except as set forth on <u>Schedule 4.10,</u> no Person acting, directly or indirectly, as a broker, finder or financial advisor for the Sellers in connection with the transactions contemplated by this Agreement is entitled to any fee or commission or like payment in respect thereof from the Sellers.

4.11    <u>Seller Security</u>.  <u>Schedule 4.11</u> sets forth a list of all surety bonds, reclamation bonds, guaranties, letters of credit, certificates of deposit, cash deposits and other similar instruments maintained by any Seller or any Affiliate of any Seller with respect to the Acquired Assets (collectively, the "***Seller Security***").

4.12    <u>Litigation</u>.  Except as set forth on <u>Schedule 4.12</u>: (a) there is no Proceeding pending, or to the knowledge of the Sellers, threatened against any Seller or any of their respective Affiliates relating to the Acquired Assets or the Assumed Liabilities; (b) to the knowledge of the Sellers, there are no claims, facts, conditions or circumstances that could reasonably be expected to give rise to a Proceeding that would be required to be disclosed pursuant to this <u>Section 4.12</u> and (c) there are no Orders outstanding against or, to the knowledge of the Sellers, threatened against, the Sellers with respect to the Acquired Assets or the Assumed Liabilities.

4.13    <u>No Known Claims</u>.  To the knowledge of the Sellers, <u>Schedule 4.13</u> identifies all Liabilities of any kind [having an estimated Liability amount in excess of $____] relating to the Acquired Assets, other than Liabilities that have arisen in the ordinary course of business consistent with the past practice of the Sellers.

4.14    <u>Intellectual Property</u>.  <u>Schedule 4.14</u> identifies all items of Intellectual Property included in the Acquired Assets.  Each Seller owns or has the right to use pursuant to license, sublicense, agreement or otherwise all such Intellectual Property included in the Acquired Assets.  The consummation of the transactions contemplated under this Agreement will not result in the loss or impairment of or payment of additional amounts with respect to, nor require the consent of any other Person in respect of, the Buyer's right to own, use or hold for use any Intellectual Property included in the Acquired Assets as owned, used or held for use as of the Effective Date. No third party has asserted in writing against any Seller or any of their respective Affiliates a claim that such Seller or its Affiliate is infringing or misappropriating the Intellectual Property of such third party.  To the knowledge of the Sellers, no third party is infringing or misappropriating the Intellectual Property included in the Acquired Assets.

4.15    <u>Contracts</u>.

23

(a)     Schedule 4.15(a) sets forth all Contracts relating to or used in connection with the Acquired Assets.  Except as disclosed on Schedule 4.15(a) and except for any defaults or violations resulting from the Chapter 11 Cases: (i) no Seller is in default of, and no written notice of alleged default has been received by any Seller under, any of the Assumed Contracts, (ii) no other party thereto, to the knowledge of the Sellers, is in default thereunder and (iii) to the knowledge of the Sellers, there exists no condition or event that, with or without notice or lapse of time or both, would constitute a default under any of the Assumed Contracts by any Seller or any other party thereto.  Each Assumed Contract constitutes a valid and binding obligation of the Seller that is party thereto and, to the knowledge of the Sellers, of the other parties thereto, enforceable in accordance with their terms, except that (A) such enforcement may be subject to any bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance or transfer or other Laws, now or hereafter in effect, relating to or limiting creditors' rights generally and (B) enforcement of this Agreement, including, among other things, the remedy of specific performance and injunctive and other forms of equitable relief, may be subject to equitable defenses and to the discretion of the court before which any proceeding therefor may be brought, and each Assumed Contract is in full force or effect. The Sellers have made available to the Buyer a true, complete and correct copy of all Contracts set forth on Schedule 4.15(a).

(b)     Except as disclosed on Schedule 4.15(b), none of the Assumed Contracts are between (i) any Seller, any Affiliate of any Seller or any of their Representatives, on the one hand, and (ii) any other Seller, any Affiliate of any Seller or any of their Representatives, on the other hand.

(c)     Schedule 4.15(c) sets forth the Sellers' estimate, based on reasonable inquiry, as of the Effective Date, of the Cure Amounts associated with each Assumed Contract.

4.16    Operational Matters.

(a)     Except as set forth on Schedule 4.16(a), all rentals, royalties, overriding royalty interests, streaming payments, production payments, net profits, interest burdens and other payments due or payable on or prior to the Effective Date with respect to the Acquired Assets have been duly paid.   All rentals, payments and obligations due and payable or performable on or prior to the Effective Date under or on account of the Acquired Assets have been duly paid, performed or provided for prior to Effective Date.   All costs, expenses and liabilities payable on or prior to the Effective Date under the terms of any contracts and agreements to which any Seller is a party or by which any Acquired Asset is bound have been duly paid, except for such expenses that are being currently paid prior to delinquency in the ordinary course of business.

(b)     Seller has conducted its activities with respect to the mining projects in accordance with all applicable Laws in all material respects and in a manner consistent with the standards observed by mining companies in the United States.  There have been no incidents of material non-compliance with safety Laws in connection with operations or activities at its mine sites in the past three years.

(c)    Except as set forth on Schedule 4.16(c), the Sellers' relationship with its customers, contractors and suppliers are good and are not subject to any material disputes or disagreements.

4.17    Insurance.  Schedule 4.17 sets forth (a) a list and brief description of all policies of insurance maintained, owned or held by or for the benefit of the Sellers with respect to the Acquired Assets and (b) all claims made by any Seller or any Affiliate of such Seller under any such policy during the past five years. The Sellers have complied with each of such insurance policies and have not failed to give any notice or present any claim thereunder in a due and timely manner. Each policy listed in Schedule 4.17 is valid and binding and in full force and effect, and no Seller has received any written notice of cancellation, non-renewal or termination in respect of any such policy or are in default thereunder. No Seller has received written notice that any insurer under any such policy is denying liability with respect to an unresolved claim thereunder or defending such claim under a reservation of rights clause.

4.18    Bank Accounts.  Schedule 4.18 provides the following information with respect to each account maintained by or for the benefit of the Sellers at any bank or other financial institution: (a) the name of the bank or other financial institution at which such account is maintained; (b) the account number; (c) the type of account; and (d) the names of all Persons who are authorized to take action with respect to such account.

4.19    Full Disclosure.  No representation or warranty by the Sellers in this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Sellers as follows:

5.1    Organization.  The Buyer is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization.  The Buyer has all necessary power and authority to own or lease and operate its assets and to carry on the business conducted by it in the manner conducted on the Effective Date.

5.2    Due Authorization, Execution and Delivery; Enforceability.  The Buyer has the requisite power and authority to enter into, execute and deliver this Agreement and the other agreements contemplated hereby and to perform its obligations hereunder and thereunder and has taken all necessary action required for the due authorization, execution, delivery and performance by it of this Agreement and the transactions contemplated hereby.  This Agreement constitutes the legally valid and binding obligation of the Buyer, enforceable against it in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency or similar Laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

5.3     Consents.  None of the execution, delivery or performance of this Agreement by the Buyer will require any material Consent of or from, or material Filing to be made by the Buyer with or to, any Governmental Entity, other than in connection with the Chapter 11 Cases.

5.4     No Conflicts.  The execution, delivery and performance of this Agreement by the Buyer and the consummation of the transactions contemplated hereby, do not and will not conflict with or result in any breach of any provision of its organizational documents, except as would not result in a material adverse effect on the ability of the Buyer to perform its obligations under this Agreement or to consummate the transactions contemplated hereby.

5.5     Financial Capability. The Buyer (a) at the Closing will have, sufficient internal funds available to pay the Consideration and any expenses incurred by the Buyer in connection with the transactions contemplated by this Agreement, (b) at the Closing will have, the resources and capabilities (financial or otherwise) to perform its obligations hereunder and (c) has not incurred any obligation, commitment, restriction or liability of any kind that would impair or adversely affect such resources and capabilities.

5.6     Financial Advisors.  No Person acting, directly or indirectly, as a broker, finder or financial advisor for the Buyer in connection with the transactions contemplated by this Agreement is entitled to any fee or commission or like payment in respect thereof from the Sellers or any of their respective Affiliates.

## ARTICLE 6
## COVENANTS OF THE PARTIES

6.1     Conduct of Business Pending the Closing.  During the period from the Effective Date and continuing until the earlier of the termination of this Agreement and the Closing (the "*Interim Period*"), except as may be required by applicable Law, or as may occur as part of the Chapter 11 Cases, or as expressly permitted or authorized hereby or relating to the transactions contemplated by this Agreement, the Sellers shall  (w) cause the Barbados Seller to be qualified as and at all times thereafter through and including the Closing Date remain qualified as an International Business Company under the laws of Barbados, (x) own, maintain, preserve and protect the Acquired Assets in the ordinary course of business, (y) use commercially reasonable efforts to maintain, preserve and repair the Acquired Assets and to keep the Acquired Assets in substantially the same state or condition as on the Effective Date, taking into account reasonable wear and tear or customary depreciation and (z) not, without the prior written consent of the Buyer (not to be unreasonably withheld, delayed or conditioned):

(a)     transfer, issue, encumber, sell or dispose of any of the Acquired Assets;

(b)     amend, encumber, modify or terminate any Assumed Contract or Acquired Permit or fail to use commercially reasonable efforts to enforce the provisions of, or renew any such Assumed Contract or Acquired Permit, or waive, release or assign any material rights or material claims thereunder;

(c)     enter into any Contract that would reasonably be likely to become an Assumed Contract;

(d)      fail to insure all of the Acquired Assets with substantially like policies and coverages comparable to those in effect on the Effective Date;

(e)      incur any Liability with respect to the Acquired Assets that will not be satisfied in full on or prior to the Closing without any continuing Liability or other obligation to the Buyer or affecting the Acquired Assets; or

(f)      agree to do anything prohibited by this Section 6.1.

6.2      Access.

(a)      Subject to applicable Law, during the Interim Period, the Sellers shall (i) give the Buyer and its Representatives reasonable access during normal business hours to the Acquired Assets and the books and records of the Sellers, (ii) furnish to the Buyer and its Representatives such Operating Records and Other Information as the Buyer and its Representatives reasonably request, and (iii) cooperate reasonably with the Buyer in its investigation of the Acquired Assets.  Such access with regard to all Mining Properties and the Mill shall also provide for the Buyer to conduct any and all testing it may determine in its sole discretion to undertake, including environmental, mining, milling and the collection of samples at or on the Mining Properties.  In connection with such testing the Parties agree that the Buyer may engage third-party vendors to analyze samples collected pursuant to this Section 6.2 (including ore samples), which analysis may take place off-site.

(b)      From and after the Closing until the date that is twelve (12) months after the Closing Date, to the extent permitted by Law, the Buyer agrees to provide the Sellers and their respective Representatives (including any liquidating trustee or committee appointed in the Chapter 11 Cases), in connection with the administration and closing of the Chapter 11 Cases, the prosecution or settlement of or any proceeding or action relating thereto, or the preparation and filing of final Tax returns, with reasonable access during normal business hours to the Operating Records and Other Information relating to the period preceding the Closing, and to allow the Sellers and their respective Representatives (including any liquidating trustee or committee appointed in the Chapter 11 Cases), at such person's sole cost and expense, to make extracts and copies of such books and records during such access. Any such access shall be during regular business hours upon reasonable advance notice under the supervision of the Buyer's personnel, in such a manner as to maintain confidentiality, and without disruption to the operations of the Mining Properties or the Buyer. The Buyer shall, to the extent permitted by Law, give thirty (30) days notice to Seller Representative of the Buyer's intent to destroy any material portion of the Operating Records and Other Information.

6.3      Public Announcements.  Seller Representative and the Buyer shall consult with each other before issuing, and provide each other the opportunity to review and comment upon, any press release or public announcement of this Agreement and the transactions contemplated hereby, and no Party shall issue any such press release or public announcement without the prior written approval of Seller Representative and the Buyer, in each case except as may be required by Law, court process (including the filing of this Agreement with the Bankruptcy Court) or obligations pursuant to the rules and regulations of, and any listing agreement with, any national securities exchange, on condition that if a Party is required to make any such announcement, the

disclosing Party shall, promptly before the announcement is made, deliver Notice to Seller Representative and Buyer thereof where practicable and lawful to do so, and the disclosing Party shall use its commercially reasonable efforts to agree upon the text of any such announcement with Seller Representative and the Buyer prior to the release of the announcement.  The Parties shall cause their respective Affiliates and Representatives to comply with this Section 6.3.

      6.4     Tax Matters.

      (a)     Any Transfer Taxes arising out of the transfer of the Acquired Assets pursuant to this Agreement shall be borne by the Sellers.  Seller Representative and the Buyer shall cooperate to timely prepare and file any Tax Returns relating to such Transfer Taxes, including any claim for exemption or exclusion from the application or imposition of any Transfer Taxes.  The Buyer and Seller Representative, as required by applicable Law, shall file all necessary documentation and returns with respect to such Transfer Taxes when due and shall promptly, following the filing thereof, furnish a copy of such return or other filing and a copy of a receipt showing payment of any such Transfer Tax to the other Party.

      (b)     The Buyer, on the one hand, and Seller Representative, on the other hand, shall furnish or cause to be furnished to the other, upon request, as promptly as practicable, such information and assistance relating to the Acquired Assets as is reasonably necessary for filing of all Tax Returns relating to Tax periods that began prior to the Closing Date, the preparation for any audit by any Tax Authority with respect to such periods, and the prosecution or defense of any Proceeding relating to any Taxes due with respect to such periods. The obligations of Seller Representative and Buyer pursuant to the immediately preceding sentence with respect to any Tax period shall expire upon the expiration of the applicable statute of limitations with respect to such period.

      6.5     Regulatory Approvals.

      (a)     The Buyer and the Sellers shall use their commercially reasonable efforts, and shall cause their Affiliates to use their respective commercially reasonable efforts, to (i) promptly obtain all Consents of all Governmental Entities that may be, or become, necessary for its execution and delivery of, performance of its obligations pursuant to, and consummation of the transactions contemplated by, this Agreement, (ii) take all such actions as may be requested by any such Governmental Entity to obtain such Consents, (iii) avoid the entry of, or effect the dissolution of, any Order that would otherwise have the effect of preventing or materially delaying the consummation of the transactions contemplated by this Agreement and (iv) cause all of the conditions to the obligations of the other Parties to consummate the transactions contemplated by this Agreement to be met as promptly as practicable and in any event on or prior to the Outside Date (to the extent such conditions are within the control or influence of such Party).  The Parties shall reasonably cooperate in connection with any filings or notifications required in connection therewith, and neither the Sellers nor the Buyer nor their respective Affiliates shall take any action that would reasonably be expected to have the effect of delaying, impairing or impeding the receipt of any required Consents.

      (b)     Seller Representative and the Buyer shall promptly notify the other of any substantive oral or written communication received from any Governmental Entity relating to the

matters that are the subject of this Agreement, permit the other Party to review in advance any substantive communication proposed to be made by such Party to any Governmental Entity and provide the other Party with copies of all correspondence, filings or other communications between them or any of their Representatives, on the one hand, and any Governmental Entity or members of its staff, on the other hand. No Party to this Agreement shall agree to participate in any meeting or discussion with any Governmental Entity in respect of any such filings, investigation or other inquiry unless it consults with Seller Representative and the Buyer in advance and, to the extent permitted by such Governmental Entity and applicable Law, gives the other Party the opportunity to attend and participate in such meeting. The Parties to this Agreement will coordinate and cooperate fully with each other in exchanging such information and providing such assistance as Seller Representative and the Buyer may reasonably request in connection with the foregoing or to secure all necessary Consents for the Buyer's ownership and operation of the Acquired Assets after the Closing.

(c)     If any Governmental Entity shall seek, or shall have indicated that it may seek, the enactment, entry, enforcement or promulgation of any Law restraining or prohibiting the transactions contemplated by this Agreement, the Buyer and the Sellers shall use their commercially reasonable efforts to resolve any such objections.

(d)     Notwithstanding anything in this Agreement to the contrary, the Buyer acknowledges on behalf of itself and its Affiliates and its and their Representatives, successors and assigns, that the ownership and maintenance of the Acquired Assets shall remain in the dominion and control of the Sellers until the Closing and that none of the Buyer, any of its Affiliates or its or their respective successors or assigns will provide, directly or indirectly, any directions, orders, advice, aid, assistance or information to any director, officer or employee of the Sellers, except as specifically contemplated or permitted by this Article 6 or as otherwise consented to in writing in advance by Seller Representative.

(e)     The Parties shall promptly file and record with each applicable Governmental Entity any conveyances, records of transfer, notices of transfer or similar documents (including any notice of transfer with the applicable state offices of the Bureau of Land Management or state agencies with oversight of water resources) and shall promptly provide to Seller Representative true, correct and complete copies of such conveyances, records of transfer, notices of transfer or similar documents.

6.6     Further Assurances.  Following the Cut-Off Date, Seller Representative will promptly notify the Buyer if any Seller becomes aware of any Contract relating to the Acquired Assets that should have been identified on Schedule 4.15(a) and provide the Buyer a true, correct and complete copy of such Contract.  Within five (5) Business Days following receipt of such notice and a copy of such Contract, the Buyer shall have the option to include or exclude such Contract from the Assumed Contracts included in the Acquired Assets. Subject to the terms and conditions herein provided, following the Closing Date, the Sellers shall execute and deliver to the Buyer such bills of sale, endorsements, assignments and other good and sufficient instruments of assignment, transfer and conveyance, in form and substance reasonably satisfactory to the Buyer, and take such additional actions as the Buyer may reasonably request, to promptly vest in the Buyer all of the Sellers' right, title and interest in and to the Acquired Assets, including the prompt transfer of Acquired Permits.

6.7    Nature of Transaction.    The Sellers are selling the Acquired Assets "as is", "where is" and with all faults, limitations and defects (hidden and apparent) and subject only to the representations and warranties contained in Article 4 or otherwise in this Agreement, without any other representation or warranty of any nature whatsoever and without any guarantee or warranty (whether express or implied) as to their title, quality, merchantability or their fitness for the Buyer's intended use or a particular purpose or any use or purpose whatsoever.

6.8    Permits Covenant.    Prior to and following Closing, the Parties shall use commercially reasonable efforts to ensure the prompt transfer to the Buyer of all Acquired Permits.

6.9    Bankruptcy Matters.

(a)    Stalking Horse Bidder Matters.

(i)    In the event that this Agreement is terminated pursuant to Sections 8.1(b), (e), (f), (g) or (h), the Sellers shall pay to the Buyer the Expense Reimbursement in cash, which shall be treated as a joint and several priority administrative claim in the Chapter 11 Cases against each Seller.  The Sellers' obligation to pay the Expense Reimbursement pursuant to the terms of this Section 6.9(a) shall be subordinate to the obligations under the DIP Facility.

(ii)    The obligations of the Sellers to pay the Expense Reimbursement as provided herein shall be entitled to superpriority administrate expense status pursuant to Sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code, senior to all other general administrative expense claims granted such status pursuant to Sections 503(b)(1) and 507(a)(2) other than superpriority administrative expense claims granted under the DIP Facility.

(iii)    The Sellers acknowledge and agree that (i) approval of the Expense Reimbursement is an integral part of this Agreement; (ii) in the absence of the Sellers' obligation to pay the Expense Reimbursement, the Buyer would not enter into this Agreement; (iii) entry of the Buyer into this Agreement is necessary for preservation of the estate of the Sellers and is beneficial to the Sellers because, in the Sellers' business judgment, it will enhance the Sellers' ability to maximize the value of their assets for the benefit of their creditors; and (iv) the Expense Reimbursement is reasonable in relation to the Buyer's efforts and the Buyer's lost opportunities resulting from the time spent pursuing such transaction.

(b)    Competing Transaction.    Other than pursuant to and in compliance with the terms and conditions of the Bid Procedures Order, the Sellers shall not, and shall cause their respective Affiliates and Representatives not to, directly or indirectly, initiate, solicit, entertain, or encourage submission of any inquiries, proposals or offers, or enter into or continue discussions or negotiations with or provide any information to or enter into any agreements or understandings with any Person (other than the Buyer and its Affiliates and Representatives) with respect to any transaction (or series of transactions) involving the direct or indirect sale, transfer or other disposition of the Acquired Assets or any other transaction that could impede or preclude the transactions contemplated under this Agreement being consummated with the Buyer or any of its Affiliates (each, a "***Competing Transaction***") or accept an offer or proposal from any Person (other than the Buyer and its Affiliates, agents and representatives) with respect to a

30

Competing Transaction. The Sellers shall, and shall cause their respective Affiliates and Representatives to discontinue all discussions with any Person other than the Buyer or any of its Affiliates or Representatives concerning any Competing Transaction.

        (c)    <u>Compliance</u>.

        (i)    The Sellers shall, and the Sellers shall cause all of their subsidiaries to, comply with all of the obligations of the Sellers under the Bid Procedures Order and the Sale Order (after the entry of such Order by the Bankruptcy Court).

        (ii)    The Sellers shall use efforts to comply with all requirements under the Bankruptcy Code and Bankruptcy Rules in connection with obtaining approval of the transactions contemplated by this Agreement. The Sellers shall serve on all required Persons in the Chapter 11 Cases, including (a) all entities that assert any lien, claim or interest in the Acquired Assets; (b) all parties to each Executory Contract and Unexpired Lease (as defined in the Bid Procedures Order); (c) all governmental taxing authorities that have or as a result of the sale of the Acquired Assets may have claims, contingent or otherwise, against the Sellers; (d) all state and local taxing authorities having jurisdiction over any of the Acquired Assets, including the Internal Revenue Service; (e) all state and local governmental agencies and environmental agencies in any jurisdiction where the Sellers own or have owned or used real property; (f) the Environmental Protection Agency; (g) all parties that filed requests for notices under Bankruptcy Rule 9010(b) or were entitled to notice under Bankruptcy Rule 2002; (h) all known creditors (whether liquidated, contingent or unmatured) of the Sellers; (i) all interested governmental, pension, environmental and other regulatory entities; (j) the Office of the Attorney General of New Mexico; (k) the Office of the Attorney General of Delaware; (l) the Office of the Attorney General of Arizona; (m) any other applicable state attorneys general; (n) the Office of the United States Trustee for the District of Delaware; (o) the United States Department of Justice; (p) all entities that, within the eighteen months prior to the Petition Date, expressed to the Sellers an interest in purchasing all or a substantial portion of the Acquired Assets (q) counsel to the Buyer and all other notice parties reasonably requested by the Buyer, any notice of the sale motion, the Sale Hearing, the Bid Procedures Order, the Sale Order, and all objection deadlines in accordance with all applicable Bankruptcy Rules, the Bid Procedures Order, and any applicable local rules of the Bankruptcy Court.

        (iii)    As provided in the Bid Procedures Order, the Sellers shall move to assume and assign to the Buyer the Assumed Contracts that are executory contracts capable of being assumed pursuant to section 365 of the Bankruptcy Code and shall provide notice thereof to (i) all counterparties to such contracts, (ii) any third party beneficiary to such contracts as requested by the Buyer (which third party beneficiaries shall be identified by the Sellers using their best efforts), (iii) any other Person that the Buyer requests, and (iv) any other Person as may be required by applicable Bankruptcy Rules, the Bid Procedures Order, and any applicable local rules of the Bankruptcy Court and any other Person requested by the Buyer. The Sellers have the right to reject any Contract that is not an Assumed Contract in accordance with the Bankruptcy Code. The Sellers shall request a ruling in the Sale Order that the Buyer shall be liable for any Cure Amount but is not otherwise obligated to cure any defaults, known or unknown, arising prior to Closing under any Assumed Contract.

(d)     Sale Order.    The Sale Order will provide, among other things, that pursuant to sections 105, 363 and 365 of the Bankruptcy Code:

(i)     the Acquired Assets shall be sold to the Buyer free and clear of all Liens (except for Permitted Liens and Assumed Liabilities);

(ii)     the transactions contemplated by this Agreement were negotiated at arm's length, that the Buyer acted in good faith in all respects and the Buyer shall be found to be a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code;

(iii)     the terms and conditions of the sale of the Acquired Assets to the Buyer as set forth herein are approved

(iv)     the Sellers are authorized and directed to consummate the transactions contemplated by this Agreement and to comply in all respects with the terms of this Agreement;

(v)     the Buyer and the Sellers did not engage in any conduct that would allow the transactions contemplated by this Agreement to be set aside pursuant to section 363(m) of the Bankruptcy Code; and

(vi)     the Sale Order is binding upon any successors to the Sellers, including any trustees in respect of the Sellers or the Acquired Assets in the case of any proceeding under chapter 7 of the Bankruptcy Code.

(e)     In the event the Sale Order is appealed, the Buyer and the Sellers shall use their respective commercially reasonable efforts to defend such appeal at their own cost and expense.

(f)     The Sellers further covenant and agree that the terms of any plan of reorganization or liquidation, or any order of dismissal, submitted to the Bankruptcy Court by the Sellers shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement.

## ARTICLE 7
## CONDITIONS TO OBLIGATIONS OF THE PARTIES

7.1     Conditions Precedent to Obligations of the Buyer.    The obligation of the Buyer to consummate the transactions contemplated by this Agreement is subject to the satisfaction (or waiver by the Buyer in the Buyer's sole discretion) at or prior to the Closing Date of each of the following conditions:

(a)     Each of the representations and warranties of the Sellers contained in this Agreement that is qualified by materiality or material adverse effect shall be true and correct at and as of the Effective Date and at and as of the Closing Date as though such representations and warranties were made at and as of such date (except for representations and warranties that are as

of a different date or period, which shall be true and correct as of such other date or period) and (ii) each of the other representations and warranties of the Sellers contained in this Agreement shall be true and correct in all material respects at and as of the Effective Date and at and as of the Closing Date as though such representations and warranties were made at and as of such date (except for representations and warranties that are as of a different date or period, which shall be true and correct in all material respects as of such other date or period);

(b)     The Sellers shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by them on or prior to the Closing Date.

(c)     There shall be no Law that materially delays or prevents the transactions contemplated by this Agreement.

(d)     The Bankruptcy Court shall have entered the Bid Procedures Order and the Sale Order, each of which shall be in form and substance acceptable to the Buyer in its sole and absolute discretion, and, as of the Closing Date the Bid Procedures Order and Sale Order shall be in full force and effect and shall not have been reversed, vacated, or stayed, and shall not have been amended, supplemented, or otherwise modified in any material respect without the prior written consent of the Buyer.

(e)     The Sale Order shall be non-appealable and not otherwise subject to review, reversal, modification or amendment, by appeal or writ of certiorari.  Notwithstanding anything herein to the contrary, the Parties may, in their sole and absolute discretion, complete the transactions contemplated by this Agreement prior to the Sale Order becoming a final non-appealable order of the Bankruptcy Court, *but only* to the extent the Sale Order provides that the Buyer is a "Good Faith Purchaser" pursuant to 363(m) of the Bankruptcy Code and is entitled to all of the protections afforded to such purchasers by that section.

(f)     The parties set forth on <u>Schedule 7.1(f)</u> shall have agreed to release or authorize the release of all Liens relating to the Acquired Assets in a form reasonably satisfactory to the Parties.

(g)     Since the date of the Agreement, there shall not have occurred any change, event, circumstance, development or effect that has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(h)     The Assumed Contracts shall have been assumed by the Sellers and assigned to the Buyer pursuant to sections 365(a) and 365(f) of the Bankruptcy Code.

7.2     <u>Conditions Precedent to the Obligations of the Sellers</u>.  The obligation of the Sellers to consummate the transactions contemplated by this Agreement is subject to the satisfaction (or waiver by Seller Representative in its sole discretion) at or prior to the Closing Date of each of the following conditions:

(a)     Each of the representations and warranties of the Buyer contained in this Agreement that is qualified by materiality or material adverse effect shall be true and correct at and as of the Effective Date and at and as of the Closing Date as though such representations and

warranties were made at and as of such date (except for representations and warranties that are as of a different date or period, which shall be true and correct as of such other date or period) and (ii) each of the other representations and warranties of the Buyer contained in this Agreement shall be true and correct in all material respects at and as of the Effective Date and at and as of the Closing Date as though such representations and warranties were made at and as of such date (except for representations and warranties that are as of a different date or period, which shall be true and correct in all material respects as of such other date or period).

(b)     The Buyer shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by it on or prior to the Closing Date.

(c)     There shall be no Law that materially delays or prevents the transactions contemplated by this Agreement.

(d)     The Bankruptcy Court shall have entered the Sale Order, which shall be in form and substance acceptable to the Sellers, and no Order staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date.

(e)     The parties set forth on Schedule 7.1(f) shall have agreed to release or authorize the release of all Liens relating to the Acquired Assets in a form reasonably satisfactory to the Parties.

## ARTICLE 8
## TERMINATION

8.1     Termination of Agreement.     This Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing:

(a)     by written agreement of Seller Representative and the Buyer;

(b)     by Seller Representative or the Buyer, if the Closing does not occur on or before [__] (the "*Outside Date*"); *provided*, *however*, that the failure of the Closing to occur on or prior to the Outside Date is not a result of or caused by the terminating party's breach of any of its representations and warranties contained in this Agreement and such terminating party has not failed in any respect to perform any of its material obligations hereunder; *provided further* that if at the Outside Date any Consent or Filing with any Governmental Entity remains outstanding and all conditions to closing have been satisfied (other than Section 7.1(a) or Section 7.1(b) to the extent related to such Consent or Filing and those conditions that by their terms are to be satisfied at Closing), the Outside Date shall automatically be extended for an additional thirty (30) days.

(c)     by Seller Representative or the Buyer, if there shall be any Law that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited, or if any Order permanently restraining, prohibiting or enjoining the Buyer or the Sellers from consummating the transactions contemplated hereby is entered and such Order shall become final;

(d)     by Seller Representative, if (i) any condition set forth in Section 7.2 shall have become incapable of fulfillment, other than as a result of a breach by any Seller of any covenant or agreement contained in this Agreement, and such condition is not waived by the Seller Representative or (ii) there has been a material violation or breach by the Buyer of any covenant, agreement, representation or warranty contained in this Agreement, in each of clause (i) and (ii), which failure, violation or breach (A) would cause any of the conditions set forth in Section 7.2(a) or Section 7.2(b) not to be satisfied and (B)(1) has not been cured within ten (10) Business Days following the delivery of written notice of such violation or breach or (2) is not capable of being cured within a ten (10) Business Day period; *provided* that the Sellers are not then in breach of this Agreement so as to cause any of the conditions set forth in Section 7.1(a) or Section 7.1(b) not to be satisfied;

(e)     by the Buyer, if (i) any condition set forth in Section 7.1 shall have become incapable of fulfillment, other than as a result of a breach by the Buyer of any covenant or agreement contained in this Agreement, and such condition is not waived by the Buyer or (ii) there has been a material violation or breach by the Sellers of any covenant, agreement, representation or warranty contained in this Agreement, in each of clause (i) and (ii), which failure, violation or breach (A) would cause any of the conditions set forth in Section 7.1(a) or Section 7.1(b) not to be satisfied and (B)(1) has not been cured within ten (10) Business Days following the delivery of written notice of such violation or breach or (2) is not capable of being cured within a ten (10) Business Day period; *provided* that the Buyer is not then in breach of this Agreement so as to cause any of the conditions set forth in Section 7.2(a) or Section 7.2(b) not to be satisfied.

(f)     by the Buyer, if the Sale Order or Bid Procedures Order, once entered, is changed in a manner that is adverse to the Buyer without the consent of the Buyer in its sole discretion;

(g)     by the Buyer, if any Seller seeks to have the Bankruptcy Court enter an order dismissing the Chapter 11 Case of any Seller or converting it to a case under Chapter 7 of the Bankruptcy Code, or if the Bankruptcy Court enters an order dismissing the Chapter 11 Case of any Seller or converting the Chapter 11 Case of any Seller to a case under Chapter 7 of the Bankruptcy Code, or appoints a trustee in any Seller's Chapter 11 Case or an examiner with enlarged powers relating to the operation of the Sellers' businesses, and such dismissal, conversion or appointment is not reversed or vacated within three business days after the entry thereof; or

(h)     automatically, without further action by any Party, if (a) the Bankruptcy Court shall enter an Order approving a Competing Transaction or (b) the Buyer is not designated as the Successful Bidder (as defined in the Bid Procedures); *provided, however*, that if the auction is held pursuant to the Bid Procedures, and the Buyer is designated, and consents in its sole discretion to serve as, the Back-Up Bidder (as such term is defined in the Bid Procedures), then this Agreement shall not terminate pursuant to this Section 8.1(h) until the earlier of (i) the Bankruptcy Court's approval of the "Successful Bid" (as such term is defined in the Bid Procedures); and (ii) thirty (30) calendar days following the conclusion of the auction.

8.2     Consequences of Termination.  In the event of any termination of this Agreement by any Party pursuant to Section 8.1 (other than Section 8.1(h)), written Notice thereof shall be given by the terminating Party to the other Party, specifying the provision hereof pursuant to which such termination is made, this Agreement shall thereupon terminate and become void and of no further force and effect (other than the obligation of the Sellers to pay the Expense Reimbursement pursuant to Section 6.9(a), Article 9 and any related definitional provisions in Article 1), and the transactions contemplated hereby shall be abandoned without further action of the Parties, except that such termination shall not relieve any Party of any Liability for any prior breach of this Agreement.

# ARTICLE 9
# MISCELLANEOUS

9.1     Expenses.  Except as set forth in this Agreement and the Bid Procedures Order and whether or not the transactions contemplated hereby are consummated, each Party shall bear all costs and expenses incurred or to be incurred by such Party in connection with this Agreement and the consummation of the transactions contemplated hereby.

9.2     Assignment.    Neither this Agreement nor any of the rights or obligations hereunder may be assigned by the Sellers without the prior written consent of the Buyer, or by the Buyer without the prior written consent of the Sellers; *provided, however*, that the Buyer may assign this Agreement to any of its Affiliates without the prior written consent of Seller Representative as long as the assignee agrees in writing to be responsible to the Sellers for all obligations, indemnities and Liabilities due to the Sellers under this Agreement.   Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

9.3     Parties in Interest.  This Agreement shall be binding upon and inure solely to the benefit of the Buyer and the Sellers, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement, except as expressly set forth herein.

9.4     Notices.     All notices, demands, requests, consents, approvals or other communications (collectively, "***Notices***") required or permitted to be given hereunder or that are given with respect to this Agreement shall be in writing and shall be deemed given on the date personally served, delivered by a nationally recognized overnight delivery service with charges prepaid, or transmitted by hand delivery, or facsimile or electronic mail with confirmation of receipt, addressed as set forth below, or to such other address as such Party shall have specified most recently by Notice; *provided*, that if delivered or transmitted on a day other than a Business Day or after 5:00 p.m., New York time, Notice shall be deemed given on the next Business Day.

If to any Seller, to Seller Representative:

With a copy to:

If to the Buyer:

36

[_____]
C/o Elko Mining Group LLC
905 Railroad Street, Suite 101
Elko, Nevada 89801
Attn: Chief Operating Officer
Facsimile: +1 (775) 623-5767

With a copy to (which shall not constitute notice):

Waterton Precious Metals Fund II Cayman, LP
C/o Waterton Global Resource Management, Inc.
199 Bay Street, Suite 5050
Toronto, ON M5L 1E2
Attn : Chief Financial Officer and General Counsel
Facsimile : +1 (416) 504-3200

Rejection of or refusal to accept any Notice, or the inability to deliver any Notice because of changed address of which no Notice was given, shall be deemed to be receipt of the Notice as of the date of such rejection, refusal or inability to deliver.

9.5     Choice of Law; Jurisdiction and Venue.  This Agreement shall be construed and interpreted, and the rights of the Parties shall be determined, in accordance with the Laws of the State of Delaware, without giving effect to any provision thereof that would require the application of the substantive Laws of any other jurisdiction and, to the extent applicable, the Bankruptcy Code.  With the exception of any appeals, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Claims or disputes that may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated.

9.6     Entire Agreement; Amendments and Waivers.    This Agreement and all agreements entered into pursuant hereto and all certificates and instruments delivered pursuant hereto and thereto constitute the entire agreement among the Parties pertaining to the subject matter hereof and supersede all prior agreements, understandings, negotiations and discussions, whether oral or written, of the Parties.  This Agreement may be amended, supplemented or modified, and any of the terms, covenants, representations, warranties or conditions may be waived, only by a written instrument executed by Seller Representative and the Buyer, or in the case of a waiver, by the Party waiving compliance; *provided, however*, that Seller Representative may agree with the Buyer to amend this Agreement so long as such amendment does not disproportionately materially adversely affect any Seller.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), and no such waiver shall constitute a continuing waiver unless otherwise expressly provided.

9.7     Schedules.   All Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Disclosure of any item on any Schedule shall not constitute an admission or indication that such item or matter is material or would have a Material Adverse Effect.

9.8     Counterparts; Facsimile and Electronic Signatures.   This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.  Counterparts to this Agreement may be delivered via facsimile or electronic mail.  In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the Party against whom enforcement is sought.

9.9     Severability.   The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement.  In the event that any of the provisions of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

9.10     WAIVER OF RIGHT TO TRIAL BY JURY.  THE PARTIES HEREBY WAIVE TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).

9.11     NO CONSEQUENTIAL DAMAGES. IN NO EVENT SHALL ANY PARTY BE LIABLE UNDER OR IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT FOR ANY INDIRECT, CONSEQUENTIAL, SPECIAL, PUNITIVE, EXEMPLARY OR INCIDENTAL DAMAGES OF ANY OTHER PARTY OR ITS AFFILIATES, WHETHER BASED IN CONTRACT, TORT (INCLUDING NEGLIGENCE OR STRICT LIABILITY), WARRANTY OR OTHERWISE, AND ALL SUCH INDIRECT, CONSEQUENTIAL, SPECIAL, PUNITIVE, EXEMPLARY AND INCIDENTAL DAMAGES ARE HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVED, RELEASED AND DISCHARGED.

9.12     Survival.   Each and every representation, warranty, covenant, and agreement contained in this Agreement or in any instrument delivered pursuant to this Agreement shall expire and be of no further force and effect as of the Closing and no Party shall thereafter have any liability whatsoever with respect thereto; *provided, however*, that the covenants contained in this Agreement that by their terms are to be performed (in whole or in part) by the Parties following the Closing shall survive in accordance with their respective terms.  Following the Closing Date with respect to the representations, warranties, and agreements contained in this Agreement or in any instrument delivered pursuant to this Agreement and, with respect to the covenants contained in this Agreement or in any instrument delivered pursuant to this Agreement, following the applicable survival date of such covenant, such representation, warranty, covenant, and agreement contained in this Agreement or in any instrument delivered

pursuant to this Agreement shall terminate and be of no further force or effect and no Party shall have any liability with respect thereto.

9.13    _Non-Recourse_.  All Claims or causes of action (whether in contract or in tort, in law or in equity) that may be based upon, arise out of or relate to this Agreement or any other document, certificate or instrument delivered pursuant hereto, or the negotiation, execution, performance or non-performance of this Agreement or any other document, certificate or instrument delivered pursuant hereto (including any representation or warranty made in or in connection with this Agreement or any other document, certificate or instrument delivered pursuant hereto or as an inducement to enter into this Agreement and the other documents delivered pursuant hereto) may be made only against the Person or Persons that are expressly identified as parties hereto or thereto.  In no event shall any Party, or party to the other documents delivered pursuant hereto, have any shared or vicarious liability for the actions or omissions of any other Person.  No Person who is not a named party to this Agreement or the other documents delivered pursuant hereto, including any past, present or future director, manager, officer, employee, incorporator, member, partner, equity holder, Affiliate, agent, attorney or Representative of any Party ("**_Non-Party Affiliates_**"), shall have any liability (whether in contract or in tort, in law or in equity, or based upon any theory that seeks to impose liability of an entity party against its owners or affiliates) for any obligations or liabilities arising under, in connection with or related to this Agreement or any other document, certificate or instrument delivered pursuant hereto or for any claim based on, in respect of, or by reason of this Agreement or any other document, certificate or instrument delivered pursuant hereto or its negotiation or execution; and each Party hereto or thereto waives and releases all such liabilities, Claims and obligations against any such Non-Party Affiliates.  The Parties acknowledge and agree that the Non-Party Affiliates are intended third-party beneficiaries of this Section 9.13.

9.14    _Seller Representative_.

(a)    Seller Representative is hereby appointed by each Seller (and its successors and assigns) as agent and attorney-in-fact with full power of substitution for such party, for and on behalf of such party, as the party authorized: (i) to negotiate, defend, dispute, contest, assert, compromise and settle all claims and matters arising under this Agreement; (ii) to agree to, enter into settlements and compromises of, and demand arbitration and comply with orders of courts and awards of arbitrators with respect to such claims and matters, and to take all actions necessary or appropriate in the reasonable judgment of Seller Representative for the accomplishment of the foregoing; (iii) to initiate or refrain from initiating or dispute or refrain from disputing any claim for indemnification or other claim under this Agreement; (iv) to take any other action expressly delegated to Seller Representative under the other terms of this Agreement; (v) to consent to and execute any amendment, waiver or consent of or under this Agreement; and (vi) to give and receive notices and communications to or from the Sellers relating to the transactions contemplated by this Agreement and the other documents delivered in connection with or pursuant to this Agreement, in each case without having to seek or obtain the consent of the Sellers.

(b)    Seller Representative shall not be liable to the Sellers for any act done or omitted hereunder as Seller Representative while acting in good faith and in the exercise of reasonable judgment.  The Sellers shall indemnify Seller Representative and hold Seller Representative

harmless against any loss, liability or expense incurred without negligence, bad faith or willful misconduct on the part of Seller Representative and arising out of or in connection with the acceptance or administration of Seller Representative's duties under this Agreement, including the reasonable fees and expenses of any legal counsel retained by Seller Representative.  This right of indemnification shall survive the termination of this Agreement.  Any Person dealing with Seller Representative is entitled to rely on the actions taken by, and consents, instructions and approvals given by, Seller Representative without the need for further investigation or confirmation and notwithstanding any knowledge of the relying Person.  Each such Person is hereby released from any liability for any acts or omissions by such Person or any of their Affiliates or their respective Representatives in reliance on any action, consent, instruction or approval of Seller Representative.

(c)     If Seller Representative becomes unable or unwilling to serve as an agent, such other Person or Persons as may be designated by the Sellers, with concurrent notice to the Buyer, shall succeed such Person as Seller Representative.  If Seller Representative should at any time become unwilling to serve as Seller Representative, Seller Representative promptly shall so notify the Sellers and the Buyer in writing, and shall bear no liability of any kind or nature whatsoever as a consequence of such determination.  In addition, at any time as determined in the sole discretion of Seller Representative, Seller Representative may decline to take any action, make any determination, or otherwise bear any expense without having first obtained the approval or consent of the Sellers.

[*Signatures Follow*]

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized officers of the Sellers, Seller Representative and the Buyer as of the date first above written.

**<u>SELLERS</u>**:

Santa Fe Gold Corporation

By: _____
        [Name]
        [Title]

Santa Fe Gold (Barbados) Corporation

By: _____
        [Name]
        [Title]

The Lordsburg Mining Company

By: _____
        [Name]
        [Title]

AZCO MICA, Inc.

By: _____
        [Name]
        [Title]

**<u>SELLER REPRESENTATIVE:</u>**

Santa Fe Gold Corporation

By: _____
     [Name]
     [Title]

**<u>BUYER</u>**:

[Waterton Entity]

By: _____
     [Name]
     [Title]